**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **TRUIST BANK**            ) | |
|                  ) | |
|       **Plaintiff,**       ) | |
|                  ) | **Civil Action Number:** |
| **v.**                  ) | _____ |
|                  ) | |
| **PRECISION CONCRETE**   ) | |
| **CONSTRUCTION, INC. and JOHN** ) | |
| **DOES**              ) | |
|                  ) | |
|       **Defendants.** | |

## COMPLAINT

**COMES NOW** Truist Bank ("Truist" or "Plaintiff"), and for its complaint against Precision Concrete Construction, Inc. ("Precision" or "Defendant") states as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Truist is a North Carolina banking corporation, as successor by merger to SunTrust Bank, who is authorized to transact business in the State of Georgia and whose principal place of business is located at 200 West Second Street, Winston-Salem, NC 27101.

2.    Precision is a Georgia Corporation with its principal place of business at 2075 Brandon Trail, Alpharetta, Georgia 30004.

3.      The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.      This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

5.      Venue is proper pursuant to 28 U.S.C. 1391(a)(2), as a substantial part of the events or omissions giving rise the claims asserted herein occurred in this judicial district.

## I.      FACTUAL BACKGROUND

**A.      BACKGROUND OF TRUIST'S RIGHT TO CLASSIC CONCRETE'S PAYMENT CLAIMS AGAINST PRECISION.**

### i.      SunTrust Bank's Lending Relationship with Classic Concrete.

6.      In 2017, then-SunTrust Bank loaned money to and opened a line of credit for a concrete contractor, Classic Concrete Forming, LLC ("Classic Concrete"), to fund Classic Concrete's business.  The loan was in the original principal amount of $1,455,000.00 and the line of credit was for $1,100,000.00 (collectively, the "Loans").

7.      The Loans were evidenced by that certain Commercial Note dated September 5, 2017 (the "Commercial Note"); that certain Business Loan Agreement dated September 7, 2017 (the "Loan Agreement"); and that certain U.S. Small Business Administration Note dated September 7, 2017 ("the SBA Note").

2

True and correct copies of the Commercial Note, the Loan Agreement, and the SBA Note are attached hereto as Composite **Exhibit A** and incorporated herein by reference.

> **ii.** **SunTrust Bank's Secured Interest in Classic Concrete's Receivables.**

8.    As security for the Loans, Classic Concrete executed that certain Commercial Security Agreement dated September 5, 2017 and that certain Security Agreement dated September 7, 2017 (collectively, the "Security Agreements"), granting SunTrust Bank a security interest in the following:

> all assets of Classic Concrete, now existing or hereafter acquired, as described in the Security Agreements, including, but not limited to, all accounts, receivables, inventory, furniture, fixtures and equipment, goods, deposit accounts, instruments, documents, commercial tort claims, letter of credit rights, investment property, chattel paper and general intangibles (as all such terms are used herein and in the Uniform Commercial Code)(the "Collateral").

True and correct copies of the Security Agreements are attached hereto as Composite **Exhibit B** and incorporated herein by reference.

9.    SunTrust Bank perfected its security interest in the Collateral by filing with the Georgia Secretary of State that certain UCC Financing Statement File No. 007-2017-038548, filed September 6, 2017, and that certain UCC Financing

Statement File No. 058-2017-001590, filed September 7, 2017 (collectively, the "UCC Financing Statements"). True and correct copies of the UCC Financing Statements are attached hereto as Composite **Exhibit C** and incorporated herein by reference.

       iii.    **<u>Truist Inherits Rights to Classic Concrete's Receivables Upon the Merger of SunTrust Bank and BB&T.</u>**

10.    On or about December 6, 2019, SunTrust merged with and into Branch Banking and Trust Company, and, subsequently, Branch Banking and Trust Company changed its name to Truist Bank.

11.    As a result of the Merger, Truist became the owner and holder of the Loans, the Notes, the Security Agreements and the UCC Financing Statements (collectively, the "Loan Documents").

**B.**    **CLASSIC CONCRETE PERFORMED UNDER MULTIPLE SUBCONTRACTS WITH PRECISION, BUT WAS NOT PAID FOR ITS WORK.**

12.    Classic Concrete worked as a valued subcontractor of Precision since at least 2009, and perhaps even before then.

13.    Most recently, Classic Concrete subcontracted with Precision to perform concrete forming work on thirteen (13) projects in the Atlanta metro area (collectively, the "Subcontracts").

4

14.    Upon information and belief, the general terms and conditions of the Subcontracts for the thirteen (13) jobs are identical, and consist of Precision's form subcontract with some addendum terms tailored to work performed by Classic Concrete. A true and correct copy of one of the Subcontracts, by way of example, is attached as **Exhibit D** and incorporated herein by reference.[1]

C.    **PRECISION, DESPITE BEING PAID BY THE OWNERS OF THE PROJECTS, DID NOT PAY CLASSIC CONCRETE FOR WORK PERFORMED OR RETAINAGE EARNED.**

15.    The Subcontracts provided the terms and conditions that were to be fulfilled before Precision contractually owed payment to Classic Concrete and to Truist, by virtue of its secured interest.

16.    Classic Concrete completed ten (10) of the thirteen (13) projects (the "Finished Projects"). All conditions to payment for these Finished Projects have been met.

17.    Upon information and belief, Precision has also been paid in full by the respective owners of the Finished Projects and has turned the Finished Projects (including Classic Concrete's work) over to these owners, but refused to pay Classic Concrete.

---

[1] For the sake of brevity of the court record, Truist has attached only one (1) of the thirteen (13) Subcontracts, but incorporates by reference the other Subcontracts and can produce them at any time the Court or a party to this litigation so requires.

48049351 v1

18.     Classic Concrete experienced significant financial hardships from Precision's decision to withhold payments, in combination with the pandemic. These ongoing issues of payment from Precision contributed to Classic Concrete's decision to abandon existing projects and close its doors.

19.     In 2020, Classic Concrete was forced to abandoned its contracted scope on three (3) remaining projects with Precision (640 Peachtree Street, August M&S, and Elan Powers) (the "Additional Projects") prior to completion.

**D.     DURING PRECISION'S FAILURES TO PAY CLASSIC CONCRETE, CLASSIC CONCRETE FAILED TO PAY ON THE LOANS AND TRUIST DECLARED DEFAULT.**

20.     Precision's decision to withhold funds owed Classic Concrete coincided with Classic Concrete's default on the Loans with Truist.

21.     On May 5, 2020 and July 31, 2020, Truist issued notices of default to Classic Concrete on the loans.

22.     Classic Concrete failed to cure the defaults and agreed to turn over and assign all existing business assets to Truist.

**E.     PRECISION HAS CONTINUED TO WITHHOLD PAYMENT MONTHS AND EVEN YEARS AFTER THE PROJECT OWNERS PAID FOR CLASSIC CONCRETE'S WORK.**

48049351 v1

### i.   Retainage Owed on the Ten (10) "Finished Projects" -- $578,851.00.

23.     At the time it transferred all payment rights to Truist, Classic Concrete had earned retainage totaling $578,851.00 on the Finished Projects, which had not been paid. Upon information and belief, Precision has been paid in full by the respective owners of these Finished Projects and has turned the Finished Projects over to their owners, along with Classic Concrete's work, but has refused to pay Classic Concrete.

24.     On May 8, 2020, after being assigned the right to payment, Truist demanded payment of the retainage fees from Precision in the amount of $578,851.00 for the Finished Projects.

25.     Precision withheld, and continues to withhold, retainage on these completed projects from Classic Concrete and Truist without justification.

### ii.   Retainage Owed on the Three (3) "Additional Projects" -- $344,806.60.

26.     At the time it transferred all payment rights to Truist, Classic Concrete had earned retainage totaling $344,806.60 on the Additional Projects, which had not been paid. Upon information and belief, Precision has now been paid in full by the respective owners of these Additional Projects and has turned the Additional

48049351 v1

Projects over to their owners, along with Classic Concrete's work, but has refused to pay Classic Concrete.

27.     On October 20, 2021, Truist demanded that the aggregate retainage amount of $872,333.00 be paid by Precision after combining the total retainage on the Finished Projects ($578,851.00) with the total retainage on the Additional Projects ($344,806.60).

28.     Precision withheld, and continues to withhold, retainage on these completed projects from Classic Concrete and Truist without justification.

**iii.    Invoices Owed on the Three (3) "Additional Projects" -- $992,884.00.**

29.     Through investigation, Truist has determined that Precision intentionally withheld other compensable amounts from Classic Concrete. Precision has since produced documents reflecting that Classic Concrete had submitted multiple pay applications for work performed on the Additional Projects that were pending (and unpaid) at the time of the abandonment.

30.     Precision withheld, and continues to withhold, these invoiced amounts from Classic Concrete and Truist without justification. These unpaid pay applications for work completed total $992,884.00.

8

31.     Precision has stated it has no intention to pay Truist the balances owed under the subcontract, despite the jobs being completed to the presumed satisfaction of the owners and Precision having been paid for this work.

32.     Adding all the unpaid amounts owed Classic Concrete together, based on the initial documentation in this matter, Truist's compensable damages under the Subcontracts are no less than $1,916,541.60. Given Precision's conduct, Truist is also entitled to applicable prompt payment penalties provided under Georgia's Prompt Pay Act, O.C.G.A. §§ 13-11-1 to 13-11-11 (the "Prompt Pay Act"), punitive damages, attorney's fees and interest.

33.     Truist expressly reserves the right to amend, supplement and/or modify its Complaint as additional information becomes available to it through discovery or otherwise.

## COUNT I
## BREACH OF CONTRACT

34.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

35.     Classic Concrete performed construction services pursuant to the Subcontracts with Precision.

36.     Classic Concrete's right to be paid for these services now belongs to Truist.

9

37.     Truist has made written demand upon Precision for the balances owed under the Subcontracts.

38.     Precision has refused to pay Classic Concrete or Truist.

39.     Precision's failure to pay the amounts owed is a breach of the terms of Subcontracts.

40.     Truist has been damaged as a result of the breaches, in an amount of no less than $1,916,541.60, together with interest thereon, the exact amounts to be shown at the trial of this cause.

## COUNT II
## CONVERSION

41.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

42.     Classic Concrete's accounts receivable involve specific money that can identified.

43.     Precision caused and/or committed a wrongful detention or interference or an illegal assumption of ownership, and/or wrongful exercise of dominion over the accounts receivable in exclusion and/or defiance of Plaintiff's rights.

44.     Precision's actions constitute a conversion over funds.

10

45.     As a direct, proximate, intended, and foreseeable result of the conduct of Precision, Plaintiff has suffered injuries and damages of not less than $1,916,541.60 including punitive damages.

46.     Truist is entitled to recovery these amounts, together with interest thereon, the exact amounts to be shown at the trial of this cause.

## COUNT III
## UNJUST ENRICHMENT

47.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

48.     Precision solicited, authorized and induced Classic Concrete to perform or continue performance on the thirteen (13) projects.

49.     Precision and the owners of the projects received the benefit of the services rendered by Classic Concrete.

50.     Precision explicitly or implicitly promised to make payment to Classic Concrete for its services rendered.

51.     Precision has been paid by the owners for the work Classic Concrete provided.

52.     Classic Concrete's claims and right of payment now belong to Truist.

53.     Equity requires that Precision pay Truist for the services Classic Concrete rendered.

48049351 v1

54.     Precision has been justly indebted to Truist in the amount of $1,916,541.60, together with interest thereon, the exact amounts to be shown at the trial of this cause.

## COUNT IV
## BREACH OF GOOD FAITH AND FAIR DEALING

55.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

56.     The actions of Precision constitute a breach of the covenant of good faith and fair dealing, which is inherent in every agreement.

57.     As a direct and proximate cause of the breach, Truist has suffered and will continue to suffer damages.

## COUNT V
## CONSTRUCTIVE TRUST

58.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

59.     A constructive trust is an implied trust arising by operation of law to satisfy the demands of justice or to prevent a failure of justice.

60.     Such a trust should be imposed herein by and through Precision's intentional failure to pay Classic Concrete, which contributed to economic issues and struggles Classic Concrete was facing during the pandemic.

48049351 v1

61.     The long-standing relationship between Precision and Classic Concrete had led to a trust and expectation that the two parties would honor their commitments to one another.

62.     It was due to this relationship that Classic Concrete continued to work for Precision, even while experiencing slow payment and/or nonpayment for work performed.

63.     Precision violated this trust and has been benefitted by income that is rightly due Classic Concrete and was received by Precision only due to the efforts of Classic Concrete, which has assigned its claim and rights to payment to Truist.

64.      The funds paid by owners of the thirteen (13) projects at issue have been and continue to be received and personally retained by Precision.

65.     A constructive trust has arisen and should be recognized by the Court, over any and all of the subject funds being received and withheld by Precision.

## COUNT IV
## PROMPT PAY ACT PENALTIES

66.     Plaintiff reasserts the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

67.     Despite demand, Precision has failed and refused and continues to fail and refuse to pay the monies due Truist pursuant to the terms of the Subcontracts.

68.     In addition to the balances owed of $1,916,541.60 and interest thereon at the maximum rate allowed by law, Truist is further entitled to statutory penalties pursuant to the Prompt Pay Act.

69.     The Prompt Pay Act provides that, when paid by the owner of a project, Precision must then pay each sub-contractor and supplier within fifteen (15) days in proportion to its percentage of work completed and, if final payment, within thirty (30) days of said payment.

70.     Precision was paid by the owners for Classic Concrete's work on the thirteen (13) projects.

71.     Without reasonable cause, Precision did not and has not paid Classic Concrete or Truist within the statutory period(s) after receipt of interim and/or final payments.

72.     Truist, as the assignee of all claims of Classic Concrete related to payment from Precision, is entitled to any and all penalties available to it under the Prompt Pay Act.

WHEREFORE, PREMISES CONSIDERED, Truist Bank, demands judgment of and from Precision Concrete Construction, Inc., as follows:

      a.     that judgment be entered in favor of Truist and against Precision on all counts of the Complaint;

48049351 v1

b. that judgment require Precision to pay Truist compensatory damages in the amounts owed by Precision to Classic Concrete under the Subcontracts or at law for no less than $1,916,541.60;

c. that the judgment require Precision to pay Truist punitive damages against Precision for its ongoing, bad faith and intentional breaches under the Subcontracts and at law in order to deter such future conduct from contracting parties;

d. that the judgment require Precision to pay Truist Prompt Pay Act penalties at one percent (1%) per month on the unpaid balances, from demand until payment in full;

e. that the judgment require Precision to pay Truist its reasonable attorneys' fees, costs incurred herein, as well as prejudgment interest and post-judgment interest on the judgment award amount;

f. that the judgment enter a constructive trust over all monies paid to Precision by any owner on the thirteen (13) projects Classic Concrete provided services to, until Truist is paid on its judgment in full; and,

h. that the judgment require Precision pay Truist all other damages and costs as this Court may deem just and proper.

    Respectfully submitted,


    */s/ Kelly Waits*
    Kelly Waits (GA Bar Number 142677)
    John Lassiter (*Pro Hac Vice* pending)
    ATTORNEYS FOR TRUIST BANK

48049351 v1

**OF COUNSEL:**

BURR & FORMAN LLP
171 Seventeenth Street, NW
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
kwaits@burr.com
jlassiter@burr.com

48049351 v1

# EXHIBIT A

 **SUNTRUST**

**Commercial Note**

| | | |
|---|---|---|
| Borrower: | Classic Concrete Forming, LLC | Date: September 05, 2017 |
| Borrower Address: | 2450 Atlanta Highway | |
| | Unit 1204 | |
| | Cumming, GA 30040 | |
| Loan Amount: | One Million, One Hundred Thousand Dollars and no cents ($1,100,000.00) | |
| Account No.: | ████3527   Note No.: 34 | Officer: Paul J. Raufman, 40664 |

For value received, the borrower(s) named above (whether one or more, "Borrower"), jointly and severally promise to pay to the order of SunTrust Bank, a Georgia banking corporation ("SunTrust") without offset in U.S. Dollars and in immediately available funds, the Loan Amount shown above, or the total of all amounts advanced under this commercial note and any modifications, renewals, extensions or replacements thereof (this "Note") if less than the full Loan Amount is advanced, plus interest and any other amounts due, upon the terms specified below. As used in this Note, the term "SunTrust Party" shall mean and include SunTrust and any current and future subsidiaries and affiliates of SunTrust and each of their respective successors and assigns.

**Loan Type:**       Revolving Demand Master Borrowing Loan

**Repayment Terms:**    This is an open end revolving line of credit. Borrower shall be liable for only so much of the Loan Amount shown above as shall be equal to the total amount advanced to Borrower, or any of them, by SunTrust from time to time, less all payments made by or for Borrower and applied by SunTrust to principal, plus interest on each such advance, and any other amounts due. Advances under this Note shall be recorded and maintained by SunTrust in its internal records and such records shall be conclusive of the principal and interest owed by Borrower unless there is a material error in such records. **This obligation is payable on demand.** SunTrust shall have no obligation to make advances and all amounts outstanding are due on demand. Accrued interest will be payable on the 5th day of each month beginning on October 05, 2017 and on demand. This Master Borrowing arrangement may be terminated without notice to the undersigned by SunTrust.

**Payout Requirement**

Borrower agrees to maintain a zero balance on the loan evidenced by this Note for at least one 30 consecutive day period during each consecutive twelve-month or 364-day period, beginning with the date of this Note, during which SunTrust has not made demand for payment pursuant to the terms of this Note. The existence of this payout requirement shall not in any way limit or restrict SunTrust's right to demand payment in full of all amounts owed under the loan evidenced by this Note at any time in SunTrust's sole and absolute discretion.

**Interest**

Interest will accrue on an actual/360 basis (on the actual number of days elapsed over a year of 360 days). Interest shall accrue from the date of disbursement on the unpaid balance and shall continue to accrue until this Note is paid in full.

This is a variable rate transaction. The interest rate is prospectively subject to increase or decrease without prior notice.

Subject to the above, interest per annum payable on this Note (the "Rate") shall be a variable rate based on the following Index:

The Prime Rate as established from time to time by SunTrust Bank. The SunTrust Prime Rate is a reference for fixing the lending rate for commercial loans and does not necessarily represent the lowest rate of interest charged for commercial borrowings. The SunTrust Prime Rate is subject to increase or decrease at the sole option of SunTrust.

The Rate shall be equal to the Index plus 1.90% per annum. Adjustments to the Rate shall be effective as of the date the Index changes. The Rate shall not exceed any maximum interest rate permitted by applicable law. For the purposes of this Note, if the Index is less than zero, the Index shall be deemed to be zero.

**Collateral**

Unless otherwise agreed in writing, any collateral pledged to SunTrust to secure any of the existing or future liabilities of the Borrower to SunTrust shall also secure this Note. To the extent permitted by law, the Borrower grants to SunTrust a security interest in and a lien upon all deposits and investments maintained by the Borrower with a SunTrust Party.

Collateral for this Note includes, but is not limited to, the following:

All assets, including but not limited to, accounts, inventory, furniture, fixtures, equipment, general intangibles, instruments, documents and chattel paper, whether now existing or hereafter acquired, and all proceeds and products thereof as more particularly described in a Security Agreement executed by Classic Concrete Forming, LLC dated this date.

All of the foregoing security is referred to collectively as the "Collateral". Unless otherwise agreed in writing, the Collateral is security for the payment of this Note and any other liability (including overdrafts and future advances) of Borrower to any SunTrust Party, however evidenced, now existing or hereafter incurred, matured or unmatured, direct or indirect, absolute or contingent, several, joint, or joint

Copies: 0
Distribution: Original-Collateral File; Copy-Borrower
630105 (02/16)

 

and several, including any extensions, modifications or renewals. The proceeds of any Collateral may be applied against the liabilities of Borrower to SunTrust in such order as SunTrust deems proper.

### Loan Purpose and Updated Financial Information Required

Borrower represents and warrants that the loan evidenced by this Note is being made solely for the purpose of acquiring or carrying on a business, professional or commercial activity or acquiring real or personal property as an investment (other than a personal investment) or for carrying on an investment activity (other than a personal investment activity). Borrower represents, warrants and covenants that no part of the proceeds of the loan evidenced by this Note will be used directly or indirectly (a) to fund or finance any operations, investments or activities in or make any payments to a (1) Person that is, or is owned or controlled by, Persons that are the subject of any Sanctions (as defined below) (each a "Sanctioned Person") or (2) country or territory that is the subject of Sanctions, or is owned or controlled by one or more Sanctioned Person (a "Sanctioned Country"), or in any other manner that would result in a violation of any Sanctions by any Person, or (b) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any laws, rules or regulations of any jurisdiction concerning or relating to bribery or corruption. Borrower further represents, warrants and covenants that while the loan evidenced by this Note remains outstanding, each Obligor, each subsidiary or affiliate of each Obligor, and their respective directors, officers, employees, or agents will not (a) be or become a Sanctioned Person, (b) allow any of their assets to be located in a Sanctioned Country, or (c) derive any of their operating income from investments in, or transactions with, one or more Sanctioned Person or Sanctioned Country. As used herein, "Sanctions" means any trade, economic or financial sanctions administered or enforced by the Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the EU, Her Majesty's Treasury or other relevant sanctions authority. As used in this Note, the term "Person" shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any governmental authority or governmental agency. As used in this Note the term "Obligor" shall individually and collectively refer to Borrower and any other Person that is primarily or secondarily liable for the payment of the loan evidenced by this Note and any Person that has conveyed or may hereafter convey any security interest or lien to SunTrust in any real or personal property to secure payment of this Note. Borrower agrees to provide to SunTrust updated financial information, including, but not limited to, tax returns, current financial statements in form satisfactory to SunTrust, as well as additional information, reports or schedules (financial or otherwise), all as SunTrust may from time to time request.

### Representations and Warranties

This Note has been duly executed and delivered by Borrower, constitutes Borrower's valid and legally binding obligations and is enforceable in accordance with its terms against Borrower. The execution, delivery and performance of this Note and the consummation of the transaction contemplated will not, with or without the giving of notice or the lapse of time, (a) violate any law applicable to Borrower, (b) violate any judgment, writ, injunction or order of any court or governmental body or officer applicable to Borrower, (c) violate or result in the breach of any material agreement to which Borrower is a party nor (d) as applicable, violate any charter, bylaws, operating agreement, partnership agreement or any other agreement by which Borrower is bound. No consent, approval, license, permit or other authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Note. As of the date of this Note, Borrower represents that neither Borrower nor the Collateral is subject to any material claim, dispute or litigation that has not been previously disclosed to SunTrust in writing.

### Setoff and Other Remedies

To the extent permitted by law, if payment is not made upon demand, SunTrust will have the right, in addition to all other remedies permitted by law, to set off the amount due under this Note or due under any other obligation of Borrower to SunTrust against any and all accounts, whether checking or savings or otherwise, credits, money, stocks, bonds or other security or property of any nature whatsoever on deposit with, held by, owed by, or in the possession of, any SunTrust Party to the credit of or for the account of Borrower, without notice to or consent by Borrower. If payment is not made upon demand, Borrower shall be deemed to be in default and SunTrust shall be entitled to interest on the unpaid balance of the Note at the lesser of (i) the Rate plus 4.00% per annum or (ii) the maximum rate allowed by law (the "Default Rate") from the time of demand until paid in full. The remedies provided in this Note and any other agreement between SunTrust and any Obligor and by applicable law are cumulative and not exclusive of any other remedies provided by applicable law.

### Late Charges And Other Authorized Fees And Charges

If any portion of a payment is at least 10 days past due, Borrower agrees to pay a late charge of the lesser of $50.00 or 5% of the amount which is past due.

Unless prohibited by applicable law, Borrower agrees to pay the fee established by SunTrust from time to time for returned checks if a payment is made on this Note with a check and the check is dishonored for any reason after the second presentment. In addition to any other amounts owed under the terms of this Note, Borrower agrees to pay those fees and charges disclosed in the attached Disbursements and Charges Summary or other form of closing statement which is incorporated in this Note by reference and, as permitted by applicable law, Borrower agrees to pay the following: (a) all expenses, including, without limitation, any and all costs incurred by SunTrust related to enforcement, all court costs and out-of-pocket collection expenses and reasonable attorneys' fees actually incurred, whether suit be brought or not, incurred in collecting this Note; (b) all costs incurred in evaluating, preserving or disposing of any Collateral granted as security for the payment of this Note, including the cost of any audits, appraisals, appraisal updates, reappraisals or environmental inspections which SunTrust from time to time in its sole discretion may deem necessary; (c) any premiums for property insurance purchased on behalf of Borrower or on behalf of the owner(s) of any Collateral pursuant to any security instrument relating to any Collateral; and (d) any expenses or costs (including reasonable attorneys' fees) incurred in defending any claim arising out of the execution of this Note or the obligations which it evidences. Borrower agrees to pay such amounts on demand or, at SunTrust's option, such amounts may be added to the unpaid balance of the Note and shall accrue interest at the stated Rate. Upon the occurrence of an event of default, or after demand and failure to pay if this Note is payable on demand, interest shall accrue at the Default Rate.

### Prepayment Provision

Borrower may make a prepayment in any amount at any time without penalty.

### Payments

Borrower is directed to make payments at the address indicated on the billing statement provided by SunTrust, or at such place as SunTrust may otherwise indicate in writing. Payments may also be made at those SunTrust branches which accept loan payments, however, Borrower acknowledges that Borrower is not directed to make payments at such branches and that SunTrust's acceptance of payments at such branches is an accommodation to Borrower which may be revoked at any time in SunTrust's sole and absolute discretion. All amounts received by SunTrust shall be applied to expenses, late fees and interest before principal or in any other order as determined by SunTrust, in its sole discretion, as permitted by law. Payments will be credited as of the date stamped upon receipt, or as of the standard payment processing date for similar payments if a payment is not stamped. Payments received on Saturday will be credited on SunTrust's next business day. If any payment date falls on a Saturday or Sunday or a legal bank holiday, payment will be due on the next business day. SunTrust's business days are Monday through Friday, not including legal bank holidays.

### Waivers

Borrower and each other Obligor waive presentment, demand, protest, notice of protest and notice of dishonor and waive all exemptions, whether homestead or otherwise, as to the obligations evidenced by this Note and waive any discharge or defenses based on suretyship or impairment of Collateral or of recourse. Borrower waives any rights to require SunTrust to proceed against any other Obligor or any Collateral before proceeding against Borrower. Borrower further agrees that without notice to any Obligor and without affecting any Obligor's liability, SunTrust, at any time or times, may grant extensions of the time for payment or other indulgences to any Obligor or permit the renewal or modification of this Note, or permit the substitution, exchange or release of any Collateral for this Note and may add or release any Obligor whether primarily or secondarily liable. Borrower further agrees that SunTrust may apply all monies made available to it from any part of the proceeds of the disposition of any Collateral or by exercise of the right of setoff either to the obligations under this Note or to any other obligations of any Obligor to SunTrust, as SunTrust may elect from time to time.

### Waiver of Jury Trial

BORROWER AND SUNTRUST HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, WHETHER IN CONTRACT OR TORT OR OTHERWISE, AT LAW OR IN EQUITY, BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUNTRUST ENTERING INTO OR ACCEPTING THIS NOTE. FURTHER, BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF SUNTRUST, NOR SUNTRUST'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUNTRUST WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.

### Waiver of Damages other than Direct or Actual

TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND SUNTRUST HEREBY IRREVOCABLY WAIVE (AND IRREVOCABLY AGREE NOT TO ASSERT) ANY CLAIM WHATSOEVER FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES OR LOST PROFITS (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) AGAINST EACH OTHER (OR AGAINST EACH OTHER'S RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS) AT ANY TIME ARISING UNDER OR RELATING TO THIS NOTE, ANY RELATED DOCUMENT, OR ANY TRANSACTION CONTEMPLATED HEREIN OR THEREIN.

### Patriot Act Notice

SunTrust hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act Title III of Pub. L. 107-56 (signed into law October 26, 2001), SunTrust may be required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow SunTrust to identify Borrower in accordance with the Act.

### Hold Harmless and Indemnification

Borrower hereby indemnifies and agrees to hold each SunTrust Party and its officers, directors, employees, agents and affiliates (each an "Indemnitee") harmless from and against all claims, damages, liabilities, costs (including reasonable attorneys' fees and legal expenses), causes of action, actions, suits and other legal proceedings (collectively, "Claims") in any matter relating to or arising out of this Note or any document or agreement executed in connection with this Note, or any act, event or transaction related thereto or to the Collateral. Borrower shall promptly provide SunTrust with written notice of any such Claim, provided, however, that this indemnity shall not apply to any Claims arising solely from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Upon request of SunTrust, Borrower shall defend each applicable Indemnitee from such Claims, and pay the reasonable attorneys' fees, legal expenses and other costs actually incurred in connection therewith, or in the alternative, at SunTrust's option, each applicable Indemnitee shall be entitled to employ its own legal counsel to defend such Claims at Borrower's sole expense.

### Miscellaneous

Any provision of this Note or any agreement executed in connection with this Note which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Note or any such agreement. No amendment, modification, termination or waiver of any provision of this Note or any agreement executed in connection with this Note, nor consent to any departure by Borrower from any term of this Note or any agreement executed in connection with this Note, shall in any event be effective unless it is in writing and signed by an authorized officer of SunTrust, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. If the Rate is tied to an external

index and the index becomes unavailable during the term of this loan, SunTrust may, in its sole and absolute discretion, designate a substitute index with notice to Borrower. No failure or delay on the part of SunTrust to exercise any right, power or remedy under this Note or any agreement executed in connection with this Note shall be construed as a waiver of the right to exercise the same or any other right at any time. The captions of the paragraphs of this Note are for convenience only and shall not be deemed to constitute a part hereof or used in construing the intent of the parties. All representations, warranties, covenants and agreements contained herein or made in writing by Borrower in connection herewith shall survive the execution and delivery of this Note and any other agreement, document or writing relating to or arising out of any of the foregoing. All notices or communications given to Borrower pursuant to the terms of this Note shall be in writing and may be given to Borrower at Borrower's address as stated below or at the top of this Note unless Borrower notifies SunTrust in writing of a different address. Unless otherwise specifically provided herein to the contrary, such written notices and communications shall be delivered by hand or overnight courier service, or mailed by first class mail, postage prepaid, addressed to Borrower at the address referred to herein. Any written notice delivered by hand or by overnight courier service shall be deemed given or received upon receipt. Any written notice delivered by U.S. Mail shall be deemed given or received on the third (3rd) business day after being deposited in the U.S. Mail. Notwithstanding any provision of this Note or any agreement executed in connection with this Note to the contrary, Borrower and SunTrust intend that no provision of this Note or any agreement executed in connection with this Note be interpreted, construed, applied, or enforced in a way that will permit or require the payment or collection of interest in excess of the highest rate of interest permitted to be paid or collected by the laws of the jurisdiction indicated below, or federal law if federal law preempts the law of such jurisdiction with respect to this transaction (the "Maximum Permitted Rate"). If, however, any such provision is so interpreted, construed, applied, or enforced, Borrower and SunTrust intend (a) that such provision automatically shall be deemed revised so as to require payment only of interest at the Maximum Permitted Rate; and (b) if interest payments in excess of the Maximum Permitted Rate have been received, that the amount of such excess shall be deemed credited retroactively in reduction of the then-outstanding principal amount of this obligation, together with interest at the Maximum Permitted Rate. In connection with all calculations to determine the Maximum Permitted Rate, Borrower and SunTrust intend (a) that all charges be excluded to the extent they are properly excludable under the usury laws of such jurisdiction or the United States, as they from time to time are determined to apply to this obligation; and (b) that all charges that may be spread in the manner provided by statute of the jurisdiction indicated or any similar law, be so spread.

### Successors and Assigns and Choice of Law

This Note shall apply to and bind Borrower's heirs, personal representatives, successors and permitted assigns and shall inure to the benefit of SunTrust, its successors and assigns. Notwithstanding the foregoing, Borrower shall not assign Borrower's rights or obligations under this Note without SunTrust's prior written consent. Borrower agrees that certain material events and occurrences relating to this Note bear a reasonable relationship to the laws of Georgia. This Note shall be governed by the laws of Georgia and, unless applicable law provides otherwise, in the event of any legal proceeding arising out of or related to this Note, Borrower consents to the jurisdiction and venue of any court located in Georgia. Nothing in this Note or in any other document or agreement entered into in connection with this Note shall affect any right that SunTrust may have to bring any action or proceeding arising out of or related to this Note against Borrower or its properties in the courts of any jurisdiction.

### Documentary and Intangible Taxes

In the event that any intangible tax or documentary stamp tax is due from SunTrust to any state or other governmental agency or authority because of the execution or holding of this Note, Borrower shall, upon demand, reimburse SunTrust for any such tax paid.

### Transfer of Loan

SunTrust may, at any time, sell, transfer or assign the Note, the related security instrument and any related loan documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). SunTrust may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Securities or any Rating Agency (as hereinafter defined) rating such Securities (collectively, the "Investor") and each prospective Investor, all documents and information which SunTrust now has or may hereafter acquire relating to Borrower, any loan to Borrower, any guarantor or the property, whether furnished by Borrower, any guarantor or otherwise, as SunTrust determines necessary or desirable. The term "Rating Agency" shall mean each statistical rating agency that has assigned a rating to the Securities.

[This space intentionally left blank]

**Counterparts**
This Note may be executed in any number of counterparts, each of which shall be an original, but all of which shall together constitute one and the same agreement. This Note shall be effective upon Borrower's execution of this Note and SunTrust's receipt of duly executed counterparts from each of the parties hereto. Upon approval by SunTrust in its sole discretion, signatures to this Note transmitted in a commonly accepted electronic format that reproduces an image of the actual executed signature page shall have the same legal effect, validity, and enforceability as a manually executed counterpart of the document to the extent and as provided for in the Federal Electronic Signatures in Global and National Commerce Act and the applicable state law based on the Uniform Electronic Transactions Act.  Further, Borrower agrees to deliver a manually executed counterpart of this Note to SunTrust no later than ten (10) days following the date of this Note.

By signing below under seal, Borrower agrees to the terms of this Note and the disbursement of proceeds as described in the Disbursements and Charges Summary or other closing statement provided in connection with this transaction.

Classic Concrete Forming, LLC

By: _____
William E. Fredrickson, Manager

Borrower's Billing Address:
2450 Atlanta Highway
Units 1204
Cumming, GA 30040

630106 (02/16)



0042

LA

LOAN AGREEMENT

## BUSINESS LOAN AGREEMENT

THIS BUSINESS LOAN AGREEMENT (the "Agreement") dated September **7**, 2017, is made and executed by and between CCF PROPERTIES, LLC and CLASSIC CONCRETE FORMING, LLC, both Georgia limited liability companies having an address of 2450 Atlanta Highway, Unit 1204, Cumming, Georgia 30040 (collectively, the "Borrower") and SUNTRUST BANK, a Georgia banking corporation having an address of 211 Perimeter Center Parkway, Suite 100, Atlanta, Georgia 30346 (the "Lender") on the following terms and conditions. Borrower has applied to Lender for a commercial loan. Borrower understands and agrees that: (A) in granting, renewing, or extending the loans, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, (B) the granting, renewing, or extending of any loan by Lender at all times shall be subject to Lender's sole judgment and discretion, and (C) all such loans shall be and remain subject to the terms and conditions of this Agreement.

**LOAN.** Subject to the terms and conditions of this Agreement, Lender agrees to make the following loan (the "Loan") available to Borrower:

> **Amount.** Lender agrees to advance to Borrower, beginning the date hereof, provided that all conditions precedent have been satisfied, amounts which will in the aggregate not exceed ONE MILLION FOUR HUNDRED FIFTY FIVE THOUSAND SIX HUNDRED AND NO/100 DOLLARS ($1,455,600.00). The Loan may be disbursed in one or more advances pursuant to the terms of this Agreement and the Note, but each such disbursement shall reduce the Lender's loan commitment hereunder.

> **Principal and Interest.** Borrower's obligation to pay Lender the principal amount of and interest on the Loan shall be evidenced by the records of Lender and by the Note.

> **Purpose.** Proceeds of the Loan shall be used to refinance existing debt and provide for working capital and closing costs.

**TERM.** This Agreement shall be effective as of the date hereof, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until the maturity date as set forth in the Note.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement, if any, shall be subject to the fulfillment to Lender's satisfaction of all the conditions set forth in this Agreement and in the Related Documents.

> **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

> **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

SU167:SU136:421393:1:ATLANTA

**Payment of Fees and Expenses**. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties**. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default**. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**Outstanding Obligations**. There shall be no outstanding, unpaid taxes, assessments or other governmental and/or municipal charges and liens against the Property.

**Collateral Priority**. Lender shall have a valid, perfected first priority security interest in the Premises and a perfected first lien security interest in all of Borrower's assets.

**Appraisal**. Lender shall be in a possession of a satisfactory appraisal and/or business value on the Collateral.

**Environmental Report**. Lender shall be in possession of a satisfactory Phase I environmental report on the Premises.

**REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of the Loan, and at all times any Indebtedness exists:

**Organization**. Borrower is a limited liability company all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Georgia. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at the location set forth in the opening paragraph of this Agreement. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names**. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.

**Authorization**. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other

2

instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information**. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect**. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties**. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled or leased in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances**. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral; (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise. Notwithstanding the foregoing, Borrower's indemnification

3

hereunder shall not extend to matters shown conclusively to arise directly from the affirmative acts of the Lender, or its agents or contractors or shown conclusively to arise directly from the omission of the Lender, or its agents or contractors but only if such omission constitutes gross negligence or reckless indifference. The Borrower and Guarantor's indemnity hereunder shall not apply to any discharge, disbursement, release, storage, treatment, generation, disposal, release, escape, or migration of Hazardous Substances conclusively shown to have occurred after the Borrower has sold the Property, or after Lender has taken title to the Property, so long as it was not caused by Borrower's act or omission.

**Litigation and Claims.** There is no action, investigation, suit or proceeding, whether civil, criminal, judicial, administrative, or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, a Guarantor, or the Property or Collateral that has not been disclosed to Lender or is not adequately covered by insurance, as determined by Lender in its sole and absolute discretion.

**Taxes.** All of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of the Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well, as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Full Disclosure.** Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Borrower acknowledges that in accepting the Note, this Agreement and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth above notwithstanding any investigation of the Property and Collateral by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in making the Loan and that Lender would not make the Loan in the absence of such warranties.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

4

**Financial Records**. Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements**. Furnish Lender with the following:

> **Annual Statements**. As soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year, Borrower's combined, compiled company budget and annual statements, including but not limited to balance sheet and income statement for the year ended, prepared by Borrower on forms acceptable to Lender. Personal financial statements and tax returns on all Guarantors shall also be provided by Borrower annually in a form acceptable to Lender and within one hundred twenty (120) days of calendar year end.

> **Tax Returns**. As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Borrower's and Guarantor's federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance**. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loan, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Flood Insurance.** Based on the Standard Flood Hazard Determination (FEMA Form 81-93): (a) if any portion of a building that is collateral for the Loan is located in a special flood hazard area, Borrower must obtain flood insurance for the building under the NFIP, (b) if any equipment, fixtures or inventory that is collateral for the loan is in a building any portion of which is located in a special flood hazard area and that building is collateral for the Loan, Borrower must also obtain flood insurance for such personal property under the NFIP, and (c) if any equipment, fixtures or inventory that is collateral for the Loan is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the Loan, Borrower must obtain available flood insurance for the personal property. Insurance coverage must be in amounts equal to the lesser of the insurable value of the property or the maximum limit of coverage available. Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the Borrower will not invalidate the interest of Lender and the United States Small Business Administration.

5

**Real Estate Hazard Insurance.** Borrower shall maintain real estate hazard insurance coverage on all real estate that is collateral for the Loan in the amount for the full replacement cost. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance must contain a mortgagee clause (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the Borrower will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

**Personal Property Hazard Insurance.** Borrower shall maintain personal property hazard insurance coverage on all equipment, fixtures or inventory that is collateral for the Loan, in the amount of full replacement costs. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a Lender's Loss Payable Clause in favor of Lender. This clause must provide that any action or failure to act by Borrower or Guarantor will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

**Liability Insurance.** Borrower shall maintain liability insurance in an amount and with an insurance company satisfactory to Lender.

**Workers' Compensation Insurance.** Borrower must provide evidence of workers' compensation insurance in an amount meeting state law requirements and with an insurance company satisfactory to Lender.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loan in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| William E. Fredrickson | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on

6

which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** . Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's Interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records)in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying, that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice,

summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loan and to perfect all Security Interests.

**Depository Relationship.**  Borrower shall at all times maintain its primary depository relationship with Lender, including, but not limited to, operating and deposit accounts.

**Lease Agreement.**  Borrower shall maintain a lease agreement between Classic Concrete Forming, LLC, as tenant, and CCF Properties, LLC, as landlord, on the Premises with terms and conditions satisfactory to Lender for the term of the Loan (the "Lease").

**List of Assets.**  Borrower shall provide Lender with a list of all assets serving as Collateral for the Loan, which list shall include a description and serial number, if applicable, for all items of Collateral valued at $5,000.00 or more.

**Member/Shareholder Loans.**  All loans from members or shareholders of Borrower to Borrower shall fully subordinate to Lender during the term of the Loan and subject to a subordination and standstill agreement between Borrower, Lender and said members or shareholders in a form approved by Lender.

**ACH Payments.**  Borrower shall make timely payments under the Loan via Automatic Clearing House (ACH) or Federal Fund Wire transfer if ACH is not available, or as otherwise may be approved by Lender.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

SU167:SU136:421393:1:ATLANTA

**Indebtedness and Liens**. (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations**. (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties**. (1) Loan, invest in or advance money or assets, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**CESSATION OF ADVANCES**. If Lender has made any commitment to make any loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF**. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT**. Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default**. Borrower fails to make any payment when due under the Loan.

**Lease and Franchise Default**. Any default by Borrower under the Lease or a termination of the Lease.

**Other Defaults**. Borrower fails to comply with or to perform any other term, obligation, covenant (whether such covenant is an affirmative covenant or a negative covenant) or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

9

**Default in Favor of Third Parties**. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loan or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements**. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency**. The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization**. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings**. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor**. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change**. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**EFFECT OF AN EVENT OF DEFAULT**. If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements) and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Death or Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be

10

exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, in the sole and absolute discretion of Lender. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or security deed; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, in the sole and absolute discretion of Lender, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Automatic Payment Withdrawal.** Upon Lender's request, Borrower shall participate in an Automated Clearing House (ACH) system whereby Borrower's monthly payment due in connection with the Loan shall be automatically withdrawn from Borrower's checking or savings account.

11

**Caption Headings**. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation**. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Credit Bureau Reports**. Guarantor herein authorized Lender to periodically pull credit bureau reports on all Guarantors as long as the Loan remains outstanding.

**Default Rate of Interest.** Upon an Event of Default, interest shall accrue under the Note at a rate of 5.00% in excess of the interest rate set forth in the Note (the "Default Rate").

**Governing Law**. This Agreement has been accepted by Lender in the State of Georgia. This Agreement shall be governed by, construed and enforced in accordance with federal law and the laws of the State of Georgia (without giving effect to Georgia principles of conflicts of law), except to the extent (a) of procedural and substantive matters relating only to the creation, perfection, foreclosure and enforcement of rights and remedies against the Collateral, which matters shall be governed by the laws of the state where the Collateral is located, and (b) that the laws of the United States of America and any rules, regulations, or orders issued or promulgated thereunder, applicable to the affairs and transactions entered into by Lender, otherwise preempt Georgia or other state law; in which event such federal law shall control. Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any Georgia or federal court sitting in the Northern District of Georgia (or any county in in the State where any portion of the Collateral is located) over any suit, action or proceeding arising out of or relating to any of the Loan Documents. All rights, powers and remedies provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Agreement invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.

**No Waiver by Lender**. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and

12

Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices**. Any notice required to be given under this Agreement shall be given in writing and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability**. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower**. To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns**. All covenants and agreements contained by or on behalf of Borrower shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties**. Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or, until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence**. Time is of the essence in the performance of this Agreement.

13

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The term "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The term "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The term "Borrower" means CCF PROPERTIES, LLC and CLASSIC CONCRETE FORMING, LLC and all other persons and entities signing the Note in whatever capacity.

**Collateral.** The term "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The term "Environmental Laws" means any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The term "Event of Default" means any of the events of default set forth in this Agreement in the "Default" section of this Agreement.

**GAAP.** The term "GAAP" means generally accepted accounting principles.

**Grantor.** The term "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The term "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The term "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

14

**Hazardous Substances**. The term "Hazardous Substances" means materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The term "Hazardous Substances" is used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness**. The term "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents. Furthermore, the word "Indebtedness" includes any and all obligations of any kind and character whatsoever owed at any time to Lender by any Guarantor.

**Lender**. The term "Lender" means SUNTRUST BANK, its successors and assigns.

**Loan**. The term "Loan" means that loan evidenced by that certain U.S. Small Business Administration Note executed this day between Borrower and Lender in the original principal amount of $1,455,600.00.

**Note**. The term "Note" means the U.S. Small Business Administration Note executed by Borrower for the benefit of Lender in the principal amount of $1,455,600.00 dated of even date herewith, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens**. The term "Permitted Liens" means (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Premises.** The term "Premises" means the Property, together with the improvements, fixtures and personal property located upon the Property.

**Property.** The term "Property" means the real property legally described in the Exhibit "A" attached to the Commercial Deed to Secure Debt and Security Agreement given this day by Borrower for the benefit of Lender to secure the Loan, which exhibit is incorporated herein by this reference.

**Related Documents.** The term "Related Documents" means all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

15

**Security Agreement**. The term "Security Agreement" means and includes without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest**. The term "Security Interest" means, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED AS OF THE DATE FIRST WRITTEN ABOVE.

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

BORROWER:

CCF PROPERTIES, LLC, a Georgia limited liability company

By: _____ (SEAL)
    William E. Fredrickson, Manager

CLASSIC CONCRETE FORMING, LLC, a Georgia limited liability company

By: _____ (SEAL)
    William E. Fredrickson, Manager

LENDER:

SUNTRUST BANK

By: _____ (SEAL)
    Josh Neel, Senior Vice President

[CORPORATE SEAL]

16

Guarantor (i) acknowledges reading and understanding this Agreement; (ii) consents to the provisions of this Agreement relating to Guarantor; (iii) agrees to furnish the financial statements to Lender that Lender reasonably requests; (iv) agrees to those portions of this Agreement that apply to Guarantor; (v) acknowledges that this Agreement has been freely executed without duress and after an opportunity to consult with counsel; and (vi) confirms that Guarantor received a copy of this Agreement, the Guaranty, and the other documents Guarantor requested.

GUARANTOR:

_____(SEAL)
WILLIAM E. FREDRICKSON

17



0042

630106

COMMERCIAL NOTE



U.S. Small Business Administration

# NOTE

| SBA Loan # | PLP ▆▆▆5450-01  GA |
|---|---|
| SBA Loan Name | Classic Concrete Forming, LLC |
| Date | September 7, 2017 |
| Loan Amount | $1,455,600.00 |
| Interest Rate | Fixed at 5.75% |
| Borrower | Classic Concrete Forming, LLC and CCF Properties, LLC |
| Operating Company | Classic Concrete Forming, LLC |
| Lender | SunTrust Bank |

1.   PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of
ONE MILLION FOUR HUNDRED FIFTY FIVE THOUSAND SIX HUNDRED AND NO/100 Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2.   DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3.   PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate is 5.75% per year.

Borrower must pay principal and interest payments of $15,979.36 every month, beginning one month from the month this Note is dated; payments must be made on the same day as the date of this Note in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note.  Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice.  If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 10 years from date of Note.

Late Charge:  If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.  DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.  Fails to do anything required by this Note and other Loan Documents;
B.  Defaults on any other loan with Lender;
C.  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G.  Fails to pay any taxes when due;
H.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I.  Has a receiver or liquidator appointed for any part of their business or property;
J.  Makes an assignment for the benefit of creditors;
K.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M.  Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.  LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.  Require immediate payment of all amounts owing under this Note;
B.  Collect all amounts owing from any Borrower or Guarantor;
C.  File suit and obtain judgment;
D.  Take possession of any Collateral; or
E.  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C.  Release anyone obligated to pay this Note;
D.  Compromise, release, renew, extend or substitute any of the Collateral; and
E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.  STATE-SPECIFIC PROVISIONS:

None.

11.   BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

CLASSIC CONCRETE FORMING, LLC, a
Georgia limited liability company

By: _____(SEAL)
        William E. Fredrickson, Manager


CCF PROPERTIES, LLC, a Georgia limited
liability company

By: _____(SEAL)
        William E. Fredrickson, Manager

# EXHIBIT B

**SUNTRUST**

**Security Agreement**

Reference Obligor Number: ▓3527

This Security Agreement dated as of September 05, 2017, made by Classic Concrete Forming, LLC (the "Owner") in favor of SunTrust Bank, its present and future affiliates and their successors and assigns (collectively, "SunTrust") provides:

**Security Agreement.** In order to induce SunTrust from time to time to enter into agreements with and to extend or continue to extend credit to Classic Concrete Forming, LLC (and any one or more and any combination if more than one, the "Borrower") and in consideration of any credit so extended, the Owner (which may include the Borrower) hereby grants, sells, assigns, transfers and conveys to SunTrust, a security interest in the collateral described below, whether now existing or hereafter acquired, and all proceeds, products, rents and profits thereof and all revenues from the right to use the collateral as described below to secure the prompt payment and performance of any and all liabilities, obligations, agreements and undertakings of Borrower to SunTrust (and, in addition, all liabilities, obligations, agreements and undertakings of Owner, or any one or more of them, to SunTrust if Owner and Borrower are not the same person or entity) in any amount, whether now existing or hereafter arising, including those owed by Borrower or Owner to others and acquired by SunTrust through purchase, assignment or otherwise, however created, evidenced or arising, whether individually or jointly with others, and whether absolute or contingent, direct or indirect, as maker, endorser, guarantor, surety or otherwise, liquidated or unliquidated, matured or unmatured, whether or not secured by other collateral, and including, without limitation, (a) all obligations to perform or forebear from performing any acts, (b) all overdrafts on deposits or accounts maintained by Borrower or Owner with SunTrust. (c) all liabilities, obligations, agreements and undertakings of Borrower or Owner to SunTrust pursuant to any interest rate hedge agreement or other derivative transaction agreement or any foreign exchange contract or any application or other agreement requesting SunTrust to issue any letter of credit including, without limitation, the obligation of Borrower or Owner to reimburse SunTrust for all amounts funded by SunTrust pursuant to any such letter of credit, (d) all obligations and other liabilities of Borrower or Owner to SunTrust in respect of any of the following services (i) any treasury or other cash management services, including, without limitation, automated clearing house (ACH) origination and other funds transfer, depository (including, without limitation, cash vault and check deposit), zero balance account and sweep, returned items processing, controlled disbursement, positive pay, lockbox, account reconciliation and information reporting, payables outsourcing, payroll processing, and trade finance services, and (ii) card services including, without limitation, credit card (including, without limitation, purchasing card and commercial card), prepaid card (including, without limitation, payroll, stored value and gift cards), merchant services processing, and debit card services and (e) all costs of collection and protection of SunTrust's rights, including attorneys' fees allowed by law (in the amount of 15% of the principal and interest secured hereby if this Security Agreement is governed by the laws of Georgia), whether such collection or protection occurs prior to, during, or after any bankruptcy proceedings filed by or against any Obligor (as such term is defined below) (all the foregoing being hereinafter collectively referred to as the "Obligations"); provided, however, that "Obligations" will not include any Excluded Swap Obligation (as hereinafter defined). "Excluded Swap Obligation" means any Swap Obligation (as hereinafter defined), if and to the extent that all or any portion of the grant of a security interest hereunder to secure such Swap Obligation is or becomes illegal under the Commodity Exchange Act (7 U.S.C. §1 *et seq.*) (as amended and, together with any successor statute, the "Commodity Exchange Act"), or any rule, regulation or order of the Commodities Futures Trading Commission (or the application or official interpretation of any thereof), by virtue of Owner's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time that this grant of a security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, the exclusion of such Swap Obligation under the grant of a security interest hereunder shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such security interest is or becomes illegal. For purposes hereof, the term "Swap Obligation" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**Collateral.** As used in this Security Agreement, the term "Collateral" shall mean the property described below, whether now existing or hereafter acquired.

All assets of Owner, as more particularly described herein, and including but not limited to, all Accounts, Inventory, furniture, fixtures and Equipment, goods, deposit accounts, instruments, documents, commercial tort claims, letter of credit rights, investment property, chattel paper and General Intangibles (as all such terms are used herein and in the Uniform Commercial Code). Without limiting the foregoing the term "Collateral" shall include all of Owner's rights, title and interest in, to and under (i) any interest rate hedge agreement or other derivative transaction agreement and (ii) any schedule or confirmation relating to such interest rate hedge agreement or derivative transaction agreement.

**Owner Representations and Warranties.** The Owner represents and warrants to SunTrust as follows:

This Security Agreement has been duly executed and delivered by Owner, constitutes a valid and legally binding obligation of Owner and is enforceable in accordance with its terms against Owner. Owner represents and warrants to SunTrust that it has rights in all of the Collateral and/or has the power to transfer rights in all of the Collateral. The execution, delivery and performance of this Security Agreement, the grant of the security interest in the Collateral and the consummation of the transactions contemplated will not, with or without the giving of notice or the lapse of time, (a) violate any material law applicable to Owner, (b) violate any judgment, writ, injunction or order of any court or governmental body or officer applicable to Owner, (c) violate or result in the breach of any material agreement to which Owner is a party or by which any of Owner's properties, including the Collateral, is bound, nor (d) violate any




restriction on the transfer of any of the Collateral. The Owner represents and warrants that as of the date of this Security Agreement it is an "eligible contract participant" as defined in the Commodity Exchange Act.

No consent, approval, license, permit or other authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Security Agreement, the creation and perfection of SunTrust's security interest in the Collateral or the valid and lawful exercise by SunTrust of remedies available to it under this Security Agreement or applicable law.

The Owner is and will continue to be the absolute owner of the Collateral and there are no other liens or security interests affecting the Collateral other than the security interest granted in this Security Agreement except those previously disclosed to SunTrust in writing by the Owner; if the Owner is acting in the capacity of trustee, administrator or executor of an estate, such fact shall be disclosed and evidence of capacity shall be provided to SunTrust;

Classic Concrete Forming, LLC is a registered partnership, limited liability company or other registered entity organized under the laws of the state of Georgia, with Organizational Identification Number 0619677, and is duly qualified and in good standing to do business in every jurisdiction where qualification is necessary; the execution and performance of this Security Agreement have been duly authorized by its partners, members or managers as applicable and no further action of any party is necessary; the execution and performance of this Security Agreement will not violate or contravene any provisions of law or regulation or any partnership agreement, articles of organization, operating agreement or other agreement to which it is a party or by which it is bound; and no consent or approval of any governmental agency or authority is required in making or performing the obligations under this Security Agreement;

The Owner will maintain the Collateral in the following location(s): 2450 Atlanta Highway, Unit 1204, Cumming, GA 30040. The Collateral shall not be moved from the location(s) without the prior written consent of SunTrust;

Business books and records of Classic Concrete Forming, LLC are maintained at 2450 Atlanta Highway, Unit 1204, Cumming, GA 30040;

The Collateral is and will be used or bought for use primarily for the following purpose: business or commercial purposes; and

All information supplied and statements made to SunTrust in any financial statement or application are true, correct, complete, valid and genuine in all material respects.

**Choice of Law.** Owner agrees that certain material events and occurrences relating to this Agreement bear a reasonable relationship to the laws of Georgia. This Agreement shall be governed by the laws of Georgia and, unless applicable law provides otherwise, in the event of any legal proceeding arising out of or related to this Agreement, the Owner consents to the jurisdiction and venue of any court located in Georgia. Unless otherwise specified, "Uniform Commercial Code" as used herein shall refer to the Uniform Commercial Code of Georgia, both current and as it may be amended or revised from time to time in the future.

**Covenants.**
The Owner shall furnish to SunTrust such financial and business information and reports in form and content satisfactory to SunTrust as and when SunTrust may from time to time require.

The Owner shall notify SunTrust in writing at least 30 days prior to any change of its name or structure or change in its jurisdiction of registration/organization, principal place of business or chief executive office.

The Owner shall maintain all of the Collateral in good condition and repair. SunTrust shall have the right to inspect the Collateral at any reasonable time and shall have the right to obtain such appraisals, reappraisals, appraisal updates or environmental inspections as SunTrust, in its sole discretion, may deem necessary from time to time. Owner will not use or permit any person or entity to use the Collateral (a) in any manner inconsistent with the provisions of this Security Agreement; or (b) in violation of any policy of insurance issued with respect to the Collateral; or (c) in violation of any local, state or federal law or regulation, including but not limited to any such law or regulation pertaining to the protection of the environment or the protection of the health or safety of persons or animals, and any such law or regulation pertaining to the control of drugs, narcotics or other controlled substances. Unless the description of the Collateral set forth above indicates the Collateral shall be attached as a fixture to real property, Owner shall not, without the express prior written consent of SunTrust, cause or permit all or any part of the Collateral to be affixed to real property so as to become a fixture as that term is defined or interpreted in the state in which the Collateral is at any time located.

The Owner will defend the Collateral against the claims and demands of all parties. The Owner will not pledge or grant any security interest in any of the Collateral to any person or entity except SunTrust, or permit any lien or encumbrance to attach to any of the Collateral, or any levy to be made on the Collateral, or any financing statement (except financing statements in favor of SunTrust) to be on file against the Collateral.

Owner hereby constitutes and appoints any officer or employee of SunTrust as its true and lawful attorney-in-fact (a) to transfer the Collateral into SunTrust's name or the name of its nominee, but SunTrust's failure to do so shall not be interpreted to be a waiver of any interest, and (b) to do and perform all other acts and things necessary, proper and requisite to carry out the intent of this Security Agreement. The power herein granted shall be deemed to be coupled with an interest and may not be revoked until the Obligations have been paid in full, including all expenses payable by Owner.

The Owner agrees to pay on demand all legal expenses and reasonable attorneys' fees (in the amount of 15% of the principal and interest secured hereby if this agreement is governed by the laws of Georgia), as permitted by applicable law, any appraisal fees and all expenses incurred or paid by SunTrust in protecting and enforcing the rights of SunTrust under this Security Agreement, including SunTrust's right to take possession of the Collateral and its proceeds, and to hold, prepare for sale, sell and dispose of the Collateral.

This Security Agreement shall be a continuing agreement and shall remain in full force and effect irrespective of any interruptions in the business relations of the Borrower with SunTrust and shall apply to any ultimate balance which shall remain due by the Borrower to SunTrust; provided, however, that the Owner may by written notice terminate this Security Agreement with respect to all Obligations of

the Borrower incurred or contracted by the Borrower or acquired by SunTrust after the date on which such notice is personally delivered to or mailed via registered mail and accepted by the Borrower's lending officer.

**Blanket Security Interest.** Owner acknowledges and agrees that this Security Agreement and any financing statement filed in connection with this Security Agreement is intended to cover and does cover all assets of the Owner, wherever located, whether now owned or subsequently acquired or arising, and all proceeds and products thereof and includes, but is not limited to all of the Owner's (a) Accounts, insurance refund claims and all other insurance claims and proceeds, tax refund claims, license fees, rents, contract rights, instruments, certificates of deposit, documents, tangible chattel paper, electronic chattel paper, promissory notes, drafts, acceptances and other forms of obligations and receivables, whether or not earned by performance; (b) Inventory; (c) Equipment; (d) General Intangibles; (e) Commercial tort claims, letter of credit rights, awards and other payments in respect of any taking and all insurance proceeds in respect of any of the foregoing, and all monies and claims for money due and to become due to Owner under all its Accounts, contract rights, leases and General Intangibles, all investment property and financial assets, all as said terms are defined in the Uniform Commercial Code.

**Accounts.**

   a.  The Owner warrants that each and every Account, now owned or hereafter acquired, is a bona fide existing obligation, valid and enforceable against the account debtor, for goods sold or leased and delivered or services rendered in the ordinary course of business; it is subject to no dispute, defense or offset; the Owner has good title to the Account and has full right and power to grant SunTrust a security interest in the Accounts and the Owner will immediately notify SunTrust of any Account to which these warranties are or become untrue; the Owner agrees that it will not permit any return of merchandise, the sale of which gave rise to any of the Accounts, except in the usual and regular course of business;

   b.  The Owner shall maintain complete and accurate books of accounts and records, and its principal books and records, including all records concerning Accounts shall be kept and maintained at the place(s) specified above. The Owner shall not move such books and records without giving SunTrust at least 30 days prior written notice. All accounting records and financial reports furnished to SunTrust shall be maintained and prepared in accordance with generally accepted accounting principles consistently applied. It is specifically agreed that SunTrust shall have and the Owner hereby grants to SunTrust a security interest in all books of accounts and records of the Owner and shall have access to them at any time for inspection, verification, examination and audit;

   c.  The Owner will prepare and deliver to SunTrust, at SunTrust's request from time to time, a listing and aging of all Accounts and any further schedules or information with respect to Accounts that SunTrust may require;

   d.  SunTrust shall have the right at any time to notify account debtors of its security interest in the Accounts and supporting obligations and require payments to be made directly to SunTrust. The Owner hereby appoints SunTrust and any officer of SunTrust, as SunTrust may from time to time designate, as its attorneys-in-fact for the Owner, to sign and endorse in the name of the Owner, to give notice in the name of the Owner, and to perform all other actions necessary or desirable in the reasonable discretion of SunTrust to effect these provisions and carry out the intent hereof, all at the cost and expense of the Owner. The Owner hereby ratifies and approves all acts of such attorneys-in-fact and neither SunTrust nor any other such attorneys-in-fact will be liable for any acts of commission or omission nor for any error of judgment. This power being coupled with an interest is irrevocable so long as any Account or General Intangible pledged to SunTrust remains unpaid and the Borrower has any unpaid Obligations to SunTrust. The costs of such collection and enforcement, including attorneys' fees and out-of-pocket expenses, shall be borne solely by the Owner whether the same are incurred by SunTrust or the Owner;

   e.  At the option of SunTrust, all payments on the Accounts received by the Owner shall be remitted to SunTrust in their original form on the day of receipt; all notes, checks, drafts and other instruments so received shall be duly endorsed to the order of SunTrust. At SunTrust's election, the payments shall be deposited into a special deposit account ("Special Account") maintained with SunTrust. SunTrust may designate with each such deposit the particular Account upon which payment was made. The Special Account shall be held by SunTrust as additional security for the Obligations. Prior to depositing payments on the Accounts into the Special Account, the Owner agrees that it will not commingle such payments with any of the Owner's funds or property, but will hold them separate and apart and in trust for SunTrust. SunTrust will have the power to withdraw funds from the Special Account. SunTrust may at any time and from time to time, in its sole discretion, apply any part of the funds in the Special Account to the Obligations whether or not the same is due. Upon full and final satisfaction of the Obligations (including without limitation all fees and expenses owing to SunTrust or its attorneys), plus termination of any commitment to extend additional funds, SunTrust will pay to the Owner any excess funds, whether received by SunTrust as a deposit in the Special Account or as a direct payment on any of the Accounts;

   f.  If any of the Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, the Owner will immediately notify SunTrust in writing and execute any instruments and take any steps required by SunTrust in order that all moneys due and to become due under such contracts shall be assigned to SunTrust and in order that proper notice be given under the Federal Assignment of Claims Act;

   g.  SunTrust shall not be liable and shall suffer no loss on account of loss or depreciation of any Account due to acts or omissions of SunTrust unless SunTrust's conduct is willful and malicious, and SunTrust shall have no duty to take any action to preserve the Collateral or collect Accounts;

   h.  Upon request by SunTrust, the Owner will note on its records concerning the Accounts, a notation of the security interest under this Security Agreement, which notation must be satisfactory to SunTrust in both form and content;

   i.  SunTrust may enforce collection of any Account and supporting obligation by suit or otherwise and may surrender, release or exchange all or any part thereof, or compromise, extend or renew the same for any period. All monies so received by SunTrust may in SunTrust's sole discretion, be either (i) applied by SunTrust directly toward payment of all or any part of the

Obligations, whether or not then due, in such order of application as SunTrust may determine; or (ii) deposited to the credit of Borrower in an account with SunTrust as security for payment of the Obligations and SunTrust may, from time to time, in its sole discretion, permit Borrower to use all or any part of the funds on deposit in said account in the normal course of business. Owner will promptly reimburse SunTrust for all expenses, including attorneys' fees and legal expenses, incurred by SunTrust in seeking to collect on or enforce collection of such amounts; and

j.   After notice from SunTrust, Owner will forthwith, upon receipt, transmit and deliver to SunTrust, in the form received, all cash, checks, drafts, items, chattel paper and other instruments or writing for the payment of money (properly endorsed, where required, so that such items may be collected by SunTrust) which may be received by Owner at any time in full or partial payment or otherwise as proceeds of any of the Accounts. After such notice from SunTrust, Owner will not commingle any such proceeds with any other of its funds or property, but will hold them separate and apart from Owner's own funds or property and in express trust for SunTrust until delivery is made to SunTrust, and

k.   To protect SunTrust's rights hereunder, Owner hereby constitutes any officer or employee of SunTrust its true and lawful attorney-in-fact with full power of substitution to endorse or sign the name of Owner upon any invoice, freight or express bill, or bill of lading relating to any Accounts covered hereby and to notify the post office authorities to change the address for delivery of Owner's mail relating to the Accounts to an address designated by SunTrust and to receive, open, and dispose of all mail addressed to Owner relating to the Accounts and to do and perform all other acts and things necessary, proper and requisite to carry out the intent of this Security Agreement. This power shall be deemed to be coupled with an interest and may not be revoked by Owner until the Obligations have been paid in full.

**Inventory.**
a.   The Owner agrees to maintain books and records pertaining to the Inventory in such detail, form and scope as SunTrust shall require. The Owner shall promptly advise SunTrust of any substantial changes relating to the type or quantity of the Inventory or any event which would have a material effect on the value of the Inventory or on the security interest granted to SunTrust.

b.   If the Inventory remains in the possession or control of any of the Owner's agents or processors, the Owner shall notify such agents or processors of SunTrust's security interest, and upon request, instruct them to hold such Inventory for SunTrust's account and subject to SunTrust's instruction.

c.   The Owner will prepare and deliver to SunTrust, at SunTrust's request from time to time, a listing of all Inventory and such information regarding the Inventory as SunTrust may require.

d.   SunTrust may require the Owner to assemble the Inventory and make it available to SunTrust at a place to be designated by SunTrust which is reasonably convenient. SunTrust may take possession of the Inventory without a court order.

e.   Until default hereunder, Owner may, unless otherwise provided in this Security Agreement, in the ordinary course of business, at its own expense, sell, lease or furnish under contract of service any of the Inventory normally held by Owner for such purpose.

All Collateral has been produced in compliance with the Fair Labor Standards Act or other applicable wage and employee law, rule, regulation or order, and that no existing or future liability shall occur as a result thereof. The Owner may contest, in good faith, the applicability of any such law, rule, regulation or order, including prosecuting any appeals, so long as SunTrust's interest in the Collateral, in the opinion of SunTrust, is not jeopardized as a result.

**Insurance, Taxes and Assessments.** The Owner shall at all times keep insurable Collateral insured against any and all risks, including, without limitation, fire, and such other insurance, including but not limited to flood insurance, as may be required by SunTrust from time to time, and in such amounts as may be satisfactory to SunTrust. Insurance may be purchased from an insurer of the Owner's choice, except as otherwise required by law. All such insurance policies are to be made payable to SunTrust, in the event of loss, under a standard non-contributory "mortgagee", "lender", or "secured party" clause and shall contain a breach of warranty provision acceptable to SunTrust which shall establish SunTrust's right to be paid the insurance proceeds irrespective of any action, inaction, breach of warranty or conditions, or negligence of Owner or any other person or entity with respect to such policies. All such insurance policies shall provide for a minimum of thirty days written notice to SunTrust prior to cancellation. Owner appoints SunTrust attorney-in-fact to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable to Owner thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments, or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies, which power of attorney shall be deemed coupled with an interest and irrevocable so long as SunTrust has a security interest in any of the Collateral. Owner shall provide proof of such insurance as requested by SunTrust. The Owner shall pay and discharge all taxes, assessments and charges of every kind prior to the date when such taxes, assessments or charges shall become delinquent and provide proof of such payments to SunTrust, upon request. However, nothing contained in this Security Agreement shall require the Owner to pay any such taxes, assessments and charges so long as it shall contest its validity in good faith and shall post any bond or security required by SunTrust against the payment. Upon the failure of the Owner to purchase required insurance or to pay such required amounts, SunTrust, at its option, and at the Owner's expense, may obtain such insurance or pay such taxes, assessments, and charges. In addition, SunTrust may from time to time, in its sole discretion, perform any undertakings of the Owner which the Owner shall fail to perform and take any other action which SunTrust deems necessary for the maintenance or preservation of any of the Collateral. Any amounts so paid shall be included in the Obligations secured by the Collateral. At SunTrust's request, the Owner agrees to promptly reimburse SunTrust on demand for all such expenses incurred by SunTrust, together with interest thereon from the date paid by SunTrust at the highest rate payable on the Obligations. Any insurance obtained by SunTrust, at its option, may be single or dual interest, protecting its rights, rights of the Owner or joint rights. Any insurance obtained by SunTrust may provide, at its option, that such insurance will pay the lesser of the unpaid balance of the Obligations or the repair or replacement value of the Collateral. SunTrust may use the proceeds of any insurance obtained by Owner or by SunTrust to repair or replace the Collateral or, if SunTrust elects to do so, to repay part or all of the Obligations, whether or not then due, and in such order as SunTrust may determine, and the

Borrower will still be responsible to repay any remaining unpaid balance of the Obligations. The whole or partial loss or destruction of all or any part of the Collateral shall not affect or impair the obligation of any person or entity liable under the Obligations.

**Deposit Accounts.** If the Collateral includes deposit accounts, the Collateral shall include all demand, time, savings, passbook and other deposit accounts of the Owner with all banks, credit unions, savings and loan associations and other financial institutions which are now owned or hereafter acquired by the Owner or in which the Owner now has or hereafter acquires any right, title or interest, together with all proceeds of the deposit accounts.

**Additional Covenants and Agreements if Borrower is Different than Owner.** If Borrower is different than Owner, then so long as any of the Obligations remain outstanding or so long as this Security Agreement shall remain in effect Owner covenants and agrees as follows: (a) Owner hereby expressly consents to and adopts any agreements which Borrower has entered into or will enter into with SunTrust regarding any of the Obligations or the Collateral; (b) Owner hereby agrees that the Collateral shall be subject to disposition in accordance with the terms and conditions of this Security Agreement and any agreements executed by Borrower in connection with any of the Obligations or the Collateral; (c) Owner will not be subrogated to SunTrust's rights to any other collateral and any proceeds thereof in which SunTrust holds a security interest to secure payment of any of the Obligations; (d) Owner agrees that SunTrust may at any time and from time to time, without notice to, or the consent of, Owner: (i) retain any of the Collateral in satisfaction of any of the Obligations to the extent permitted by applicable law, (ii) retain or obtain a security interest or lien in any property in addition to the Collateral to secure payment or performance of any of the Obligations, (iii) allow or cause any Obligations to be incurred, (iv) retain or obtain persons or entities that are primarily or secondarily obligated upon any of the Obligations other than the Borrower, (v) extend or renew any of the Obligations for any period (whether or not longer than the original term), (vi) release, compromise or modify any of the Obligations, (vii) release, in whole or in part, any person or entity primarily or secondarily obligated upon any of the Obligations or enter into any compromise with respect to the obligation of any such person or entity relative to any of the Obligations, (viii) release, with or without consideration, SunTrust's security interest or lien in any property other than the Collateral which may at any time secure payment or performance of any of the Obligations, (ix) accept substitutions or exchanges for any property other than the Collateral which may at any time secure payment or performance of any of the Obligations, (x) exercise its rights as a secured party and dispose of the Collateral without having first resorted to any property securing any of the Obligations other than the Collateral and without having first proceeded against or demanded payment from any person or entity primarily or secondarily obligated upon any of the Obligations; and (e) Owner specifically waives any and all rights pursuant to O.C.G.A. Sec. 10-7-24 or T.C.A. Sec. 47-12-101 et seq. if this Security Agreement is governed by the laws of Georgia or Tennessee, and the same or similar provision contained in the Uniform Commercial Code of any other state or states which may govern this Security Agreement.

**Events of Default.** As used herein the term "Obligor" shall individually, collectively, jointly and severally refer to Borrower, Owner and any other person or entity that is primarily or secondarily liable upon all or any part of the Obligations secured hereby and any person or entity that has conveyed or may hereafter convey any security interest or lien to SunTrust in any real or personal property to secure payment of all or any part of the Obligations. Unless prohibited by applicable law, an "Event of Default" shall occur hereunder upon the occurrence of any breach, default or event of default under any agreement, instrument or other document evidencing the Obligations; the Collateral or any part thereof is located for more than thirty consecutive days outside the state or states in which the Collateral is to be located pursuant to this Security Agreement or if the Collateral or any part hereof is removed from such state with the intent that it will be located outside such state for more than thirty days; or should the name of Owner or state of residence, organization or registration of Owner change without prior written notice of such change being given to SunTrust.

**Remedies Upon Default; Acceleration of Obligations.** Unless prohibited by applicable law, the Obligations secured hereby shall automatically and simultaneously mature and become due and payable, without notice or demand, upon the filing of any petition or the commencement of any proceeding by an Obligor for relief under any bankruptcy or insolvency law, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization, or composition or extension of debt. Unless prohibited by applicable law, upon the occurrence of any one or more of the other Events of Default describe above, the Obligations secured hereby shall, at the option of SunTrust, immediately mature and become due and payable, without notice or demand. If all or any part of the Obligations secured hereby are not paid as and when due and payable, whether by acceleration or otherwise, then SunTrust may, at its option, without notice or demand of any kind: (a) transfer all or any part of the Collateral into the name of SunTrust or its nominee, at Owner's expense, with or without disclosing that such Collateral is subject to SunTrust's security interest; (b) require the Owner to assemble the Collateral and make it available to SunTrust at a place to be designated by SunTrust which is reasonably convenient, enter upon premises upon which the Collateral is located and, to the extent permitted by law without legal process, take exclusive possession of the Collateral, and redeem the Collateral, or any part thereof (irrespective of redemption penalty); (c) appropriate and apply toward payment of such of the Obligations, and in such order of application, as SunTrust may from time to time elect, all or any part of any balances, credits, items or monies in any bank deposit or deposit account constituting a part of the Collateral; (d) sell the Collateral at public or private sale, either in whole or in part, and SunTrust may purchase the Collateral at any such public sale and at any private sale as permitted by law. Such sale shall result in the sale, conveyance and disposition of all right, title and interest of Owner in all or any part of the Collateral which is the subject of such a disposition. SunTrust is authorized as attorney-in-fact for Owner to sign and execute any transfer, conveyance or instrument in writing that may be necessary or desirable to effectuate any such disposition of the Collateral, which power shall be coupled with an interest; and (e) exercise all other rights of a secured party under the Uniform Commercial Code and all other rights under law or pursuant to this Security Agreement, all of which shall be cumulative. If any notification of intended disposition of any Collateral is required by law, reasonable notification shall be deemed given if written notice is deposited in the U.S. Mail, first class or certified postage prepaid, addressed to Owner and such other persons or entities as SunTrust deems to be appropriate, stating all items required by applicable statutes, including the time and place of any public sale, or the time and place of any public sale or the time after which any private sale or disposition is to be made, at least ten (10) days prior thereto. The proceeds of any disposition of the Collateral shall be applied in the following order (i) First, to pay all costs and expenses associated with the retaking, holding, preparation and disposition of the Collateral; (ii) Then to pay attorneys' fees; (iii) Next, to pay all accrued but unpaid interest upon the Obligations in such order as SunTrust may determine at its discretion; and (iv) Finally, to all

unpaid principal outstanding upon the Obligations, whether or not due and payable, in such order as SunTrust may determine at its discretion. Any remaining surplus shall be paid to Owner or otherwise in accordance with law. If the proceeds of such disposition are insufficient to pay the Obligations in full, Borrower and all other persons or entities liable thereon shall remain fully obligated to SunTrust for the unpaid balance thereof.

**Execution by More than One Party.** The term "Owner" as used in this Security Agreement shall, if this instrument is signed by more than one party, mean the "Owner and each of them" and each shall be jointly and severally obligated and liable. If any party is a partnership or limited liability company, the agreements and obligations on the part of the Owner shall remain in force and applicable regardless of any changes in the parties comprising the partnership or limited liability company and the term "Owner" shall include any altered or successor partnership, limited liability company or other legal entity and the predecessor partnership or limited liability company and its partners or members/managers shall not be released from any obligation or liability.

**Waivers by the Owner.** To the extent permitted by applicable law, the Owner hereby waives (a) notice of acceptance of this Security Agreement and of any extensions or renewals of credit by SunTrust to the Borrower; (b) presentment and demand for payment of the Obligations; (c) protest and notice of dishonor or default to the Owner or to any other party with respect to the Obligations; (d) all other notices to which the Owner might otherwise be entitled; and (e) if for business purposes, the benefit of the Homestead Exemption. To the extent permitted by applicable law, the Owner further waives any right to require that any action be brought against the Borrower or any other party, the right to require that resort be had to any security or to any balance of any deposit account or credit on the books of SunTrust in favor of the Borrower or any other party, the right to redeem the Collateral and to object to SunTrust's proposal to retain the Collateral in satisfaction of any of Obligations and any right to obtain injunctive or other relief relative to SunTrust's sale or other disposition of the Collateral and to recover losses caused by SunTrust's failure to approve or correct any list of Collateral provided to SunTrust for any purpose by any person or entity.

**No Obligation to Extend Credit.** This Security Agreement shall not be construed to impose any obligation on SunTrust to extend or continue to extend any credit at any time.

**Indemnity.** The Owner agrees to indemnify and hold harmless SunTrust, its subsidiaries, affiliates, successors, and assigns and their respective agents, directors, employees, and officers from and against any and all complaints, claims, defenses, demands, actions, bills, causes of action (including, without limitation, costs and attorneys' fees), and losses of every nature and kind whatsoever, which may be raised or sustained by any directors, officers, employees, shareholders, creditors, regulators, successors in interest, or receivers of the Borrower or any third party as a result of or arising out of, directly or indirectly, SunTrust extending credit as evidenced by the Obligations to the Borrower, and taking the Collateral as security for the Obligations, and the Owner agrees to be liable for any and all judgments which may be recovered in any such action, claim, proceeding, suit, or bill, including any compromise or settlement thereof, and defray any and all expenses, including, without limitation, costs and attorneys' fees, that may be incurred in or by reason of such actions, claims, proceedings, suits, or bills.  This obligation to indemnify shall survive the payment of the Obligations and the satisfaction of this Security Agreement.

**Additional Documentation.** The Bank is authorized to file such financing statements and amendments as the Bank deems necessary to perfect, continue or assure its security interest in the Collateral and the Owner hereby ratifies any financing statement filed previously by the Bank. The Owner will deliver such instruments of future assignment or assurance as the Bank may from time to time . request to carry out the intent of this Security Agreement, and will join with the Bank in executing any documents in form satisfactory to the Bank, and pay any cost of filing the same, including all recordation, transfer and other taxes and fees, deemed advisable by the Bank.

**Environmental Requirements.** No part of the Collateral has been, and never will be so long as this Security Agreement remains a lien on the Collateral, used for the generation, collection, manufacture, storage, treatment, disposal, release or threatened release of any hazardous substance, as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C., Section 9601, et seq. ("CERCLA"), Superfund Amendments and Reauthorization Act ("SARA"), applicable state laws, or regulations adopted pursuant to either of the foregoing. The Owner agrees to comply with any federal, state or local law, statute, ordinance or regulation, court or administrative order or decree or private agreement regarding materials which require special handling in collection, storage, treatment or disposal because of their impact on the environment ("Environmental Requirements"). The Owner agrees to indemnify and hold SunTrust harmless against any and all claims, losses and expenses resulting from a breach of this provision of this Security Agreement and the Owner will pay or reimburse SunTrust for all costs and expense for expert opinions or investigations required or requested by SunTrust which, in SunTrust's sole discretion, are necessary to ensure compliance with this provision of this Security Agreement. The obligation to indemnify shall survive the payment of the Obligations and the satisfaction of this Security Agreement.

**Successor in Interest; SunTrust as Collateral Agent.** This Security Agreement shall be binding upon the Owner, its successors and assigns, and the benefits hereof shall inure to SunTrust, its successors and assigns. SunTrust Bank shall serve as collateral agent on behalf of itself and present and future affiliates.

**Miscellaneous.** (a) Each and every power given herein is coupled with an interest and is irrevocable by death or otherwise. (b) The captions of the paragraphs of this Security Agreement are for convenience only and shall not be deemed to constitute a part hereof or used in construing the intent of the parties. (c) If any part of any provision of this Security Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Security Agreement. (d) This Security Agreement shall not be modified or amended except in a writing signed by Owner and SunTrust. (e) All representations, warranties, covenants and agreements contained herein or made in writing by Owner in connection herewith shall survive the execution and delivery of this Security Agreement and any and all notes, other agreements, documents and writings relating to or arising out of any of the foregoing or any of the Obligations. (f)

All rights and remedies of SunTrust expressed herein are in addition to all other rights and remedies possessed by SunTrust under applicable law or other agreements, including rights and remedies under any other agreement or instrument relating to any of the Obligations or any security therefor. (g) No waiver by SunTrust of any of its rights or remedies or of any default shall operate as a waiver of any other right or remedy or of any other default or of the same right or remedy or of the same default on a future occasion. No delay or omission on the part of SunTrust in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by SunTrust of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No action of SunTrust permitted hereunder or under any agreement or instrument relating to any of the Obligations or any security therefor shall impair or affect the rights of SunTrust in and to the Collateral. (h) All terms as defined herein shall include both the plural and singular, where applicable. (i) All notices or communications given to Owner and SunTrust pursuant to the terms of this Security Agreement shall be in writing and given to Owner and SunTrust at the address set forth below. Unless otherwise specifically provided herein to the contrary, such written notices and communications shall be delivered by hand or overnight courier service, or mailed by first class mail, postage prepaid, addressed to the parties hereto at the addresses referred to herein or to such other addresses as either party may designate to the other party by a written notice given in accordance with the provisions of this Security Agreement. Any written notice delivered by hand or by overnight courier service shall be deemed given or received upon receipt. Any written notice delivered by U.S. Mail shall be deemed given or received on the third (3rd) business day after being deposited in the U.S. Mail. (j) SunTrust shall not be responsible or liable for its failure to give notice to Owner of any default in the payment of any amounts that might become due and owing with respect to the Collateral nor shall SunTrust be responsible or liable for SunTrust's failure to collect any amounts payable with respect to the Collateral. (k) SunTrust shall be under no obligation to monitor the market value of any Collateral, to advise the Owner of such market value, or to take any action whatsoever to preserve the value of any Collateral by selling, exchanging or otherwise disposing of such Collateral in order to avoid any loss to the Owner resulting from a decline in the market value of such Collateral; and (l) SunTrust shall be under no obligation to pay any amounts owing with respect to any Collateral. (m) This Security Agreement is in addition to and not in replacement of any other agreement between Owner and SunTrust, and in the event any previous or subsequent security agreement by Owner does not exclude an Excluded Swap Obligation from the grant of a security interest thereunder, the terms of this Security Agreement as it relates to any Excluded Swap Obligation will control. (n) The term Owner shall include all persons signing below as Owner and the obligation of such Owners hereunder shall be their joint and several obligations.

WAIVER OF JURY TRIAL. OWNER AND SUNTRUST HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUNTRUST ENTERING INTO OR ACCEPTING THIS AGREEMENT. FURTHER, OWNER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF SUNTRUST, NOR SUNTRUST'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUNTRUST WOULD NOT IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.

Addresses for Purpose of Notice

Owner Address: 2450 Atlanta Highway, Unit 1204, Cumming, GA 30040

SunTrust Address: 211 Perimeter Center Parkway, Suite 100, Atlanta, GA 30346

This Security Agreement has been executed by the undersigned, under seal, as of the date first written above.

Classic Concrete Forming, LLC

By: _____
William E. Fredrickson, Manager



0042

630127U

SECURITY AGREEMENT(GENERAL)

**Security Agreement**

 **SunTrust**

This Security Agreement dated as of __September__ __7__ , __2017__ , by
__CLASSIC CONCRETE FORMING, LLC, a Georgia limited liability company__ (the "Owner")
in favor of SunTrust Bank, its present and future affiliates and their successors and assigns ("SunTrust" or "Lender") provides:

In order to induce SunTrust from time to time to enter into agreements with and to extend or continue to extend credit to
__CLASSIC CONCRETE FORMING, LLC and CCF PROPERTIES, LLC, both Georgia limited liability companies__
(and any one or more and any combination if more than one, the "Borrower") and in consideration of any credit so extended, the Owner (which may include the Borrower) hereby grants, sells, assigns, transfers and conveys to SunTrust, a security interest in the Collateral and all proceeds, products, rents and profits thereof and all substitutions and replacements therefore and all revenues from the right to use the Collateral to secure the prompt payment and performance of any and all liabilities, obligations, agreements and undertakings of Borrower to SunTrust (and, in addition, all liabilities, obligations, agreements and undertakings of Owner, or any one or more of them, to SunTrust if Owner and Borrower are not the same person or entity) in any amount, whether now existing or hereafter arising, including those owed by Borrower or Owner to others and acquired by SunTrust through purchase, assignment or otherwise, however created, evidenced or arising, whethenor individually or jointly with others, and whether absolute or contingent, direct or indirect, as maker, endorser, guarantor, surety or otherwise, liquidated or unliquidated, matured or unmatured, whether or not secured by other collateral, and including, without limitation, (a) all obligations to perform or forbear from performing any acts, (b) all overdrafts on deposits or accounts maintained by Borrower or Owner with SunTrust, (c) all liabilities, obligations, agreements and undertakings of Borrower or Owner to SunTrust pursuant to any interest rate hedge agreement or other derivative transaction agreement or any foreign exchange contract or any application or other agreement requesting SunTrust to issue any letter of credit including, without limitation, the obligation of Borrower or Owner to reimburse SunTrust for all amounts funded by SunTrust pursuant to any such letter of credit, (d) all obligations and other liabilities of Borrower or Owner to SunTrust in respect of any of the following services (i) any treasury or other cash management services, including, without limitation, automated clearing house (ACH) origination and other funds transfer, depository (including, without limitation, cash vault and check deposit), zero balance account and sweep, returned items processing, controlled disbursement, positive pay, lockbox, account reconciliation and information reporting, payables outsourcing, payroll processing, and trade finance services, and (ii) card services, including, without limitation, credit card (including, without limitation, purchasing card and commercial card), prepaid card (including, without limitation, payroll, stored value and gift cards), merchant services processing, and debit card services and (e) all costs of collection and protection of SunTrust's rights, including attorneys' fees allowed by law (in the amount of 15% of the principal and interest secured hereby if this Security Agreement is governed by the laws of Georgia), whether such collection or protection occurs prior to, during, or after any bankruptcy proceedings filed by or against any Obligor (as such term is defined below) (all the foregoing being hereinafter collectively referred to as the "Obligations"; provided, however, that "Obligations" will not include any Excluded Swap Obligation (as hereinafter defined). "Excluded Swap Obligation" means any Swap Obligation (as hereinafter defined), if and to the extent that all or any portion of the grant of a security interest hereunder to secure such Swap Obligation is or becomes illegal under the Commodity Exchange Act (7 U.S.C. §1 et seq.) (as amended and, together with any successor statute, the "Commodity Exchange Act"), or any rule, regulation or order of the Commodities Futures Trading Commission (or the application or official interpretation of any thereof), by virtue of Owner's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time that this grant of a security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, the exclusion of such Swap Obligation under the grant of a security interest hereunder shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such security interest is or becomes illegal. For purposes hereof, the term "Swap Obligation" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**Collateral.** As used in this Security Agreement, the term "Collateral" shall mean the following, whether now existing or hereafter acquired:

> **All assets** of Owner, as more particularly described herein, and including but not limited to, all Accounts, Inventory, furniture, fixtures and Equipment, goods, deposit accounts, instruments, documents, commercial tort claims, letter of credit rights, investment property, chattel paper and General Intangibles (as all such terms are used herein and in the Uniform Commercial Code). Without limiting the foregoing the term "Collateral" shall include all of Owner's rights, title and interest in, to and under (i) any interest rate hedge agreement or other derivative transaction agreement and (ii) any schedule or confirmation relating to such interest rate hedge agreement or derivative transaction agreement.

**Representations and Warranties.** The Owner represents and warrants to SunTrust as follows:

a. This Security Agreement has been duly executed and delivered by Owner, constitutes Owner's valid and legally binding obligation and is enforceable in accordance with its terms against Owner. Owner represents and warrants to SunTrust that it has rights in all of the Collateral and/or has the power to transfer rights in all of the Collateral. The execution, delivery and performance of this Security Agreement, the grant of the security interest in the Collateral and the consummation of the transactions contemplated will not, with or without the giving or notice of the lapse of time, (a) violate an material law applicable to Owner, (b) violate any judgment, writ, injunction or order of any court or governmental body or officer applicable to Owner, (c) violate or result in the breach of any material agreement to which Owner is a party or by which any of Owner's

Copies. 0
Distribution: Original - Collateral File
630127U (11/14)
Security Agreement (Commercial) – Attorney Prepared
SU167:SU136:421383:1:ATLANTA

Page 1 of 8

*127U*

property, including the Collateral, is bound or (d) violate any restriction on the transfer of any of the Collateral. The Owner represents and warrants that as of the date of this Security Agreement it is an "eligible contract participant" as defined in the Commodity Exchange Act. The Owner is and will continue to be the absolute owner of the Collateral and there are no other liens or security interests affecting the Collateral other than the security interest granted in this Security Agreement except those previously disclosed to SunTrust in writing by the Owner; If the Owner is acting in the capacity of trustee, administrator or executor of an estate, such fact shall be disclosed and satisfactory evidence of capacity and authorization shall be provided to SunTrust;

b.   The Owner is a registered limited liabiltiy company under the laws of the State of Georgia and the Owner's Organizational Identification Number is 0619677. The Owner is duly qualified and in good standing to do business in every jurisdiction where qualification is necessary, the execution and performance of this Security Agreement have been duly authorized by its partners/ members/managers as applicable and no further action of any party is necessary; the execution and performance of this Security Agreement will not violate or contravene any provisions of law or regulation or any partnership agreement, articles of organization, operating agreement or other agreement to which it is a party or by which it is bound; and no consent or approval of any governmental agency or authority is required in making or performing the obligations under this Security Agreement

c.   Primary Collateral location will be   2450 Atlanta Highway, Units 1203 & 1204, Cumming, Georgia 30040                          .
The Owner will maintain the Collateral in the above location(s). The Collateral shall not be moved from the above location(s) without the prior written consent of SunTrust;

d.   The Owner maintains its books and records at   2450 Atlanta Highway, Unit 1204, Cumming, Georgia 30040                     .

e.   All information supplied and statements made to SunTrust in any financial statement are true, correct, complete, valid and genuine in all material respects;

f.   No part of the Collateral has been, and never will be so long as this Security Agreement remains a lien on the Collateral, used for the generation, collection, manufacture, storage, treatment, disposal, release or threatened release of any · hazardous substance, as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C., Section 9601, et seq. ("CERCLA"), Superfund Amendments and Reauthorization Act ("SARA"), applicable state laws, or regulations adopted pursuant to either of the foregoing. The Owner agrees to comply with any federal, state or local law, statute, ordinance or regulation, court or administrative order or decree or private agreement regarding materials which require special handling in collection, storage, treatment or disposal because of their impact on the environment ("Environmental Requirements"). The Owner agrees to indemnify and hold SunTrust harmless against any and all claims, losses and expenses resulting from a breach of this provision of this Security Agreement and the Owner will pay or reimburse SunTrust for all costs and expense for expert opinions or investigations required or requested by SunTrust which, in SunTrust's sole discretion, are necessary to ensure compliance with this provision of this Security Agreement. The obligation to indemnify shall survive the payment of the Obligations and the satisfaction of this Security Agreement; and

g.   All Collateral has been produced in compliance with the Fair Labor Standards Act or other applicable wage and employee law, rule, regulation or order, and that no existing or future liability shall occur as a result thereof. The Owner may contest, in good faith, the applicability of any such law, rule, regulation or order, including prosecuting any appeals, so long as SunTrust's interest in the Collateral, in the opinion of SunTrust, is not jeopardized as a result.

**Choice of Law.** Owner agrees that certain material events and occurrences relating to this Security Agreement bear a reasonable relationship to the laws of __Georgia__ . This Security Agreement shall be governed by the laws of such jurisdiction and, unless applicable law provides otherwise, in the event of any legal proceeding arising out of or related to this Security Agreement, Owner consents to the jurisdiction and venue of any court located in such jurisdiction. Unless otherwise specified, "Uniform Commercial Code" as used herein shall refer to the Uniform Commercial Code of such jurisdiction, both current and as it may be amended or revised from time to time in the future.

**Covenants.**

a.   The Owner shall furnish to SunTrust such financial and business information and reports in form and content satisfactory to SunTrust as and when SunTrust may from time to time require.

b.   The Owner, if a corporation, shall maintain its corporate existence, and if another entity shall maintain such entity standing, in each case in good standing and shall not consolidate or merge with or acquire the stock or other ownership interest of any other corporation or entity without the prior written consent of SunTrust; the Owner shall, at the request of SunTrust, qualify as a foreign corporation or other applicable entity and obtain all requisite licenses and permits in each jurisdiction where the Owner does business.

c.   The Owner shall notify SunTrust in writing at least 30 days prior to any change of its name or structure or change in its state of residence, jurisdiction of registration or organization, principal place of business or chief executive office.

d.   The following shall apply if the Collateral consists of tangible personal property: The Owner shall maintain all of the Collateral in good condition and repair. SunTrust shall have the right to inspect the Collateral at any reasonable time and shall have the right to obtain such appraisals, reappraisals, appraisal updates or environmental inspections as SunTrust, in its sole discretion, may deem necessary from time to time. Owner will not use or permit any person or entity to use the Collateral (i) in any manner inconsistent with the provisions of this Security Agreement; or (ii) in violation of any policy of insurance issued with respect to the Collateral; or (iii) in violation of any local, state or federal law or regulation, including but not limited to any such law or regulation pertaining to the protection of the environment or the protection of the health or safety of persons or animals, and any such law or regulation pertaining to the control of drugs, narcotics or other controlled substances. If the Collateral has been used or is hereafter used in violation of the covenants and agreements contained herein, Owner shall

indemnify SunTrust and hold SunTrust harmless against all claims, actions, causes of action, costs, expenses, fees and penalties in connection with such use. Without the express prior written consent of SunTrust, Owner shall not cause or permit all or any part of the Collateral to be affixed to real property so as to become a fixture as that term is defined or interpreted in the state in which the Collateral is at any time located.

e.  The Owner will not pledge or grant any security interest in any of the Collateral to any person or entity except SunTrust, or permit any lien or encumbrance to attach to any of the Collateral, or any levy to be made on the Collateral, or any financing statement (except financing statements in favor of SunTrust) to be on file against the Collateral.

f.  Owner hereby constitutes and appoints any officer or employee of SunTrust as its true and lawful attorney-in-fact (i) to transfer the Collateral into SunTrust's name or the name of its nominee, but SunTrust's failure to do so shall not be interpreted to be a waiver of any interest, and (ii) to do and perform all other acts and things necessary, proper and requisite to carry out the intent of this Security Agreement. The power herein granted shall be deemed to be coupled with an interest and may not be revoked until the Obligations have been paid in full, including all expenses payable by Owner and no amounts may be re-borrowed.

g.  The Owner agrees to pay on demand all legal expenses and reasonable attorneys' fees (in the amount of 15% of the principal and interest secured hereby if this agreement is governed by the laws of Georgia), as permitted by applicable law, any appraisal fees and all expenses incurred or paid by SunTrust in protecting and enforcing the rights of SunTrust under this Security Agreement, including SunTrust's right to take possession of the Collateral and its proceeds, and to hold, prepare for sale, sell and dispose of the Collateral.

h.  This Security Agreement shall be a continuing agreement and shall remain in full force and effect irrespective of any interruptions in the business relations of the Borrower with SunTrust and shall apply to any ultimate balance which shall remain due by the Borrower to SunTrust; provided, however, that the Owner may by written notice terminate this Security Agreement with respect to all Obligations of the Borrower incurred or contracted by the Borrower or acquired by SunTrust after the date on which such notice is personally delivered to or mailed via registered mail to the SunTrust address set forth below and accepted by SunTrust.

i.  The Owner will defend the Collateral against the claims and demands of all parties. The Owner will not, without prior written consent of SunTrust, grant any security interest in the Collateral and will keep it free from any lien, encumbrance or security interest;

**Blanket Security Interest.** If the Collateral is identified a Blanket Security Interest, Owner acknowledges and agrees that this Security Agreement and any financing statement filed in connection with this Security Agreement is intended to cover and does cover all assets of the Owner, wherever located, whether now owned or subsequently acquired or arising and all proceeds and products thereof and includes, but is not limited to all of the Owner's:

a.  Accounts, insurance refund claims and all other insurance claims and proceeds, tax refund claims, license fees, rents, contract rights, instruments, certificates of deposit, documents, tangible chattel paper, electronic chattel paper, promissory notes, drafts, acceptances and other forms of obligations and receivables, whether or not earned by performance;

b.  Inventory;

c.  Equipment;

d.  General Intangibles;

e.  Commercial tort claims, letter of credit rights, awards and other payments in respect of any taking and all insurance proceeds in respect of any of the foregoing, and all monies and claims for money due and to become due to Owner under all its Accounts, contract rights, leases and General Intangibles, all investment property and financial assets, all as said terms are defined in the Uniform Commercial Code.

**Accounts.** If the Collateral includes Accounts, the following shall apply.

a.  The Owner warrants that each and every Account, now owned or hereafter acquired, is a bona fide existing obligation, valid and enforceable against the account debtor, for goods sold or leased and delivered or services rendered in the ordinary course of business; it is subject to no dispute, defense or offset; the Owner has good title to the Account and has full right and power to grant SunTrust a security interest in the Accounts and the Owner will immediately notify SunTrust of any Account to which these warranties are or become untrue; the Owner agrees that it will not permit any return of merchandise, the sale of which gave rise to any of the Accounts, except in the usual and regular course of business;

b.  The Owner shall maintain complete and accurate books and records, and its principal books and records, including all records concerning Accounts, shall be kept and maintained at the place(s) specified above. The Owner shall not move such books and records without giving SunTrust at least 30 days prior written notice. All accounting records and financial reports furnished to SunTrust shall be maintained and prepared in accordance with generally accepted accounting principles consistently applied. It is specifically agreed that SunTrust shall have and the Owner hereby grants to SunTrust a security interest in all books and records of the Owner and shall have access to them at any time for inspection, verification, examination and audit;

c.  The Owner will prepare and deliver to SunTrust, at SunTrust's request from time to time, a listing and aging of all Accounts and any further schedules or information with respect to Accounts that SunTrust may require;

d.  SunTrust shall have the right at any time to notify account debtors of its security interest in the Accounts and supporting obligations and require payments to be made directly to SunTrust. The Owner hereby appoints SunTrust and any officer or employee of SunTrust, as SunTrust may from time to time designate, as its attorneys-in-fact for the Owner, to sign and endorse in the name of the Owner, to give notice in the name of the Owner, and to perform all other actions necessary or desirable in the reasonable discretion of SunTrust to effect these provisions and carry out the intent hereof, all at the cost and expense of the Owner. The Owner hereby ratifies and approves all acts of such attorneys-in-fact and neither SunTrust nor any other such attorneys-in-fact will be liable for any acts of commission or omission nor for any error of judgment. This power being coupled with an interest is irrevocable so long as any Account or General Intangible pledged to SunTrust remains unpaid and the Borrower has any unpaid Obligations to SunTrust. The costs of such collection and enforcement, including

reasonable attorneys' fees and out-of-pocket expenses, shall be borne solely by the Owner whether the same are incurred by SunTrust or the Owner;

e. At the option of SunTrust, all payments on the Accounts received by the Owner shall be remitted to SunTrust in their original form on the day of receipt; all notes, checks, drafts and other instruments so received shall be duly endorsed to the order of SunTrust. At SunTrust's election, the payments shall be deposited into a special deposit account ("Special Account") maintained with SunTrust. SunTrust may designate with each such deposit the particular Account upon which payment was made. The Special Account shall be held by SunTrust as additional security for the Obligations. Prior to depositing payments on the Accounts into the Special Account, the Owner agrees that it will not commingle such payments with any of the Owner's funds or property, but will hold them separate and apart and in trust for SunTrust. SunTrust will have the power to withdraw funds from the Special Account. SunTrust may at any time and from time to time, in its sole discretion, apply any part of the funds in the Special Account to the Obligations whether or not the same is due. Upon full and final satisfaction of the Obligations (including without limitation all fees and expenses owing to SunTrust or its attorneys), plus termination of any commitment to extend additional funds, SunTrust will pay to the Owner any excess funds, whether received by SunTrust as a deposit in the Special Account or as a direct payment on any of the Accounts;

f. If any of the Owner's Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, the Owner will immediately notify SunTrust in writing and execute any instruments and take any steps required by SunTrust in order that all moneys due and to become due under such contracts shall be assigned to SunTrust and in order that proper notice be given under the Federal Assignment of Claims Act;

g. SunTrust shall not be liable and shall suffer no loss on account of loss or depreciation of any Account due to acts or omissions of SunTrust unless SunTrust's conduct is willful and malicious, and SunTrust shall have no duty to take any action to preserve the Collateral or collect Accounts;

h. Upon request from SunTrust, the Owner will note on its records concerning the Accounts, a notation of the security interest under this Security Agreement, which notation may be satisfactory to SunTrust in both form and content;

i. SunTrust may enforce collection of any Account and supporting obligation by suit or otherwise and may surrender, release or exchange all or any part thereof, or compromise, extend or renew the same for any period. All monies so received by SunTrust may in SunTrust's sole discretion, be either (i) applied by SunTrust directly toward payment of all or any part of the Obligations, whether or not then due, in such order of application as SunTrust may determine; or (ii) deposited to the credit of Borrower or in an account with SunTrust as security for payment of the Obligations and SunTrust may, from time to time, in its sole discretion, permit Borrower to use all or any part of the funds on deposit in said account in the normal course of business. Owner will promptly reimburse SunTrust for all expenses, including  reasonable attorneys' fees and legal expenses, incurred by SunTrust in seeking to collect on or enforce collection of such amounts; and

j. After notice from SunTrust, Owner will forthwith, upon receipt, transmit and deliver to SunTrust, in the form received, all cash, checks, drafts, items, chattel paper and other instruments or writing for the payment of money (properly endorsed, where required, so that such items may be collected by SunTrust) which may be received by Owner at any time in full or partial payment or otherwise as proceeds of any of the Accounts. After such notice from SunTrust, Owner will not commingle any  such proceeds with any other of its funds or property, but will hold them separate and apart from Owner's own funds or property and in express trust for SunTrust until delivery is made to SunTrust, and

k. To protect SunTrust's rights hereunder, Owner hereby constitutes any officer or employee of SunTrust its true and lawful attorney-in-fact with full power of substitution to endorse or sign the name of Owner upon any invoice, freight or express bill, or bill of lading relating to any Account covered hereby and to notify the post office authorities to change the address for delivery of Owner's mail relating to the Accounts to an address designated by SunTrust and to receive, open, and dispose of all mail relating to the Accounts addressed to Owner and to do and perform all other acts and things necessary, proper and requisite to carry out the intent of this Security Agreement. This power shall be deemed to be coupled with an interest and may not be revoked by Owner until the Obligations have been paid in full.

**Inventory.** If the Collateral includes Inventory, the following shall apply:

a. The Owner agrees to maintain books and records pertaining to the Inventory in such detail, form and scope as SunTrust shall require. The Owner shall promptly advise SunTrust of any substantial changes relating to the type, or quantity of the Inventory or any event which would have a material effect on the value of the Inventory or on the security interest granted to SunTrust.

b. If the Inventory remains in the possession or control of any of the Owner's agents or processors, the Owner shall notify such agents or processors of SunTrust's security interest, and upon request, instruct them to hold such Inventory for SunTrust's account and subject to SunTrust's instruction.

c. The Owner will prepare and deliver to SunTrust, at SunTrust's request from time to time, a listing of all Inventory and such information regarding the Inventory as SunTrust may require.

d. SunTrust may require the Owner to assemble the Inventory and make it available to SunTrust at a place to be designated by SunTrust which is reasonably convenient. SunTrust may take possession of the Inventory without a court order.

e. Until default hereunder, Owner may, unless otherwise provided in this Security Agreement, in the ordinary course of business, at its own expense, sell, lease or furnish under contract of service any of the Inventory normally held by Owner for such purpose.

**Insurance, Taxes and Assessments.** The Owner shall at all times keep insurable Collateral insured against any and all risks, including, without limitation, fire, and such other insurance, including but not limited to flood insurance, as may be required by SunTrust from time to time, and in such amounts as may be satisfactory to SunTrust. Insurance may be purchased from an insurer of the Owner's choice, except as otherwise required by law. All such insurance policies are to be made payable to SunTrust, in the event of loss, under a standard non-contributory "mortgagees", "lenders", or "secured party" clause and shall contain a breach of warranty provision acceptable to SunTrust which shall establish SunTrust's right to be paid the insurance proceeds irrespective of any action, inaction, breach of warranty or conditions, or negligence of Owner or any other person or entity with respect to such policies. All such

insurance policies shall provide for a minimum of thirty days written notice to SunTrust prior to cancellation. Owner appoints SunTrust attorney-in-fact to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable to Owner hereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments, or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies, which power of attorney shall be deemed coupled with an interest and irrevocable so long as SunTrust has a security interest in any of the Collateral. Owner shall provide proof of such insurance as requested by SunTrust. The Owner shall pay and discharge all taxes, assessments and charges of every kind prior to the date when such taxes, assessments or charges shall become delinquent and provide proof of such payments to SunTrust, upon request. However, nothing contained in this Security Agreement shall require the Owner to pay any such taxes, assessments and charges so long as it shall contest its validity in good faith and shall post any bond or security required by SunTrust against the payment. Upon the failure of the Owner to purchase required insurance or to pay such required amounts, SunTrust, at its option, and at the Owner's expense, may obtain such insurance or pay such taxes, assessments, and charges. In addition, SunTrust may from time to time, in its sole discretion, perform any undertakings of the Owner which the Owner shall fail to perform and take any other action which SunTrust deems necessary for the maintenance or preservation of any of the Collateral. Any amounts so paid shall be included in the Obligations secured by the Collateral. At SunTrust's request, the Owner agrees to promptly reimburse SunTrust on demand for all such expenses incurred by SunTrust, together with interest thereon from the date paid by SunTrust at the highest rate payable on the Obligations. Any insurance obtained by SunTrust, at its option, may be single or dual interest, protecting its rights, rights of the Owner or joint rights. Any insurance obtained by SunTrust may provide, at its option, that such insurance will pay the lesser of the unpaid balance of the Obligations or the repair or replacement value of the Collateral. SunTrust may use the proceeds of any insurance obtained by Owner or by SunTrust to repair or replace the Collateral or, if SunTrust elects to do so, to repay part or all of the Obligations, whether or not then due, and in such order as SunTrust may determine, and the Borrower will still be responsible to repay any remaining unpaid balance of the Obligations. The whole or partial loss or destruction of all or any part of the Collateral shall not affect or impair the obligation of any person or entity liable under the Obligations.

**Deposit Accounts.** If the Collateral includes deposit accounts, the Collateral shall include all demand, time, savings, passbook and other deposit accounts of the Owner with all banks, credit unions, savings and loan associations and other financial institutions which are now owned or hereafter acquired by the Owner or in which the Owner now has or hereafter acquires any right, title or interest, together with all proceeds of the deposit accounts.

**Additional Covenants and Agreements if Borrower is Different than Owner.**   If Borrower is different than Owner, then so long as any of the Obligations remain outstanding or so long as this Security Agreement shall remain in effect Owner covenants and agrees as follows: (a) Owner hereby expressly consents to and adopts any agreements which Borrower has entered into or will enter into with SunTrust regarding any of the Obligations or the Collateral; (b) Owner hereby agrees that the Collateral shall be subject to disposition in accordance with the terms and conditions of this Security Agreement and any agreements executed by Borrower in connection with any of the Obligations or the Collateral; (c) Owner will not be subrogated to SunTrust's rights to any other collateral and any proceeds thereof in which SunTrust holds a security interest to secure payment of any of the Obligations; (d) Owner agrees that SunTrust may at any time and from time to time, without notice to, or the consent of, Owner: (i) retain any of the Collateral in satisfaction of any of the Obligations to the extent permitted by applicable law, (ii) retain or obtain a security interest or lien in any property in addition to the Collateral to secure payment or performance of any of the Obligations, (iii) allow or cause any Obligations to be incurred, (iv) retain or obtain persons or entities that are primarily or secondarily obligated upon any of the Obligations other than the Borrower, (v) extend or renew any of the Obligations for any period (whether or not longer than the original term), (vi) release, compromise or modify any of the Obligations, (vii) release, in whole or in part, any person or entity primarily or secondarily obligated upon any of the Obligations or enter into any compromise with respect to the obligation of any such person or entity relative to any of the Obligations, (viii) release, with or without consideration, SunTrust's security interest or lien in any property other than the Collateral which may at any time secure payment or performance of any of the Obligations, (ix) accept substitutions or exchanges for any property other than the Collateral which may at any time secure payment or performance of any of the Obligations, (x) exercise its rights as a secured party and dispose of the Collateral without having first resorted to any property securing any of the Obligations other than the Collateral and without having first proceeded against or demanded payment from any person or entity primarily or secondarily obligated upon any of the Obligations; and (e) Owner specifically waives any and all rights pursuant to O.C.G.A. Sec. 10-7-24 or T.C.A. Sec. 47-12-101 et seq. if this Security Agreement is governed by the laws of Georgia or Tennessee and the same or similar provision contained in the Uniform Commercial Code of any other state or states which may govern this Security Agreement.

**Events of Default.** As used herein the term "Obligor" shall individually, collectively, jointly and severally refer to Borrower, Owner and any other person or entity that is primarily or secondarily liable upon all or any part of the Obligations secured hereby and any person or entity that has conveyed or may hereafter convey any security interest or lien to SunTrust in any real or personal property to secure payment of all or any part of the Obligations. Unless prohibited by applicable law, an "Event of Default" shall occur hereunder upon the occurrence of any one or more of the following events or conditions:

   a. the occurrence of any breach, default or event of default under any agreement, instrument or other document evidencing the Obligations;
   b. the Collateral or any part thereof is located for more than thirty consecutive days outside the state or states in which the Collateral is to be located pursuant to this Security Agreement or if the Collateral or any part hereof is removed from such state with the intent that it will be located outside such state for more than thirty days; or
   c. should the state of organization or registration of Owner (if an entity) change.

**Remedies Upon Default; Acceleration of Obligations.** Unless prohibited by applicable law, the Obligations secured hereby shall automatically and simultaneously mature and become due and payable, without notice or demand, upon the filing of any petition or the commencement of any proceeding by or against an Obligor for relief under any bankruptcy or insolvency law, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization, or composition or extension of debt.  Unless prohibited by

applicable law, upon the occurrence of any one or more of the other Events of Default described above, the Obligations secured hereby shall, at the option of SunTrust, immediately mature and become due and payable, without notice or demand. If all or any part of the Obligations secured hereby are not paid as and when due and payable, whether by acceleration or otherwise, then SunTrust may, at its option, without notice or demand of any kind: (a) transfer all or any part of the Collateral into the name of SunTrust or its nominee, at Owner's expense, with or without disclosing that such Collateral is subject to SunTrust's security interest; (b) enter upon premises upon which the Collateral is located and, to the extent permitted by law without legal process, take exclusive possession of the Collateral, and redeem the Collateral, or any part thereof (irrespective of redemption penalty); (c) appropriate and apply toward payment of such of the Obligations, and in such order of application, as SunTrust may from time to time elect, all or any part of any balances, credits, items or monies in any bank deposit or deposit account constituting a part of the Collateral; (d) sell the Collateral at public or private sale, either in whole or in part, and SunTrust may purchase the Collateral at any such public sale and at any private sale as permitted by law. Such sale shall result in the sale, conveyance and disposition of all right, title and interest of Owner in all or any part of the Collateral which is the subject of such a disposition and SunTrust is authorized as attorney-in-fact for Owner to sign and execute any transfer, conveyance or instrument in writing that may be necessary or desirable to effectuate any such disposition of the Collateral, which power shall be coupled with an interest; and (e) exercise all other rights of a secured party under the Uniform Commercial Code and all other rights under law or pursuant to this Security Agreement, all of which shall be cumulative. If any notification of intended disposition of any Collateral is required by law, reasonable notification shall be deemed given if written notice is deposited in the U.S. Mail, first class or certified postage prepaid, addressed to Owner and such other persons or entities as SunTrust deems to be appropriate, stating all items required by applicable statutes, including the time and place of any public sale or the time after which any private sale or disposition is to be made, at least ten (10) days prior thereto. The proceeds of any disposition of the Collateral shall be applied in the following order (i) First, to pay all costs and expenses associated with the retaking, holding, preparation and disposition of the Collateral; (ii) Then to pay attorneys' fees; (iii) Next, to pay all accrued but unpaid interest upon the Obligations in such order as SunTrust may determine in its discretion; and (iv) Finally, to all unpaid principal outstanding upon the Obligations, whether or not due and payable, in such order as SunTrust may determine in its discretion. Any remaining surplus shall be paid to Owner or otherwise in accordance with law. If the proceeds of such disposition are insufficient to pay the Obligations in full, Borrower and all other persons or entities liable thereon shall remain fully obligated to SunTrust for the unpaid balance thereof.

**Execution by More than One Party.** The term "Owner" as used in this Security Agreement shall, if this instrument is signed by more than one party, mean the "Owner and each of them" and each shall be jointly and severally obligated and liable. If any party is a partnership or limited liability company, the agreements and obligations on the part of the Owner shall remain in force and applicable regardless of any changes in the parties comprising the partnership or limited liability company and the term "Owner" shall include any altered or successor partnership, limited liability company or other legal entity, and the predecessor partnership or limited liability company and its partners or members/managers shall not be released from any obligation or liability.

**Waivers by the Owner.** To the extent permitted by applicable law, the Owner hereby waives (a) notice of acceptance of this Security Agreement and of any extensions or renewals of credit by SunTrust to the Borrower; (b) presentment and demand for payment of the Obligations; (c) protest and notice of dishonor or default to the Owner or to any other party with respect to the Obligations; (d) all other notices to which the Owner might otherwise be entitled; and (e) if for business purposes, the benefit of any homestead exemption. To the extent permitted by applicable law, the Owner further waives any right to require that any action be brought against the Borrower or any other party, the right to require that resort be had to any security or to any balance of any deposit account or credit on the books of SunTrust in favor of the Borrower or any other party, the right to redeem the Collateral and to object to SunTrust's proposal to retain the Collateral in satisfaction of any of Obligations and any right to obtain injunctive or other relief relative to SunTrust's sale or other disposition of the Collateral and to recover losses caused by SunTrust's failure to approve or correct any list of Collateral provided to SunTrust for any purpose by any person or entity. Owner waives all rights, claims and defenses based on principles of suretyship.

**No Obligation to Extend Credit.** This Security Agreement shall not be construed to impose any obligation on SunTrust to extend or continue to extend any credit at any time.

**Indemnity.** The Owner agrees to indemnify and hold harmless SunTrust, its subsidiaries, affiliates, successors, and assigns and their respective agents, directors, employees, and officers from and against any and all complaints, claims, defenses, demands, actions, bills, causes of action (including, without limitation, costs and attorneys' fees), and losses of every nature and kind whatsoever, which may be raised or sustained by any directors, officers, employees, shareholders, creditors, regulators, successors in interest, or receivers of the Borrower or any third party as a result of or arising out of, directly or indirectly, SunTrust extending credit as evidenced by the Obligations to the Borrower, and taking the Collateral as security for the Obligations, and the Owner agrees to be liable for any and all judgments which may be recovered in any such action, claim, proceeding, suit, or bill, including any compromise or settlement thereof, and defray any and all expenses, including, without limitation, costs and attorneys' fees, that may be incurred in or by reason of such actions, claims, proceedings, suits, or bills. This obligation to indemnify shall survive the payment of the Obligations and the satisfaction of this Security Agreement.

**Financing Statements and Additional Documentation.** SunTrust is authorized to file such financing statements and amendments as SunTrust deems necessary to perfect, continue or assure its security interest in the Collateral and the Owner hereby ratifies any financing statement filed previously by SunTrust. The Owner will deliver such instruments of future assignment or assurance, and such other agreements, as SunTrust may from time to time request to carry out the intent of this Security Agreement, and will join with SunTrust in executing any documents in form satisfactory to SunTrust, and hereby authorizes SunTrust to sign for Owner, or to file without signature, any financing statements, amendments and other documents and instruments from time to time as SunTrust may deem advisable, and pay any cost of filing the same, including all recordation, transfer, indebtedness and other taxes and fees, deemed advisable by SunTrust.

**Successor in Interest: SunTrust as Collateral Agent.** This Security Agreement shall be binding upon the Owner, its successors and assigns, and the benefits hereof shall inure to SunTrust, its successors and assigns. Notwithstanding the foregoing, Owner shall not assign Owner's rights or obligations under this Security Agreement without SunTrust's prior written consent. SunTrust Bank shall serve as collateral agent on behalf of itself and present and future affiliates.

**Miscellaneous.** (a) Each and every power given herein is coupled with an interest and is irrevocable by death or otherwise. (b) The captions of the paragraphs of this Security Agreement are for convenience only and shall not be deemed to constitute a part hereof or used in construing the intent of the parties. (c) If any part of any provision of this Security Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of such provision or the remaining provisions of this Security Agreement. (d) This Security Agreement shall not be modified or amended except in a writing signed by Owner and SunTrust. (e) All representations, warranties, covenants and agreements contained herein or made in writing by Owner in connection herewith shall survive the execution and delivery of this Security Agreement and any and all notes, other agreements, documents and writings relating to or arising out of any of the foregoing or any of the Obligations. (f) All rights and remedies of SunTrust expressed herein are in addition to all other rights and remedies possessed by SunTrust under applicable law or other agreements, including rights and remedies under any other agreement or instrument relating to any of the Obligations or any security therefor. (g) No waiver by SunTrust of any of its rights or remedies or of any default shall operate as a waiver of any other right or remedy or of any other default or of the same right or remedy or of the same default on a future occasion. No delay or omission on the part of SunTrust in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by SunTrust of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No action of SunTrust permitted hereunder or under any agreement or instrument relating to any of the Obligations or any security therefor shall impair or affect the rights of SunTrust in and to the Collateral. (h) All terms as defined herein shall include both the plural and singular, where applicable. (i) All notices or communications given to Owner or SunTrust pursuant to the terms of this Security Agreement shall be in writing and given to Owner and SunTrust at the address set forth below. Unless otherwise specifically provided herein to the contrary, such written notices and communications shall be delivered by hand or overnight courier service, or mailed by first class mail, postage prepaid, addressed to the parties hereto at the addresses referred to herein or to such other addresses as either party may designate to the other party by a written notice given in accordance with the provisions of this Security Agreement. Any written notice delivered by hand or by overnight courier service shall be deemed given or received upon receipt. Any written notice delivered by U.S. Mail shall be deemed given or received on the third (3rd) business day after being deposited in the U.S. Mail. (j) SunTrust shall not be responsible or liable for its failure to give notice to Owner of any default in the payment of any amounts that might become due and owing with respect to the Collateral nor shall SunTrust be responsible or liable for SunTrust's failure to collect any amounts payable with respect to the Collateral. (k) SunTrust shall be under no obligation to monitor the market value of any Collateral, to advise the Owner of such market value, or to take any action whatsoever to preserve the value of any Collateral by selling, exchanging or otherwise disposing of such Collateral in order to avoid any loss to the Owner resulting from a decline in the market value of such Collateral. (l) SunTrust shall be under no obligation to pay any amounts owing with respect to any Collateral. (m) This Security Agreement is in addition to and not in replacement of any other agreement between Owner and SunTrust, and in the event any previous or subsequent security agreement by Owner does not exclude an Excluded Swap Obligation from the grant of a security interest thereunder, the terms of this Security Agreement as it relates to any Excluded Swap Obligation will control. (n) The term Owner shall include all persons signing below as Owner and the obligation of such Owners hereunder shall be their joint and several obligations.

**Notice: This Section Does Not Apply To Transactions Governed by the Laws of North Carolina or West Virginia.**
**WAIVER OF JURY TRIAL. OWNER AND SUNTRUST HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT AND ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS SECURITY AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUNTRUST ENTERING INTO OR ACCEPTING THIS SECURITY AGREEMENT. FURTHER, OWNER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF SUNTRUST, NOR SUNTRUST'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUNTRUST WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.**

**SBA.** The loan secured by this lien (the "Loan") was made under a United States Small Business Administration (the "SBA") nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

    (a)    When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

    (b)    Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower or defeat any claim of SBA with respect to this Loan.

    Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

    As used herein, the term "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

The undersigned has executed this Security Agreement as of the date first written above.

CLASSIC CONCRETE FORMING, LLC, a Georgia limited
liability company

By: _____ (SEAL)
William E. Fredrickson, Manager

**Addresses**

| | |
|---|---|
| Owner Address for Purpose of Notice | 2450 Atlanta Highway, Unit 1204, Cumming, Georgia 30040 |
| | Attn: William E. Fredrickson |
| | |
| SunTrust Address for Purpose of Notice | 211 Perimeter Center Parkway, Suite 100, Atlanta, Georgia 30346 |
| | Attention:  Legal Notice Specialist |

# EXHIBIT C



0034

630288

FINANCING STATEMENT (UCC-1)

# iLien Cover Page

Date Printed:  09/06/2017

Debtor:
CLASSIC CONCRETE FORMING, LLC
2450 Atlanta Highway
Unit 1204
Cumming, GA  30040

Cost ctr #/Assign Unit:  1887024
obligor/obligation: ███ 3527 / 34
Roll-up:
RM:
Portfolio Manager:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  65680355
Order Confirmation #:  60486673

UserID:  240167
UserName:  RACHEL WERT
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  GA, Barrow

1709180446

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

CT Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 007-2017-038548
File Date   : 06-Sep-2017

A. NAME & PHONE OF CONTACT AT FILER (optional)
   Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
   CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   25773 - SUNTRUST WLS

CT Lien Solutions          60486673
P.O. Box 29071
Glendale, CA  91209-9071   GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ac)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| CLASSIC CONCRETE FORMING, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 2450 Atlanta Highway, Unit 1204 | Cumming | GA | 30040 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| SunTrust Bank | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 211 Perimeter Center Pkwy, Suite 100 | Atlanta | GA | 30346 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of the Debtor's rights, title and interest now existing or hereafter acquired in all assets, including but not limited to, accounts, inventory, furniture, fixtures and equipment, general intangibles, instruments, documents and chattel paper and all proceeds, products thereof and further including all amounts payable under any policies of insurance with respect thereto and proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
60486673          1887024                                          ▮3527 / 34

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

GSCCCA eFile#: EF_001454952_000429876_058  Received:Wednesday, September 06, 2017 3:38:11 PM  Page 1 of 1

▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

FILED & RECORDED
Thursday, September 07, 2017 9:00:57 AM
File Number: 058-2017-001590
Greg G. Allen
Forsyth County Clerk of Superior Court

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
**Amy L. Baker, ESQ. 404-739-8889**

**B. E-MAIL CONTACT AT FILER (optional)**
**abaker@stites.com**

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

⌐ **Amy L. Baker, ESQ.**
   **Stites & Harbison, PLLC**
   **303 Peachtree Street NE, 28th Floor**
   **Atlanta GA 30308** ⌐

**Print**    **Reset**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **CLASSIC CONCRETE FORMING, LLC** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **2450 Atlanta Highway, Unit 1204** | **Cumming** | **GA** | **30040** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **SunTrust Bank** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **211 Perimeter Center Parkway, Suite 100** | **Atlanta** | **GA** | **30346** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**ALL PROPERTY OF DEBTOR, INCLUDING, BUT NOT LIMITED TO, THE PROPERTY DESCRIBED ON THE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)     ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction     ☐ Manufactured-Home Transaction     ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien     ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):     ☐ Lessee/Lessor     ☐ Consignee/Consignor     ☐ Seller/Buyer     ☐ Bailee/Bailor     ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**SU167. SU136**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

GSCCCA eFile#: EF_001454952_000429877_058  Received:Wednesday, September 06, 2017 3:38:11 PM  Page 1 of 1          058-2017-001590

## EXHIBIT "A"

All right, title and interest of Debtor, whether now existing or owned or hereafter acquired, and wherever located, in all personal property of Debtor including, but not limited to, the following types of collateral:

<u>Inventory:</u> All inventory wherever located which Debtor owns now or may own in the future, which Debtor sells or leases, or which has been or will be supplied under contracts of service, or which are raw materials, work in progress, or materials used or consumed in Debtor's business.

<u>Equipment and Fixtures:</u> All equipment which Debtor owns now or may own in the future, including, but not limited to, all machinery, vehicles, furniture, fixtures, manufacturing equipment, shop equipment, office and record keeping equipment, and parts and tools. Any equipment or fixtures described in a list or schedule which Debtor gives or has given to Secured Party will also be included in the secured property, but such a list is not necessary for a valid security interest in Debtor's equipment.

<u>Accounts, Instruments, Documents, Chattel Paper and Other Rights to Payment:</u> (a) all of Debtor's accounts, accounts receivables, contract rights, chattel paper, commissions receivable, instruments, drafts and general intangibles, whether now existing or hereafter arising or acquired (herein collectively referred to as the "Receivables") and all of Debtor's interest in goods which shall have given or shall give rise to such Receivables, whether now existing or hereafter arising or acquired; and (b) rights to payment arising out of all present and future debt instruments, chattel paper and loans and obligations receivable. The above include any rights and interest (including all liens and security interests) which Debtor may have by law or agreement against any account debtor or obligor of Debtor.

<u>General Intangibles:</u> All general intangibles Debtor owns now or may own in the future, including, but not limited to, tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, and the right to use Debtor's name.

<u>Proceeds:</u> All accessions to, substitutions for and all replacements, products and proceeds of the foregoing, including without limitation, proceeds of insurance policies insuring any of the foregoing collateral. As used herein, "proceeds" includes not only what is received upon sale, exchange, collection or other deposition of Collateral or loss of or damage to Collateral (including without limitation any equipment, as defined in the Georgia Uniform Commercial Code, acquired with any proceeds of the Collateral), but also all rents, profits, and other revenues (including without limitation chattel paper, instruments, and money) derived from renting, leasing or otherwise permitting the use of the Collateral.

All of such property (including without limitation the Inventory and the Receivables) is hereafter referred to as the "Collateral", and shall also include all direct and remote proceeds thereof

# EXHIBIT D



# SUBCONTRACT

| | | |
|---|---|---|
| Subcontract Date: | 10/11/19 | Subcontract Number: 20-2123 |
| Work: Cast-in-place Concrete Formwork | | Precision Job Number: 20-2123 |
| Project: Elan Powers Ferry | | |
| 1935 Powers Ferry Rd | | |
| (Street Address) | | |
| Atlanta GA 30339 | | |
| (City, State, Zip) | | |

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, this agreement is made and entered into effective as of the date written above ("Subcontract Date") between:

**CONTRACTOR:**    Precision Concrete Construction, Inc.
2075 Brandon Trail
Alpharetta, GA 30004
Attention:  Chris Benifield
Telephone: 770-751-3887 Ext 5516
Mobile:    770-294-6863

**SUBCONTRACTOR:**    Classic Concrete Forming, LLC
(Name)
Limited Liability Corporation
(Corporation, Partnership, or Proprietorship)
2450 Atlanta Highway, Unit 1204, Cumming, GA  30040
(City, State, Zip)
Attention:  Brian Middlebrooks
Phone:    770.887.4695
Fax:      770.887.4696
Subcontractor's Federal Employer Identification No._____
Subcontractor's Sales Tax No._____
Subcontractor's State License No._____

| | |
|---|---|
| Subcontract Amount: | $317,492 |
| Retainage: | 10% |
| Other Retainage Provisions: | None |
| Payment Application Date: | 20th day of each month |

Performance & Payment Bond    ☐Required    ☒Not Required

**GENERAL CONTRACTOR**

Name:  Greystar LP

Street Address:  10 Glenlake Parkway, Suite 445

City, State, Zip: Atlanta, GA 30328

**ARCHITECT/ENGINEER**

Name:  Dwell Design Studio, Inc.

Street Address:  3655 Brookside Parkway, Suite 150

City, State, Zip:  Alpharetta, GA 30022

## ARTICLE 1

### SUBCONTRACT

1.1     The term "Subcontract means this agreement, including all Change Orders to it as defined in Article 14. The word "notify" means to send a notice as defined in Article 17.

1.2     The term "Contract Documents" means the Subcontract and the Contract between the GC/Owner and the Contractor and its general conditions, supplementary general conditions and special conditions, all drawings, Specifications, addenda and other changes issued prior to the Subcontract Date and all modifications issued subsequent to the Subcontract Date. The Contract Documents have been completely and fully reviewed by the Subcontractor, including those documents identified in Exhibit "A".

1.3     With respect to its "work" as defined in Article 3, Subcontractor shall have all obligations, duties and responsibilities to Contractor as Contractor has to the GC/Owner under the Contract Documents, including all contractually required representations, conditions, indemnities, warranties and guarantees.

1.4     The drawings, specifications and addenda, as they relate to the Work, are intended to be complimentary. However, in the event of an irreconcilable difference between drawings and specifications, such conflict shall be resolved in the manner set forth in the Contract Documents. If such Contract Documents do not resolve the conflict, then the Subcontractor will be bound by the resolution of such conflict ultimately determined between the **GC**/Owner and Contractor.

1.5     The terms of this Subcontract control the contractual relationship between Subcontractor and Contractor irrespective of any provisions to the contrary in the other Contract Documents. No language or term in any other Contract Document that varies with or conflicts with the terms of this Subcontract shall create a claim of contractual ambiguity or form the basis of any other claim by Subcontractor. The Subcontractor's right to payment is exclusively governed by this Subcontract irrespective of any provisions relating to such rights in any other Contract Document.

## ARTICLE 2

### THE SUBCONTRACT AMOUNT

2.1     Subject to the provisions of this Subcontract, the "Subcontract Amount" is that amount set forth on page 1 of this Subcontract. Unit prices and related quantities, if any, and how they relate to the Subcontract Amount are set forth in Exhibit "B".

2.2     The Subcontract Amount includes, without limitation, all labor, supervision, fringe benefit costs, material, equipment, transportation, storage, taxes, insurance premiums, bond premiums, permit and license fees, royalties and all things necessary for the complete performance of the Work, and includes all other expenses and costs required to completely perform the Work in accordance with the Contract Documents. When required by the Contractor or this Subcontract, Subcontractor will furnish evidence satisfactory to Contractor that all such costs and expenses have been paid.

## ARTICLE 3

### THE WORK

3.1     The "Work" shall be set forth in the Contract Documents as identified in Article 1 and is more particularly defined  and described in Exhibit "B". The "work includes all things reasonably inferable from the Contract Documents, and anything and everything necessary or required, to completely and satisfactorily perform the Work in accordance with the Schedule, as defined in Article 5. The Work is not, and shall not be, limited or Defined by the organization of any Contract Document into divisions or parts.

3.2     Unless expressly excluded by Exhibit "B" , the Work includes, without limitation:

3.2.1   The preparation, submission, and resubmission as requires, of all necessary shop drawings, erection drawings, field use drawings, diagrams, samples, laboratory reports, inspection reports, product data reports,  mock-ups, and any other required submittals, in sufficient time to permit the timely prosecution of the Work,  and as directed by the Contractor.

3.2.2   Furnishing to the Contractor in a timely fashion all information necessary for the preparation and submission by Contractor to the GC/Owner of any and all reports and schedules required by the Contract Documents.

3.2.3   Daily clean up of all debris occasioned by the Work and hauling of debris to a central location designated by the Contractor necessary to keep the Project clean; provided, however, any trash, debris, or liquid that poses a possible threat of fire or safety shall be lawfully, properly and safely removed from the Project by Subcontractor immediately. If, after twenty-four hours written notice by Contractor to Subcontractor, Subcontractor has not diligently proceeded with the required clean-up, then Contractor has the right, but not the obligation, to proceed with the clean-up work at the Subcontractor's cost and

expense, and to deduct the cost of same from the Subcontract Amount. Subcontractor shall participate in composite clean-up crew if required by this contract or Owner/GC contract.

3.2.4   Subcontractor's layout and the protection and preservation of all installed engineering data and layout points. Subcontractor shall take all necessary precautions to insure that such data are not damaged, destroyed, altered or changed.

3.2.5   Cutting and patching required for the performance of the Work.

3.2.6   Any remedial work necessary or required to bring the Work into compliance with the Contract Documents.

3.3   The quality of Subcontractor's Work is subject to the decisions and directions of the Architect, Owner, or General Contractor to the same extent and in the same manner that the Contractor is subject to the decisions and directions of the Architect, Owner or General Contractor with respect to the Work to the extent required by the Contract Documents.

3.4   Subcontractor's Work, workmanship, materials, submissions, and samples are subject to the approval of Owner, Architect, General Contractor, and Contractor to the extent required by the Contract Documents.

## ARTICLE 4

### WARRANTIES & GUARANTEES

4.1   Subcontractor warrants that all materials and equipment furnished and incorporated into the Project shall be new, unless otherwise specified, and that all Work under this Subcontract shall be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming with the Contract Documents shall be considered defective and shall be repaired or replaced by Subcontractor at its expense. This warranty shall be in addition to, and not a limitation of, any other warranty or remedy provided by law or the Contract Documents.

4.2   Subcontractor hereby expressly warrants and guarantees its Work and all portions of the Work to GC/Owner and to Contractor as required by the Contract Documents, and Subcontract shall promptly perform all corrective or remedial work required by such warranties and guarantees, and shall execute and deliver to Contractor such other and further documents as are reasonably requested by Contractor to further evidence all warrantees and guarantees. Other than this Subcontract, no writings are necessary to effectuate all guarantees and warrantees. In the event this Subcontract is terminated for any reason, Subcontractor's warranties, guarantees and indemnities with respect to its Work performed through the date of termination shall survive such termination and be in full force and effect for the period of time prescribed by the Contract Documents, this Subcontract, or law, whichever is longer.

4.3   This Article does not and shall not limit, modify or abridge any implied warranties created by law or contract.

4.4   Subcontractor warrants that if at any time the GC/Owner or any other person asserts a claim or institutes a suit, arbitration or other proceeding against Contractor involving Subcontractor's Work or its performance, Subcontractor shall hold and save Contractor harmless against all liability, loss, damage or expense (including attorney's fees and litigation and arbitration expenses) arising out of or resulting from such claim, suit, arbitration or proceeding. In addition to holding Contractor harmless, Subcontractor shall, upon receiving written direction from Contractor, promptly assumes the defense of claim, suite, arbitration or proceeding at Subcontractor's expense with counsel approved by Contractor. Contractor shall cooperate with Subcontractor in any such litigation. If Subcontractor fails or refused to promptly undertake the defense of such claim, suit, arbitration or proceeding after receiving a written request from Contractor, or fails or refused at any time to proceed with the defense to the satisfaction of the Contractor, Contractor may assume said defense at Subcontractor's expense.

## ARTICLE 5

### DUTIES & RESPONSIBILITIES OF CONTRACTOR

5.1   Contractor shall prepare, update, and periodically modify, a schedule coordinating the times and sequences required for each area of work on the Project (the "Schedule") included as Exhibit "C".

5.2   Contractor may provide Subcontractor use of hoisting facilities, if so indicated as being provided in the scope of work, during regular working hours, provided adequate facilities are available and Subcontractor has scheduled the use of the facilities with Contractor. Otherwise, the Subcontractor shall provide all necessary hoisting at Subcontractor's expense.

5.3   Contractor may provide Subcontractor use of any temporary facilities if so indicated as being provided in the scope of work and they are available and adequate, and Subcontractor has scheduled the use of same with the Contractor. Otherwise, Subcontractor shall furnish, install, relocate and remove all temporary facilities that are necessary for the performance of Subcontractor's Work at its own expense.

5.4   Subcontractor will maintain and up-to date set of drawings and specifications for the Project in its Project Office. Subcontractor will permit contractor to review such documents at all reasonable times, and upon written request. Contractor will provide Subcontractor with copies of any such documents at Subcontractor's expense.

5.5   Contractor may assign this Subcontract to the GC/Owner or construction lender if required to do so under the Contract Documents or by any construction lender financing the Project. Contractor may assign its interest in this Subcontract to an entity related to the Contractor.

5.6   Contractor may, upon reasonable notice, audit, copy, and inspect all books and records of Subcontractor relating to the Project; but only if Subcontractor is in breach of this Subcontract, or if the Contract Documents provide for inspection of Contractor's records by GC/Owner.

ARTICLE 6

**PROGRESS PAYMENT APPLICATIONS**

6.1   Subcontractor shall, within 30 days after the Subcontract Date, and at least 15 days before its first Application for Payment, submit to Contractor a Schedule of Values of the various parts of the Work aggregating the Subcontract amount in such detail as the Contractor or the Contract Documents may require, supported by such documentation as Contractor may require. This Schedule of Values, when approved by Contractor, shall be used as the basis for the Applications for Payments of Subcontractor.

6.2   Subcontractor shall submit to Contractor on a monthly basis its Application for Payment in triplicate, or as otherwise directed, complete with required breakdown of data to permit checking and approval, in a form acceptable to Contractor, not later than the Application for Payment Date provided on page 1 hereof. The amount of each such Application will be the total of: (a) the value of labor and materials incorporated by Subcontractor in the work; (b) if authorized by the Contract Documents and approved in advance in writing by Contractor, the value of materials stored; (c) less the aggregate of previously paid amounts, if any, and the applicable portion of the retainage amount set forth on page 1 hereof.

6.3   In addition to any other requirements of this Subcontract, the Subcontractor's right to each Progress Payment shall not arise unless and until the following conditions precedent to each such Progress Payment have been satisfied: (a) approval and acceptance of Subcontractor's Application for Payment by Owner, Architect and Contractor; (b) receipt by Contractor from GC/Owner of Payment by Subcontractors requisitions amount from GC/Owner, in accordance with a Contractor approved Application for Payment provided by Subcontractor; (c) furnishing to Contractor satisfactory evidence by Subcontractor that all labor and material costs incurred by Subcontractor in connection with its work covered by previous payments have been paid in full including any certified payrolls required by the Contract Documents; (d) furnishing to Contractor by Subcontractor a partial waiver of lien on the form provided by Contractor; (e) furnishing to Contractor Payment and Performance Bonds as provided for in Article 13; (f) furnishing to Contractor proof or required insurance coverages in accordance with Article 10; (g) furnishing to Contractor applicable business license, sales tax numbers as well as proof of a valid contractor's license for the State in which the Project is located. Subcontractor expressly assumes the risk of non-payment by the GC/Owner to the Contractor.

6.4   Application for Payment Amounts, whether progress or final, may be reduced by Contractor on account of: (a) defective work not remedied; (b) claims filed; (c) reasonable evidence indicating probability of filing claims; (d) failure of Subcontractor to make payments properly to its Subcontractors or suppliers for material or labor, or applicable taxes, fees and fringe benefits; (e) reasonable doubt that this Subcontract can be completed for the balance of the Subcontract Amount then unpaid; (f) any material breach of this Subcontract; (g) back charges; or (h) monies previously paid to Subcontractor, payment of which was not properly chargeable by Subcontractor. If the said causes are not removed, within forty-eight (48) hours after receipt of notice to do so, Contractor may rectify the same at Subcontractor's expense. Unless prohibited by law, it is agreed that Contractor may setoff against the Subcontract Amount the amount of any liability of Subcontractor to Contractor, whether or not relating to the Project. Subcontractor specifically consents and agrees to such right of setoff.

ARTICLE 7

**FINAL PAYMENT APPLICATION**

7.1   Subcontractor's Application for Final Payment shall be submitted in the same form specified in Article 6.

7.2   In addition to any other requirements of this Subcontract, the Subcontractor's right to Final Payment shall not arise unless and until the following conditions precedent to Final Payment have been satisfied: (a) approval and acceptance of Subcontractor's Application for Final Payment by General Contractor, Owner, Architect and Contractor; (b) completion of all "punch-list" work and other work required to bring the Work into compliance with the Contract Documents; (c) delivery to Contractor of all manuals, "as builts", all guarantees and warranties including those for material and equipment as required by the Contract Documents, and any documents required by federal, state or local statutes; (d) receipt of Final Payment for Subcontractor's Work by Contractor from GC/Owner; (e) furnishing to Contractor satisfactory evidence by Subcontractor that all labor and material accounts incurred by Subcontractor in connection with its Work have been paid in full; (f) furnishing to Contractor a complete general release and a final waiver of lien in form provided by Contractor, and (g) furnishing to Contractor the written consent of surety to Final Payment. Subcontractor expressly assumes the risk of non-payment by the GC/Owner to the Contractor.

7.3   The Application for Final Payment Amount will be the difference between the Subcontract Amount, as modified and adjusted in accordance with this Subcontract, and the aggregate sum of the amounts previously paid under this Subcontract, less any Subcontractor costs or expenses paid by Contractor.

7.4   No payment to Subcontractor, whether Progress or Final Payment, shall operate as an approval of Subcontractor's Work or material, or any part thereof, or constitute a waiver of any right by Contractor. Neither Progress nor Final Payments shall

4Initials_____

bear interest.

ARTICLE 8

**DUTIES & RESPONSIBILITIES OF SUBCONTRACTOR**

8.1  Subcontractor hereby represents that it has reviewed and inspected the site of the Project and the Contract Documents, and has investigated and satisfied itself as to the conditions affecting the Work including, but not restricted to, those bearing upon transportation, disposal, handling and storage of materials, availability of qualified labor, water, electric power, roads, and uncertainties of weather, river stages, tides, and the physical conditions of the site and the type of equipment and facilities needed preliminary to and during the performance of the Work. Subcontractor has satisfied itself as to existing and known information concerning the surface and subsurface conditions of the site from a physical inspection of the site and a review of all exploratory reports prepared for the Owner or Contractor, as well as from information presented by the drawings and specifications. Any failure by Subcontractor to acquaint itself with the available information will not relieve it from responsibility for estimating properly the difficulty or cost of successfully performing the Work.

8.2   Subcontractor agrees to commence with the Work when directed by Contractor and to diligently, timely and continuously prosecute and perform such Work and its obligations under this Subcontract in accordance with the Schedule, and to coordinate the Work with other work being done on the Project by other trades, so that Contractor shall not be delayed by any act or omission of Subcontractor in the timely completion of the Project as provided in the Schedule.

8.3   Subcontractor shall cooperate in scheduling the times and sequences required in performing Subcontractor's Work and hereby agrees to perform its Work in accordance with the Schedule and sequence including all modifications to it. Subcontractor shall continuously monitor the Schedule and advise Contractor of the status of Subcontractor's progress on a regular basis, including information on the status of shop drawings, samples, submittals and materials or equipment which may be in the course of preparation or manufacture.

8.4   Subcontractor's project Supervisor or Foreman shall report to Contractor's Project Superintendent prior to commencing any Work on the Project and report again prior to commencing any Work after any absence of more than 5 days from the Project in order to advise Contractor's Project Superintendent of the particular phase of Work Subcontractor is about to perform. During the time Subcontractor is performing the Work, daily work report forms approved by Contractor shall be completed by Subcontractor and turned in at the Contractor's Project Office at the end of each work day. Subcontractor's Project Supervisor or Foreman shall attend meetings as scheduled by Contractor's Project Superintendent for the purpose of scheduling and coordinating all activities on the Project, discussing or implementing safety programs, and any other lawful purposes.

8.5   If Subcontractor is responsible for any delays in the time or sequence of the Schedule, Subcontractor shall be liable for all resulting costs and damages.

8.6   In the event that Subcontractor's performance of the Work is delayed, accelerated or interfered with, for any reason and for any period of time, by acts or omissions of General Contractor, Owner, Architect, Contractor, other subcontractors, or third persons, Subcontractor may request an extension of time for performance of the Work in accordance with Article 14, but shall not be entitled to any increase in the Subcontract Amount or to damages or additional compensation as a consequence of such delays, accelerations, or interference, except to the extent that the Contract Documents entitle Contractor to compensation and then only to the extent of any amounts that Contractor may, on behalf of Subcontractor, actually receive from GC/Owner.

8.7   Any time Subcontractor is behind Schedule in its Work, as a result of acts or omissions by Subcontractor or as a result of delays for which Subcontractor is not entitled to an extension (including, but not limited to, delays for which Subcontractor has failed to notify Contractor of pursuant to Article 14), Subcontractor shall, at its own expense, provide Contractor with a recovery schedule on request from Contractor, and supply additional labor, supervision and equipment, perform overtime work, and do everything necessary to bring its Work back on Schedule pursuant to such recovery schedule.

8.8   For Contractor's convenience, Subcontractor shall perform overtime work when directed to do so in writing by Contractor and Contractor shall pay the cost of the premium time portion of such directed overtime without overhead or profit.

8.9   Subcontractor acknowledges that the Project will be constructed, and work performed, utilizing many other employers, subcontractors, suppliers and vendors providing supplies and materials, who may or who may not, be party to, or signatory to, collective bargaining agreement(s). The Contractor has no control nor seeks to exercise any control over the labor relations policies of the Subcontractor; however, if pickets are established by unions at the jobsite, Subcontractor agrees that its employees will either cross picket lines or enter the jobsite through a separate entrance established for such use. Failure of Subcontractor to man the job with a sufficient number of skilled workers during a labor dispute shall have no effect on Contractor's remedies under in Article 16 of this Subcontract. Subcontractor agrees that Contractor is entitled to all remedies provided in Article 16 of this Subcontract should Subcontractor delay the job as a result of a labor dispute of any nature.

8.10  Subcontractor shall at its expense, up to the final acceptance of the Project by the Owner: (a) take all necessary precautions to protect the work of other trades from any damage caused by Subcontractor's operations;(b)protect from damage or injury, by any cause whatsoever, the work, complete or otherwise, and all of Subcontractor's materials, supplies, tools and equipment at or near the Project;(c) protect the site, Owner's property and all adjacent property from damage (including, but not limited to lateral support) due to Subcontractor's operations; and(d)waive any right of subrogation and caused all of its insurance companies to waive their rights of subrogation as to the Contractor and GC/Owner.

8.11  Subcontractor shall pay for all labor and material used in performing the Work. Subcontractor shall not allow mechanic's or materialmen's liens to be filed against the Project, or stop notices to be delivered to any lender or any other third party, either by it or any person or entity in privity of contract with Subcontractor. If the Contract Documents prohibit the filing of

5Initials_____

mechanic's or materialmen's liens, or the Contractor has waived its lien rights, Subcontractor shall not file its own lien against the Project. If Subcontractor is otherwise lawfully entitled to file or deliver its own lien or stop notice, nothing in this Subcontract shall prevent that filing or delivery. If Subcontractor is not entitled to file a mechanic's or materialmen's lien, it shall promptly bond off any mechanic's or materialmen's lien filed by any person or entity in privity of contract with it. If Subcontractor files an improper or overstated lien, or delivers an improper or overstated stop notice, Subcontractor shall be liable to Contractor for all resultant damages and attorneys fees incurred by Contractor.

8.12  Subcontractor shall cooperate with Contractor and other subcontractors whose work or responsibilities might interfere with Subcontractor's work, and shall prepare coordination drawings and schedules as may be required by Contractor or the Contract Documents, and shall coordinate operations in areas of congestion, specifically noting and advising Contractor of any such interference.

8.13 Subcontractor shall not subcontract, assign or transfer this Subcontract without the prior written consent of Contractor. Subcontractor shall notify Contractor of the names, addresses and telephone numbers of all proposed sub-subcontractors and suppliers utilized by Subcontractor on this project.

<u>ARTICLE 9</u>

**INDEMNITY**

9.1  FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, including the first $1,000 of the Subcontract Amount, Subcontractor shall TO THE FULLEST EXTENT PERMITTED BY LAW, unconditionally indemnify, hold harmless, protect and defend Contractor, General Contractor, Owner, and Architect, and all of their agents and employees (the "Indemnitee" or "Indemnitees") from and against all claims, damages, losses, liabilities and expenses (including but not limited to attorney's fees, other litigation expenses, and punitive damages if allowed by applicable law), arising out of or resulting from the performance of Subcontractor's Work or other activities or services of any kind undertaken by Subcontractor, whether occurring on or off the Project site, provided that any such claim, damage, loss, liability or expense is attributed to bodily injury, sickness, disease, or death of any person (including employees of Subcontractor. Indemnitees and any third parties), or patent infringement, or to injury to or destruction of tangible property including the loss of use resulting therefrom, and (b) is caused in whole or in part by any negligent or wrongful act or omission of Subcontractor or anyone directly or indirectly employed by it or anyone for whose acts it may be liable, or is caused by or arises out of the use of any products, material or equipment furnished by Subcontractor.

9.2  This indemnification obligation shall expressly include but not be limited to, protecting, defending and holding harmless each Indemnitee from and against all claims, losses, costs, damages, expenses and liabilities (partial or otherwise) caused by or arising out of each Indemnitee's negligence or wrongful acts or omissions, but it shall not apply to any Indemnitee who is solely negligent. In any and all claims against Indemnitees, by any employee of Subcontractor, or anyone directly or indirectly employed by Subcontractor, or anyone for whose acts Subcontractor may be liable, the indemnification obligation under paragraph 9.1 shall not be limited in anyway by any limitation on the amounts or type of damages, compensation, or benefits payable by or for Subcontractor under Workers' Compensation acts, Disability Benefit acts or other employee benefit acts.

9.2  The obligations of Subcontractor under this Article 9 shall not extend to the liability of Architect, its agents, or employees, arising out of: (a) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs, or specifications; or (b) the giving of or the failure to give directions or instruction by Architects, its agents, or employees, provided such giving or failure to give is the sole cause of the injury or damage.

<u>ARTICLE 10</u>

**INSURANCE**

10.1 Subcontractor shall maintain, at a minimum, at all times during the course of the work at Subcontractor's cost and expense the coverages, terms, riders and amendments, required of subcontractors by the insurance provisions of the Contract Documents and Exhibit "D". Such insurance shall be maintained with insurance companies both acceptable to Contractor and licensed to transact business and issue insurance in the State where the Project is located.

10.2 Prior to commencing Work, Subcontractor shall have the insurance companies prepare, execute and deliver to Contractor the Certificate of Insurance on the form set forth as Exhibit "D" attached hereto with all required insurance coverages and amounts as required by paragraph 10.1

10.3 In the event Subcontractor fails or neglects to obtain or renew the required insurance and furnish evidence thereof to Contractor with the executed Certificate of Insurance form, Contractor shall have: (a) the right, but not the obligation, to procure such insurance and reduce the Subcontract Amount by the cost thereof; or (b) Hold payments until proper certificate is provide, or (c) to deem such failure or neglect on the part of the Subcontractor as a material breach of this Subcontract.

<u>ARTICLE 11</u>

**SAFETY, GOVERNMENTAL COMPLIANCE & HAZARDOUS MATERIALS**

11.1 Subcontractor shall be responsible for safety of its operations and its employees and shall take all reasonable safety precautions with respect to its Work. Subcontractor, in addition to its own standards, shall comply with all safety policies and procedures initiated by Contractor for the Project, including Contractor's policy regarding drugs, alcohol and controlled substances, and shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including, but not limited to, the Federal Occupational Safety and Health Act (OSHA). Subcontractor shall immediately notify Contractor of any injury to any of the Subcontractor's employees. Subcontractor shall require its personnel to attend any safety meetings the Contractor might conduct and direct Subcontractor to attend. meetings the Contractor might conduct and direct Subcontractor to attend.

11.2 Subcontractor agrees that in performing its Work, it will not create, use or dispose of any hazardous chemicals or substances in an unlawful or hazardous manner and shall be solely responsible for the lawful, proper and safe handling, storage and removal of all hazardous wastes, chemicals, and substances which are introduced to the site, or removed from the site, by Subcontractor's operations. The term "hazardous wastes, chemicals or substances" shall mean those materials and substances prohibited, proscribed, or the use of which is controlled by any agency of the federal government or the applicable state or local agency having jurisdiction of such matters. Subcontractor shall comply with all federal, state and local regulations dealing with the use, storage or disposal of all hazardous wastes, chemicals and substances. Subcontractor shall be responsible for any and all claims and damages resulting from its use, handling, storage, removal and disposal of such hazardous wastes, chemicals or substances from the Project, and will defend and hold Contractor harmless from any and all liability associated with such use, handling, storage, removal and disposal including all associated attorney's fees and costs and costs of all cleanup operations wherever and whenever required by any governmental authority or Contractor.

11.3 Subcontractor shall receive, respond to, defend, indemnify, and save harmless Contractor, as well as anyone to whom Contractor is obligated, and their agents, servants, and employees from and against any loss, liability, or expense (including attorney's fees) arising from any violations and any citations, assessments, fines or penalties resulting form any OSHA related fines or citations caused by the Subcontractor or any of its subcontractors or suppliers.

ARTICLE 12

**STATUATORY COMPLIANCE & BUILDING CODES**

12.1 Subcontractor shall give all notices and comply with all codes, laws, ordinances, rules, regulations and orders of any public authority bearing on the performance of the Work.

12.2 Subcontractor shall promptly review all Contract Documents again following execution of this Subcontract and notify Contractor of any variance noted between the Contract Documents and applicable codes, laws, ordinances, rules and regulations pertaining to the Work. If Subcontractor performs any Work and knows or should have known its performance did not comply with any applicable codes, laws, ordinances, rules or regulations, without having given such notice to the Contractor, Subcontractor shall assume full responsibility therefor, and shall bear all costs and damages attributable thereto.

12.3 Subcontractor shall comply with federal, state and local tax laws, the Social Security Act, immigration laws, applicable unemployment compensation acts and workers' compensation acts, insofar as applicable to the performance of this Subcontract, and shall comply with all procedures, rules and regulations with regard to nondiscrimination implemented or required by any federal, state or local government or agency, including the Equal Employment Opportunity Commission, insofar as they may apply to the Work.

ARTICLE 13

**PAYMENT & PERFORMANCE BONDS**

13.1 Subcontractor shall provide Payment and Performance Bonds**,** if required as indicated on page 1,  on the forms attached hereto as Exhibits "E" and "F" each in the Subcontract Amount, with a surety both licensed to do business and to issue bonds in the State where the Project is located, and acceptable to Contractor. Subcontractor consents to Contractor's communicating directly with the surety on all matters which, in Contractor's opinion, bear upon Subcontractor's performance of this Subcontract.

13.2 The premiums for these Bonds shall be paid by Subcontractor and the cost thereof is included in the Subcontract Amount.

13.3 Subcontractor shall include the cost of any increase in bond premiums in any Change Order Request submitted to Contractor for Change Order under Article 14, and shall pay the increased premium applicable to an approved Change Order.

13.4 In addition to any other remedy Contractor may have, any material breach of this Subcontract or any of its provisions shall entitle Contractor to declare Subcontractor in default of this Subcontract and demand the surety to perform or to pay as provided by the Payment and Performance Bonds, as applicable.

13.5 Should Subcontractor's surety become insolvent, be put into conservatorship, receivership or liquidation during the course of construction of the Project, such event shall constitute a material breach on the part of the Subcontractor.

13.6 Any surety issuing bonds pursuant to this Article expressly agrees that any modifications, additions or alterations which may be made to this Subcontract or the Work, or any time extension to this Subcontract, or other forbearance on the part of either the obligee(s) or the Subcontractor to the other, shall not in any way release the Subcontractor or the surety, or either of them, from liability hereunder, notice to surety of any such modifications, additions, extensions or forebearances being hereby expressly waived.

ARTICLE 14

**CHANGES**

14.1 A "Change Order Request" is a detailed cost estimate submitted by the Subcontractor to the Contractor outlining a change in the Work and costs associated with the change, including detailed documentation justifying any proposed adjustment in time. This estimate shall be computed using costs for labor and materials at prevailing rates in the Project area. A "Change Order" is a written order from the Contractor accepting a Change Order Request, or directing a modification, alteration, addition or deletion (collectively "change") to the Work. The Work may be modified by Contractor at any time and in any manner by notice or Change Order to Subcontractor.

14.2 No change shall be made to the work by Subcontractor, except pursuant to a Change Order or a notice from Contractor. Subcontractor shall have no claim for additional work or changed work unless such work has been done pursuant to a

7Initials_____

Change Order or notice from the Contractor. Any extra work performed without a Change Order or notice from Contractor will be at Subcontractor's expense.

14.3 If Subcontractor receives notice from Contractor to make a change in the Work that, in Subcontractor's opinion, affects the Subcontract Amount or Schedule, Subcontractor shall notify Contractor within 7 days of receipt of the notice of the change from Contractor unless a shorter period of time is required in the Contract Documents. In which case, the shorter period of time is applicable. Subcontractor shall provide Contractor with its Change Order Request within 14 days from receipt of notice from the Contractor of such change unless a shorter period of time is provided in the Contract Documents. Subcontractor's failure to notify the Contractor of any additional cost or time required, or to timely submit its Change Order Request shall constitute Subcontractor's agreement that the change can be accomplished at no additional cost and be completed within the Schedule.

14.4 If Subcontractor becomes aware of a condition, occurrence or reason for an increase in the Subcontract Amount or of any reason justifying an extension of the Schedule for the performance of the work, Subcontractor shall notify the Contractor of such condition, occurrence or reason as required by the Contract Documents, or within 48 hours of the first observance of such condition, occurrence or reason, whichever is sooner. The reasons and conditions justifying an increase in time or Subcontract Amount are limited to those circumstances warranting an increase in time to Contractor under the Contract Documents. Failure to timely provide Contractor with a Change Order Request within 14 days from the first observance of any such condition, occurrence or reason, or such shorter period of time as may be required by the Contract Documents, shall constitute a waiver of all such claim(s).

14.5 If Contractor notifies the Subcontractor to proceed with a change, Change Order Request or work in dispute, or if Contractor disputes the validity or amount of a Change Order Request submitted by Subcontractor, but notifies Subcontractor to proceed with the disputed change pending resolution of the dispute, Subcontractor shall promptly undertake such change or disputed work and expeditiously complete it notwithstanding the pendency of such Change Order Request or dispute. when a change is disputed, or work is disputed, such dispute is not an agreement by either party that a "change" exists or has occurred, or that the disputed work is within this Subcontract.

## ARTICLE 15

## DISPUTE RESOLUTION

15.1   The first step in the resolution of any dispute between Subcontractor and Contractor shall be a meeting to discuss and attempt to resolve the dispute. If both parties agree, the dispute will be submitted to mediation under paragraph 15.2.3. If the dispute is not resolved by agreement or by mediation, then the dispute shall be resolved as follows:

15.1.1 Disputes solely between Contractor and Subcontractor shall be resolved by litigation.

15.1.2 Disputes between the Contractor, Subcontractor, and other subcontractors, sub-subcontractors and suppliers shall be resolved by litigation.

15.1.3 Disputed between Subcontractor, Contractor, General Contractor, and Owner, Owner's agents, or Architect arising out of or related to this Subcontract shall be resolved by the dispute resolution method set forth in the Contract Documents. Absent a provision for dispute resolution in the Contract Documents, such disputes shall be resolved by litigation. Disputes arising out of or related to Subcontractor's Work or this Subcontract asserted by the Owner are subject to this paragraph.

15.2 With respect to any dispute arising out of or related to this Subcontract, the following provisions shall apply:

15.2.1 Choice of Law. The laws of the State in which the Project is located shall govern this Subcontract, unless otherwise provided in the Contract Documents.

15.2.2 Choice of Forum. All disputes which must be litigated, shall mandatorily be asserted by Contractor or Subcontractor in a court of competent jurisdiction in the State or Federal District where the Project is located, unless otherwise provided in the Contract Documents. Subcontractor expressly agrees not to bring any action against Contractor in any other forum.

15.2.3  Mediation. In any mediation proceeding the Construction Industry Mediation Rules and the services of the American Arbitration Association shall be used. Any settlement of a claim, or dispute resulting from mediation shall not be enforceable unless the parties execute a written settlement agreement.

15.2.4  Arbitration. In any arbitration proceeding, the Construction Industry Arbitration Rules and the services of the American Arbitration Association shall be used, unless otherwise provided in the Contract Documents, and the proceeding shall be conducted before a three (3) member tribunal. Judgement upon the award rendered by the tribunal may be entered in any court of competent jurisdiction. All such awards shall be final and binding upon the parties. The Contractor and Subcontractor hereby expressly agree not to challenge the validity of the arbitration or the award. The Contractor and Subcontractor expressly agree that the discovery rules of the American Arbitration Association shall be modified to allow discovery in accordance with the Federal Rules of Civil Procedure, except that the discovery period shall be limited to six (6) months unless otherwise ordered by the arbitrators.

15.2.5  Work During Dispute. Subcontractor shall continue to diligently perform all Work despite the pendency of any dispute.

15.2.6  Joinder. Subcontractor agrees to be joined as a party in any litigation, arbitration, or proceeding involving the Contractor and any third party which involves any issue or fact arising out of or related to this Subcontract and its performance and hereby expressly consents to the jurisdiction of the court where such litigation is instituted. In the event the Owner and Contractor litigate any issue involving any of Subcontractor's Work, rights or claims, Subcontractor agrees to be bound by the result of such litigation, whether or not a party to such litigation. If Subcontractor is not a party to such litigation, Contractor will notify Subcontractor of such litigation and permit the Subcontractor to submit evidence at any trial as a witness. The result of such litigation shall be final and conclusive as to subcontractor who shall be bound by such decision and estopped to contest it.

8Initials_____

15.2.7  Frivolous Disputes. If any dispute is determined to be frivolous or lacking a good faith basis, the prevailing party shall be entitled to its attorney's fees.

## Article 16

## TERMINATION

16.1  The Contractor may terminate Subcontractor or suspend the Work under this Subcontract for the same reasons the GC/Owner may terminate or suspend the Contractor under the Contract Documents, whether or not the GC/Owner has terminated the Contractor or suspended Contractor's Work.

16.2  If Subcontractor at any time and for any reason refuses, neglects or becomes unable to supply: (a) adequate supervision; (b) sufficiently skilled workmen; (c) materials of the proper quality or quantity; (d) fails in any respect to perform the work as required by the Schedule with promptness and diligence; (e) fails in their performance of any other obligations of this Subcontract; or (f) otherwise delays the work of Contractor or others; the Subcontractor will have breached this Subcontract. In such event Contractor may notify Subcontractor in writing of the occurrence of the breach and the corrective action required.

16.3  If any breach by Subcontractor continues for five (5) days following the receipt of notice of breach from Contractor, and if the Subcontractor has refused or failed to cure such breach during such five (5) days, then such breach shall be deemed to be a "material" breach.

16.4  Upon the occurrence of a material breach, Contractor shall have the right to declare the Subcontractor in default and to call upon the surety, as provided in Article 13 to undertake and perform the obligations of the Subcontractor. The Contractor shall also have the right to immediately suspend performance of all the Contractor's obligations under this Subcontract. In the event the surety fails to elect to remedy the default, or if the bonds required by Article 13 were waived for this subcontract, the Contractor shall have the right to terminate the Subcontractor and complete the work required by this Subcontract at the Subcontractor's or surety's expense. Upon termination, the Contractor shall have the right to take possession of all materials, appliances and equipment in the possession of Subcontractor relating to the Project and to arrange for the performance of Subcontractor's obligations. The Contractor's expenses arising from such termination shall included, in addition to the expense of arranging for the performance of Subcontractor's default, including attorney's fees. Such expenses of the Contractor's additional expenses and actual damages flowing from Subcontractor's obligations; all of Contractor's additional expenses and actual damages flowing from Subcontractor's default, including attorney's fees. Such expenses of the Contractor shall be the responsibility of the Subcontractor and its surety and, to the extent such expenses exceed the unpaid Subcontract balance, the Contractor shall have the right to make claim against Subcontractor or surety for the excess.

16.5  In addition to the foregoing rights, at any time there is breach of this Subcontract, Contractor may, after forty-eight (48) hours written notice to Subcontractor, without prejudice to any other remedy Contractor has, provide labor, materials, equipment or services necessary or required in Contractor's opinion as a result of such breach, and deduct the cost from the Subcontract Amount.

## ARTICLE 17

## NOTICES & CONTINUATION OF TIME PERIODS

17.1  "Notices" must be in writing and may be given by the parties at the addresses set forth on Page 1**.** Such addresses may be changed by either party giving notice to the other party sent in accordance with this paragraph.

17.2  Except for facsimile notices, notices are effective upon receipt, whether given by hand delivery, regular or certified mail. Notices may also be sent by facsimile copy of a writing. If a notice is sent by facsimile, it shall be deemed received the day of the facsimile transmittal.

17.3  When time limits are set forth in this Subcontract for corrective or other action to take place, such time period(s) are to be calculated using calendar days.

## ARTICLE 18

## MISCELLANEOUS PROVISIONS

18.1  The headings and captions of the Articles and paragraphs of this Subcontract are not substantive or limiting and are for convenience only. They are not to be considered in construing this Subcontract.

18.2  This Subcontract contains the entire agreement between the parties. All prior proposals, negotiations and agreements prior to the Subcontract Date are not included in this Subcontract and are hereby voided.

18.3  This Subcontract does not create, nor does any course of conduct between the Contractor and Subcontractor, create, any contractual relationship or benefit to any third party claimant not a party to it.

18.4  If any portion or provision of this Subcontract is determined judicially to be invalid or unenforceable, it is to be judicially rewritten so as to make such provision valid and enforceable if permissible. In the event of partial invalidity, all other provisions are to be enforced as written and such partial invalidity shall only affect the invalid provision(s).

18.5 The Subcontract Amount and the other provisions and terms of this Subcontract have been negotiated and agreed to by experienced, knowledgeable and consenting persons. Accordingly, this Subcontract form shall not be construed for, or against, either Subcontractor or Contractor if ambiguity exists.

18.6 Time is of the essence of this Subcontract.

18.7 THIS SUBCONTRACT INCLUDES THE FOLLOWING EXHIBITS:

    A – Contract Documents (See Exhibit "A")
    B – Scope of Work (See Exhibit "B")
    C – Project Schedule (See Exhibit "C")

In witness whereof, the parties have executed this Subcontract with requisite corporate, partnership or individual authority effective the day and year first above written.

**CONTRACTOR**

Name: <u>Precision Concrete Construction, Inc.</u>

BY: _____  11/4/2019
   (Signature)
   E70D3ED2F59D419...

<u>Mark Teal</u>
(Printed Name)

Title: <u>Project Manager</u>

**SUBCONTRACTOR**

Name: <u>Classic Concrete Forming, LLC</u>
   (Legal name of Corporation, Partnership, or Individual)

BY: *Brian Middlebrooks* 11/4/2019
   (Signature)
   E90F5CC28A3F4D1...

<u>Brian Middlebrooks</u>
(Printed Name)

Title: <u>VP Operations</u>

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984



Printed on Fri Oct 11, 2019 at 09:01 am EDT

Job #: 20-2123 Elan Powers Ferry

## Current Drawings

### Architectural

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A0-01 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-02 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-03 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-04 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-05 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-06 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-07 | OVERALL BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A0-08 | OVERALL ROOF PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-11 | BUILDING 1000 - BASEMENT - 932' - 0" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-11.1 | BUILDING 1000 - EOS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-12 | BUILDING 1000 - LEVEL 1 - 945' - 10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-12.1 | BUILDING 1000 - EOS - LEVEL 1 - 945' - 10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-13 | BUILDING 1000 - LEVEL 2 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-13.1 | BUILDING 1000 - EOS - LEVEL 2 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-14 | BUILDING 1000 - LEVEL 3 - 967' - 37/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-15 | BUILDING 1000 - LEVEL 4 - 977' - 11 3/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-16 | BUILDING 1000 - LEVEL 5 - 988' - 75/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-17 | BUILDING 1000 - LEVEL 6 - 999' - 31/2" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-18 | BUILDING 1000 - ROOF PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-22 | BUILDING 2000 - BASEMENT - 945' - 10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-22.1 | BUILDING 2000 - EOS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-23 | BUILDING 2000 - LEVEL 1 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-23.1 | BUILDING 2000 - EOS - LEVEL 1 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-24 | BUILDING 2000 - LEVEL 2 - 967' - 37/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-25 | BUILDING 2000 - LEVEL 3 - 977' - 10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-26 | BUILDING 2000 - LEVEL 4 - 988' - 75/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-27 | BUILDING 2000 - LEVEL 5 - 999' - 31/2" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-28 | BUILDING 2000 - ROOF PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-31 | BUILDING 3000 - BASEMENT - 935' - 0" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-31.1 | BUILDING 3000 - EOS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-32 | BUILDING 3000 - LEVEL 1 - 945' - 10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-32.1 | BUILDING 3000 - EOS - LEVEL 1 - 945' - 105/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-33 | BUILDING 3000 - LEVEL 2 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-33.1 | BUILDING 3000 - EOS - LEVEL 2 - 956' - 71/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-34 | BUILDING 3000 - LEVEL 3 - 967' - 37/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A1-35 | BUILDING 3000 - LEVEL 4 - 9'7"-10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-36 | BUILDING 3000 - LEVEL 5 - 9'88" - 7 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-37 | BUILDING 3000 - LEVEL 6 - 9'99" - 3 1/2" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A1-38 | BUILDING 3000 - ROOF PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-00 | LEASING ENLARGED PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-01 | CLUB ROOM/ FITNESS ENLARGED PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-02 | BUILDING 1000 - ENLARGED PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-03 | BUILDING 2000 - ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-04 | BUILDING 3000 - ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-05 | BUILDING 3000 - ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-10 | BUILDING 1000 - DRIVE UNDER 1 PLANS & SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-11 | BUILDING 3000 - DRIVE UNDER 2 PLANS & SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-12 | ENLARGED RAMP PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-20 | STAIR A ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-20A | STAIR A SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-21 | STAIR B ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-21A | STAIR B SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-22 | STAIR C ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-22A | STAIR C SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-23 | STAIR D ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-23A | STAIR D SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-24 | STAIRS E ENLARGED PLANS & SECTION | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-25 | STAIR PLANS & SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-30 | STAIR DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-31 | STAIR DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-40 | BUILDING 1000 - ELEVATOR 1 PLANS/ SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-41 | BUILDING 2000 - ELEVATOR 2 PLANS & SECTION | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-42 | BUILDING 3000 - ELEVATOR | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A2-45 | ELEVATOR DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-00 | UNIT NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-01 | UNIT S1 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-01.1 | UNIT S1 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-01.2 | UNIT S1 VARIATION PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-10 | UNIT A1 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-10.1 | UNIT A1 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-10.2 | UNIT A1 VARIATION PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-10.3 | UNIT A1 VARIATION PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-11 | UNIT A1D TYPE "A" PLAN AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-12 | UNIT A2 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A3-12.1 | UNIT A2 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-13 | UNIT A3 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-13.1 | UNIT A3 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-14 | UNIT A4 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-14.1 | UNIT A4 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-15 | UNIT A5 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-15.1 | UNIT A5 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-16 | UNIT A5 TYPE "A" PLAN AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-17 | UNIT A7 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-17.1 | UNIT A7 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-20 | UNIT B1 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-20.1 | UNIT B1 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-20.2 | UNIT B1 VARIATION PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-20.3 | UNIT B1C & B1D PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-21 | UNIT B1 TYPE "A" PLAN AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-22 | UNIT B2 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-22.1 | UNIT B2 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-22.2 | UNIT B2 VARIATION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-23 | UNIT B3 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-23.1 | UNIT B3 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-23.2 | UNIT B3A PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-24 | UNIT B4 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-24.1 | UNIT B4 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-25 | UNIT B5 PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-25.1 | UNIT B5 PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-30M | UNIT S1A-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-30M.1 | UNIT S1A-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-31M | UNIT S1B-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-31M.1 | UNIT S1B-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-32M | UNIT S2-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-32M.1 | UNIT S2-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-40M | UNIT A1A-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-40M.1 | UNIT A1A-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-41M | UNIT A1B-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-41M.1 | UNIT A1B-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-42M | UNIT A1C-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-42M.1 | UNIT A1C-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-43M | UNIT A1D-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-43M.1 | UNIT A1D-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A3-44M | UNIT A4-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-44M.1 | UNIT A4-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-45M | UNIT A5-M TYPE "A" PLAN AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-51M | UNIT B2A-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-51M.1 | UNIT B2A-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-52M | UNIT B3A-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-52M.1 | UNIT B3A-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-53M | UNIT B4-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-53M.1 | UNIT B4-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-54M | UNIT B5-M PLANS AND ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A3-54M.1 | UNIT B5-M PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-00 | BUILDING ELEVATION MATERIAL KEY | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-01 | OVERALL BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-02 | OVERALL BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-03 | ENLARGED BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-04 | ENLARGED BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-05 | ENLARGED BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-06 | ENLARGED BUILDING ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-07 | COURTYARD ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-08 | GARAGE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-09 | GARAGE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-10 | DISCLAIMER: THIS DRAWING AND ASSOCIATED DOCUMENTS ARE THE EXCLUSIVE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A4-11 | DISCLAIMER: THIS DRAWING AND ASSOCIATED DOCUMENTS ARE THE EXCLUSIVE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-01 | TYPICAL | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-02 | TYPICAL | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-05 | OVERALL BUILDING SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-06 | OVERALL BUILDING SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-10 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-11 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-12 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-20 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-21 | BUILDING 2000 ENLARGED ELEVATION & WALL SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-22 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-23 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-30 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-31 | BUILDING 3000 ENLARGED ELEVATION & WALL SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A5-32 | BUILDING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-00 | INTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-01 | INTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A6-02 | INTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-03 | TYPICAL INTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-05 | EXPANSION JOINT COVER | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-06 | FIBER CEMENT TRIM DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-10 | TYPE IIIA FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-11 | EXTERIOR FRAMING PLAN DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-12 | EXTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-13 | EXTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-14 | EXTERIOR FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-15 | BALCONY DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-16 | DECORATIVE TRIM PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-20 | FOUNDATION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-30 | FIRE WALL FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-35 | FLASHING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-40 | ROOF & PARAPET DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-41 | ROOF DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-42 | ROOFING DETAILS- BASIS OF DESIGN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-43 | ROOFING DETAILS- BASIS OF DESIGN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-44 | ROOFING DETAILS- BASIS OF DESIGN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-60 | UNIT FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A6-61 | UNIT FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-00 | WINDOW SCHEDULE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-01 | WINDOW HEAD, JAMB & SILL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-05 | FLASHING INSTALLATION GUIDELINES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-10 | DOOR SCHEDULE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-11 | DOOR SCHEDULE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-11A | DOOR HARDWARE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-11B | DOOR HARDWARE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-12 | DOOR HEAD, JAMB, & THRESHOLD DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-13 | DOOR HEAD AND JAMB DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-14 | DOOR DETAILS AT PRECAST WALL | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-20 | STOREFRONT SCHEDULE | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| A7-21 | STOREFRONT HEAD, JAMB, AND | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-01 | PARKING DECK - LEVEL 1 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-02 | PARKING DECK - LEVEL 2 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-03 | PARKING DECK - LEVEL 3 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-04 | PARKING DECK - LEVEL 4 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-05 | PARKING DECK - LEVEL 5 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP1-06 | PARKING DECK - LEVEL 6 PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984



Printed on Fri Oct 11, 2019 at 09:01 am EDT

Job #: 20-2123 Elan Powers Ferry

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| AP2-00 | PARKING DECK < ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP2-01 | PARKING DECK < ENLARGED PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP2-20 | STAIR F PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP2-20A | STAIR F SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP2-21 | STAIR G PLANS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP2-21A | STAIR G SECTION AND AXONOMETRIC | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP4-01 | PARKING DECK ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP4-02 | PARKING DECK ELEVATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP4-03 | AXONOMETRIC VIEWS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP5-01 | PARKING DECK SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP5-02 | PARKING DECK SECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| AP6-00 | PARKING DECK DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| **Civil** | | | | | |
| 1 | Land Survey | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| 2 | Land Survey | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C0.00 | COVER SHEET | 1 | 10/01/2019 | | Site Wall (10/01/19) |
| C0.01 | STANDARD SPECIFICATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C0.02 | STANDARD SPECIFICATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C0.03 | STANDARD SPECIFICATIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C1.00 | ZONING CONDITIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C1.01 | ZONING CONDITIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C2.00 | MASTER DEMO PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C2.01 | DETAILED DEMOLITION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C2.02 | DETAILED DEMOLITION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C2.03 | DETAILED DEMOLITION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C2.04 | DETAILED DEMOLITION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.00 | MASTER SITE PLAN | 1 | 10/01/2019 | | Site Wall (10/01/19) |
| C3.10 | DIMENSION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.11 | DIMENSION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.12 | DIMENSION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.20 | SIGNAGE & STRIPING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.21 | ENTRANCE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.22 | ENTRANCE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.23 | ENTRANCE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.24 | ENTRANCE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C3.40 | FIRE ACCESS PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.00 | MASTER GRADING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.01 | DETAILED GRADING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.02 | DETAILED GRADING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C4.03 | DETAILED GRADING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.10 | MASTER ADA ACCESSIBILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.11 | DETAILED ADA ACCESSIBILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.12 | DETAILED ADA ACCESSIBILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.13 | DETAILED ADA ACCESSIBILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.20 | DRAINAGE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.30 | STORMWATER MANAGEMENT PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C4.31 | OUTLET CONTROL STRUCTURE DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.00 | MASTER UTILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.01 | DETAILED UTILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.02 | DETAILED UTILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.03 | DETAILED UTILITY PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.04 | OFFSITE SANITARY SEWER PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.05 | OFFSITE SANITARY SEWER PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.06 | WATER METER DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C5.07 | FIRE FLOW TEST RESULTS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.00 | EROSION CONTROL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.01 | EROSION CONTROL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.02 | EROSION CONTROL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.03 | EROSION CONTROL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.10 | INITIAL EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.11 | INITIAL EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.20 | INTERMEDIATE A EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.21 | INTERMEDIATE A EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.25 | INTERMEDIATE B EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.26 | INTERMEDIATE B EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.30 | FINAL EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.31 | FINAL EROSION CONTROL PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.40 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.41 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.42 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.43 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.44 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.45 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C6.46 | EROSION & SEDIMENT CONTROL DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.00 | SANITARY SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.01 | SANITARY SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.02 | SANITARY SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.50 | STORM SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984



Printed on Fri Oct 11, 2019 at 09:01 am EDT

Job #: 20-2123 Elan Powers Ferry

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C7.51 | STORM SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.52 | STORM SEWER PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.53 | STORM PIPE DATA | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.54 | STORM PIPE DATA | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C7.60 | WATER VAULT PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C8.00 | SIGHT DISTANCE PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C8.01 | SIGHT DISTANCE PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C8.02 | SIGHT DISTANCE PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C8.03 | SIGHT DISTANCE PROFILES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.00 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.01 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.02 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.03 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.04 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.05 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.06 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.07 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.08 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.09 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| C9.10 | CONSTRUCTION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| **Pre-Cast** | | | | | |
| E000 | Cover Sheet | 0 | | | Pre-Cast Shops |
| E001 | HANDLING AND BRACING NOTES | 0 | | | Pre-Cast Shops |
| E100 | FOUNDATION PLAN | 0 | | | Pre-Cast Shops |
| E101 | CIP WALL ELEVATIONS | 0 | | | Pre-Cast Shops |
| E120 | FRAMING PLAN AT LEVEL 2 | 0 | | | Pre-Cast Shops |
| E130 | FRAMING PLAN AT LEVEL 3 | 0 | | | Pre-Cast Shops |
| E140 | FRAMING PLAN AT LEVEL 4 | 0 | | | Pre-Cast Shops |
| E150 | FRAMING PLAN AT LEVEL 5 | 0 | | | Pre-Cast Shops |
| E160 | FRAMING PLAN AT LEVEL 6 | 0 | | | Pre-Cast Shops |
| E170 | FRAMING PLAN ABOVE LEVEL 6 | 1 | | | Pre-Cast Shops |
| E200 | EXTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E210 | EXTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E220 | EXTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E230 | EXTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E240 | INTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E250 | INTERIOR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E260 | STAIR ELEVATIONS | 0 | | | Pre-Cast Shops |
| E270 | STAIR ELEVATIONS | 0 | | | Pre-Cast Shops |

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984



Printed on Fri Oct 11, 2019 at 09:01 am EDT

Job #: 20-2123 Elan Powers Ferry

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E300 | STAIR F PLAN | 1 | | | Pre-Cast Shops |
| E301 | Stair F Plan | 0 | | | Pre-Cast Shops |
| E302 | Stair F Plan and Cross Section | 1 | | | Pre-Cast Shops |
| E303 | Stair G Plan | 1 | | | Pre-Cast Shops |
| E304 | Stair G Plan | 1 | | | Pre-Cast Shops |
| E305 | Stair G Plan and Cross Section | 0 | | | Pre-Cast Shops |
| E400 | FOUNDATION DETAILS | 1 | | | Pre-Cast Shops |
| E401 | FOUNDATION DETAILS | 1 | | | Pre-Cast Shops |
| E450 | CONNECTION DETAILS | 0 | | | Pre-Cast Shops |
| E451 | CONNECTION DETAILS | 0 | | | Pre-Cast Shops |
| E452 | CONNECTION DETAILS | 1 | | | Pre-Cast Shops |
| E453 | CONNECTION DETAILS | 0 | | | Pre-Cast Shops |
| E454 | CONNECTION DETAILS | 1 | | | Pre-Cast Shops |
| E455 | CONNECTION DETAILS | 0 | | | Pre-Cast Shops |
| E456 | CONNECTION DETAILS | 0 | | | Pre-Cast Shops |
| **Site Wall** | | | | | |
| S1-01 | Site Det. Pond Wall Plans | 2 | 10/01/2019 | | Site Wall (10/01/19) |
| S5-01 | Notes and Details | 2 | 10/01/2019 | | Site Wall (10/01/19) |
| **Structural** | | | | | |
| S0-01 | GENERAL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S0-02 | GENERAL NOTES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S0-03 | SPECIAL INSPECTIONS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S-1-01 | Building 1000 Foundation Plan | 1 | 07/30/2019 | | Construction Documents (07/30/19) |
| S1-02A | BUILDING 2000 BASEMENT FOUNDATION PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S1-02B | Building 2000 Level 1 Foundation Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S1-03 | Building 3000 Foundation Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-13A | Building 1000 Level 3 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-13B | Building 1000 Level 3 Slab Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-13C | BUILDING 1000 LEVEL 3 PT PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-13D | Building 1000 Level 3 Mild Reinforcing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-14 | Building 1000 Level 4 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-15 | BUILDING 1000 Level 5 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-16 | BUILDING 1000 Level 6 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-17 | BUILDING 1000 Level 7 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-18 | BUILDING 1000 Roof Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-23A | BUILDING 2000 Level 1 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-23B | BUILDING 2000 Level 1 Slab Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-23C | BUILDING 2000 LEVEL 1 PT PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-23D | BUILDING 2000 LEVEL 1 Mild Reinforcing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-24A | BUILDING 2000 Level 2 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S2-24B | BUILDING 2000 Level 2 Slab Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-24C | BUILDING 2000 LEVEL 2 PT PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-24D | BUILDING 2000 Level 2 Mild Reinforcing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-25 | BUILDING 2000 Level 3 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-26 | BUILDING 2000 Level 4 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-27 | BUILDING 2000 Level 5 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-28 | BUILDING 2000 Roof Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-32A | BUILDING 3000 Level 1 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-32B | BUILDING 3000 Level 1 Slab Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-32C | BUILDING 3000 Level 1 PT Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-32D | BUILDING 3000 Level 1 Mild Reinforcing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-33A | BUILDING 3000 Level 2 Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-33B | BUILDING 3000 Level 2 Slab Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-33C | BUILDING 3000 LEVEL 2 PT PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-33D | BUILDING 3000 Level 2 Mild Reinforcing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-34 | BUILDING 3000 Level 3 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-35 | BUILDING 3000 Level 4 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-36 | BUILDING 3000 Level 5 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-37 | BUILDING 3000 Level 6 Framing | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S2-38 | BUILDING 3000 Roof Framing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-00A | FRAMING NOTES & SCHEDULES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-00B | FRAMING NOTES & Schedule | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-01 | UNIT FRAMING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-02 | UNIT FRAMING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-03 | UNIT FRAMING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S3-04 | UNIT FRAMING | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S4-00 | BRACING DETAILS & SCHEDULES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S4-01 | BUILDING 1000 Bracing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S4-02 | BUILDING 2000 Bracing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S4-03 | BUILDING 3000 Bracing Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S5-02 | FOUNDATION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S5-03 | FOUNDATION Details | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-01 | FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-02 | FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-11 | PT DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-12 | PT DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-13 | STOREFRONT & PT BALC DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S6-21 | CMU DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S7-01 | ROOF FRAMING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |



| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S7-02 | ROOF FRAMING Details | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S8-01 | MILD REINFORCING DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| S10-01 | REINFORCING DETAILS & SCHEDULES | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP0-01 | PARKING DECK General Notes | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-01 | ARCHITECTURAL SITE PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP1-01 | PARKING DECK Foundation Plan | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-02 | MATRIX | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP2-01 | PARKING DECK FOUNDATION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-03 | ADDRESSING PLAN 935'-2" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP3-01 | PARKING DECK FOUNDATION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP3-02 | PARKING DECK FOUNDATION DETAILS | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-04 | ADDRESSING PLAN 945'-10 5/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-05 | ADDRESSING PLAN 956'-7 1/4" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-06 | ADDRESSING PLAN 967'-3 7/8" | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-07 | FIRE APPARATUS ACCESS PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |
| SP-08 | CONSTRUCTION PHASING PLAN | 0 | 07/30/2019 | | Construction Documents (07/30/19) |

Subcontract
Exhibit B - Scope of Work
Date: 10/11/19
Project: Elan Powers Ferry

**SCOPE OF WORK:**  Pursuant to Article 1 of this Subcontract, Subcontractor shall prosecute and complete the following work:

Subcontractor shall coordinate and cooperate in all respects, during every phase of Subcontractor's performance of the Work, with Owner, General Contractor, Contractor, Architect, Other Subcontractors and any public authority or third party who may be employed or engaged in activity on or near the site in relation to the Project. Subcontractor recognizes and acknowledges that its coordination and cooperation obligations are essential terms of the Subcontract, and shall include, without limitation, making Work areas available to Other Subcontractors.

Without limitation of the obligations set forth in the preceding paragraph, Subcontractor recognizes and acknowledges that certain areas of the Project may be, as such areas are executed and completed, designated restricted areas to which access by Subcontractor may be limited or prohibited. Subcontractor also recognizes and acknowledges that such designated areas may interfere with the orderly plan and schedule of its operations and performance of the Work. Accordingly, Subcontractor shall not assume there will be unrestricted access to or use of any area and must, prior to the commencement of the Work and as the Work progresses, assure to its satisfaction the access and other conditions affecting the Work.

Furnish all supervision, labor, materials, tools, taxes, equipment, insurance, and services necessary to install and complete all **Cast-in-Place Concrete Formwork** as authorized by the Contractor, all complete and in accordance with the Contract Documents listed in Exhibit A without exception unless otherwise herein provided, subject to the approval of the Architect, Owner and Contractor.  Particular reference is made to Specification section(s) in:

Division 00 Procurement and Contracting Requirements

Division 01 General Requirements

Division 03 Concrete
    03 30 00 Cast-In-Place Concrete  (as it applies to this scope of work)

All work shall be performed in accordance with Federal, State and Local code requirements to the best of current practices and to a quality of work acceptable to the Owner, Architect and General Contractor.  In the event that any discrepancies and/or errors are found in the drawings or specifications, this Subcontractor shall be required to notify the Contractor before proceeding with the work, and shall be deemed to have estimated the highest quality way of doing the work.

This Subcontract is intended to cover all of the Contractor's responsibility for the Construction of all **Cast-in-Place Concrete Formwork** unless specifically stated otherwise in this Agreement.

**Subcontract**
**Exhibit B - Scope of Work**
**Date: 10/11/19**
**Project: Elan Powers Ferry**

This Subcontract specifically includes, but is not necessarily limited to the following items which may or may not be clearly defined in the Contract Documents as being within the scope of work of this Subcontract:

1.  Design, Furnish, Install, and Remove all concrete horizontal formwork in accordance with the Contract Documents.

    -Formwork to be designed by a registered structural engineer in the <u>State of South Carolina</u>. Formwork to be designed to support dead load and live construction loads.

    -Design shall include all required shoring and re-shoring.

    -Drawings shall be submitted for approval as required by the project specifications and in time for review and approval prior to starting formwork.

    Live loads are considered to be normal live loads associated with concrete frame scope of work (formwork materials, reinforcing steel for each floor, small tools and equipment, workers of all trades, concrete bucket, tool boxes, MEP rough-in materials, etc.  Live loads do not include any large non-typical loads such as concrete pump placing boom, any large equipment)

2.  All elevated cast-in-place slabs and associated edge form, construction joints, bulkheads, shoring, re-shores, hardware, plywood decking, beam-sides, drop beams, drop heads, slab openings, construction joint, depressed slab edge-forms, edge-forms, hanging forms, and bracing. Subcontractor excludes all MEP sleeves.

3.  Edgeforms will be set to finish slab elevation to allow for screed to be used in placement of concrete.

4.  See attached schedule Exhibit C.  This schedule shall serve as the baseline schedule for the concrete formwork scope of work.  Any changes to this schedule by this subcontractor shall be submitted in writing to Precision's project manager and mutually agreed upon prior to the work affected proceeding.

5.  Subcontractor shall protect all floor openings per OSHA standards while forming operations are being performed on a floor.  Subcontractor shall also protect all floor openings on floors that are still re-shored.  Once the re-shores are stripped from this floor, this subcontractor shall coordinate with Precision's on site management to turn-over the opening to be protected by others. **At no time shall a floor opening cover be removed by this subcontractor without Precision's knowledge and/or authorization.** Protection of openings installed by others will not be Subcontractor's responsibility.

6.  Subcontractor shall provide proper warning (i.e. red flagging) for other trades on site while formwork operations are ongoing that require 100% tie-off.

7.  This subcontractor shall provide access ladders through the building for any floors that they are still working on (including floors with re-shores on them).  Ladders to remain until permanent access is provided.  Location of access ladders to be coordinated with Precision's on site superintendent. Subcontractor to supply up to two ladders per floor.

8.  This subcontractor shall provide necessary insurance required by the subcontract agreement with Precision.

9.  Subcontractor shall provide a full-time superintendent that is competent in concrete formwork operations that will work on the jobsite and take direction from Precision on site management. If the superintendent is sick or on vacation it is this Subcontractors responsibility to provide a comparable replacement.

10. Subcontractor shall provide red vest for all crane rigger and signalers.

11. Monitor all formwork during concrete pours by a competent person and provide sufficient manpower to correct any deficiencies during pour. Placing of concrete by others.

12. This subcontractor shall clean-up their working area on a daily basis and dispose of all trash into dumpsters provided by others.  Scrape up seepage/leakage of concrete through elevated slab formwork during slab pours so it does not adhere to slab. This contractor shall broom clean all floors after stripping operations are completed. The use of the tower crane to assist with clean-up operations shall be coordinated with Precision's on site superintendent. Dumpster to be within reach of the crane.

13. Blowing/cleaning elevated deck after completion of formwork and prior to MEP rough-in and rebar installation.

14. Mud sills will be provided to pour off grade if necessary at an additional cost of $2.00 per sf.

15. Chamfer all exposed edges or as required by Contract Documents.

16. Removal of all fins left after formwork removal

17. All formwork shall be cleaned, maintained and form release agent applied prior to installation or re-installation.

18. Class "B" smooth formwork finish will be provided on all concrete exposed to view, Class "C" formed surface not exposed to view.

19. Replace all formwork that becomes deteriorated or that causes an unacceptable formed finish.

20. Contractor to provide hoisting. Sub to provide rigging, dunnage, radios on the same frequency with crane operator and Contractors Superintendent, proper protocol in using and signaling crane. Subcontractor will provide flagman for all of subcontractor's deliveries. Contractor to supply adequate hoisting to maintain schedule.

21. Provide adequate quantity of formwork, personnel, and equipment to maintain project schedule shown on Exhibit "C".

22. Provide material, personnel and equipment to support schedule.

23. Safety rails that meet OSHA requirements at all formed elevated slabs. Install sleeves in columns, if required, for safety cable by others.  Cover all holes or openings in slabs per OSHA requirements. Includes all toe boards at safety rails. Hand rails on form deck only. Barrier safety cable to be installed by others prior to hand rails on forming deck being removed and slab formwork is stripped.

24. Subcontractor shall have all onsite employees go through orientation and drug testing if required by GC. Drinking water, ice and cups shall be provided by subcontractor to their employees.

25. Contractor to provide general lay-out of column line offsets, wall ~~offsets~~ lines, edge form, slab openings, and slab elevation, Top of column elevation, block-outs, bench marks. Sub is responsible for all other lay-out. Contractor to check forms placement of concrete.

26. Chipping, patching, cutting, rubbing and all work associated with correcting concrete due to formwork failure, shift, excessive gaps in formwork or out of tolerance concrete due to formwork.

**Subcontract**
**Exhibit B - Scope of Work**
**Date: 10/11/19**
**Project: Elan Powers Ferry**

27. All overtime and week-end work to maintain project schedule (subcontractor not responsible for delays by others). If on occasion overtime is required and subcontractor is not behind on the schedule, manpower will be supplied to the extent subcontractor can supply it, and the contractor will pay the cost of the premium time plus insurance, taxes, and other costs based on premium time. Notice for this overtime work will be made 48 hours in advance.

28. As-built drawings.

29. Subcontractor agrees to accommodate time savings by other trades as the work progresses.

30. All deliveries shall be coordinated with the Contractors Project Superintendent. If deliveries are not on the delivery schedule they are subject to being turned away. Subcontractor will be responsible for washing down its delivery trucks to keep mud off the streets. If mud is track onto the street subcontractor will be responsible for clean-up.  Wash area to be provided by others.

31. Sub to coordinate and cooperate with other trades during shop drawing preparation to facilitate a fully comprehensive set of shop drawings.

32. Items not included: Wall and Column Formwork, Slab on Grade edgeform, blow – off slab prior to pour, placing concrete, patching tie-holes, install PT anchors, work outside building lines (except at indicated above), weather protection, secondary pours, styrofoam fill, grout tight forms, rebar dowel templates, work on existing structure.

33. Subcontractor to inspect formwork prior to placement of concrete. Subcontractor's Superintendent as well as one other qualified person not involved in day to day forming on this project shall inspect the formwork prior to concrete placement and provide a signed formwork checklist applicable to the forming system being used to the Contractor's superintendent.

34. If work day is lost due to weather it shall be made-up the following Saturday. However, only one rain day will be made up on Saturday of that week.  If more than one rain day occurs during the week, the additional days would be made up at the expense of the Contractor if the agreed schedule is to be maintained

35. Contractor to provide Hi Early concrete to allow PT stressing to begin a maximum of 72 hours after pour and form removal immediately after approval of stressing, for conventionally reinforced slabs, Hi Early concrete will be provided to allow form removal to begin as required by schedule after pour.

36. Subcontractor will not be allowed to park onsite.  Subcontractor is responsible for their employees parking and transportation to the jobsite. Subcontractor shall provide one covered entrance into the project for protection of falling debris.

37. Subcontractor to coordinate and cooperate with other trades during shop drawing preparation to facilitate a fully comprehensive set of shop drawings.

38. Subcontract agrees to comply with and participate in the Greaystar Safety Program for this project, including orientation.  Subcontractor agrees to comply with and participate in the Precision Concrete Safety Program.

39. **This subcontractor shall not perform any change order work unless written approval is received from Precision's project manager.  This includes ticket work, changes to contract drawings and/or submittals, etc.  Any work performed without approval in writing from Precision's project manager prior to the work commencing will constitute non-payment for said work. Subcontractor shall not be responsible for any delay to the schedule caused by waiting for**

**written approval. Contractor agrees to pay for premium time if any ticket work causes the subcontractor to work overtime to maintain schedule.**

40. Calculation of Contract Amount:

      Base Bid      $317,482.00

      **Total**      **$317,492.00**

41. Lines of Communication – Subcontractor acknowledges that Contractor's Project Superintendent is the contact point with the General Contractor. All coordination, planning, scheduling, means and methods, and all other project information shall go through Contractor and shall not go directly to the General Contractor.  If Subcontractor is contacted directly by the General Contractor they shall refer all questions to Contractor or contact Contractor to set-up a joint meeting to review issue.

DocuSign Envelope ID: 499E230F-59E1-4411-BBD0-F9584C992984

Elan Powers Ferry

Classic Schedule Layout

10-Oct-19 08:28

| Activity ID | Activity Name | Original Duration | Start | Finish | Total Float |
|---|---|---|---|---|---|
| **Elan Powers Ferry** | | | | | |
| **Parking Deck** | | 125 | 28-Oct-19 | 23-Apr-20 | 0 |
| A1000 | Mobilize -Layout | 100 | 28-Oct-19 | 19-Mar-20 | 25 |
| A1010 | Foundations | 5 | 28-Oct-19* | 01-Nov-19 | 0 |
| A1020 | Walls | 20 | 04-Nov-19* | 03-Dec-19 | 0 |
| A1030 | Backfille Ramp (BO) | 20 | 11-Nov-19 | 10-Dec-19 | 0 |
| A1040 | MEP underground (BO) | 3 | 11-Dec-19 | 13-Dec-19 | 0 |
| A1050 | SOG at Ramp | 3 | 16-Dec-19 | 18-Dec-19 | 0 |
| A1060 | Precast Erection (BO) | 5 | 19-Dec-19 | 26-Dec-19 | 0 |
| A1520 | Balance of SOG MEP underg | 30 | 27-Dec-19 | 07-Feb-20 | 27 |
| A1530 | Balance of SOG prep and po | 5 | 02-Mar-20 | 06-Mar-20 | 25 |
| | | 7 | 11-Mar-20 | 19-Mar-20 | |
| **Building 1000** | | 53 | 04-Dec-19 | 18-Feb-20 | 46 |
| A1070 | Foundations (34 to T line) | 10 | 04-Dec-19 | 17-Dec-19 | 10 |
| A1080 | Walls/Columns (34 to T line) | 10 | 11-Dec-19 | 24-Dec-19 | 10 |
| A1090 | Wall Backfill (BO) | 5 | 26-Dec-19 | 02-Jan-20 | 11 |
| A1100 | MEP Underground (BO) | 7 | 03-Jan-20 | 09-Jan-20 | 11 |
| A1110 | SOG | 7 | 10-Jan-20 | 20-Jan-20 | 11 |
| A1120 | Level 3 Pour 1 - Form | 10 | 21-Jan-20 | 03-Feb-20 | 11 |
| A1130 | WF Anchors/MEP (BO) | 2 | 04-Feb-20 | 05-Feb-20 | 46 |
| A1140 | Rebar/PT/Inspections | 5 | 06-Feb-20 | 12-Feb-20 | 46 |
| A1150 | Place Finish | 1 | 13-Feb-20 | 13-Feb-20 | 46 |
| A1160 | Stress | 1 | 18-Feb-20 | 18-Feb-20 | 46 |
| **Building 2000** | | 80 | 18-Dec-19 | 09-Apr-20 | 10 |
| A1170 | Foundations | 20 | 18-Dec-19 | 16-Jan-20 | 10 |
| A1180 | Walls/Columns | 28 | 26-Dec-19 | 04-Feb-20 | 10 |
| A1190 | Brace Wall | 23 | 10-Jan-20 | 11-Feb-20 | 12 |
| A1200 | Backfill Wall (BO) | 23 | 15-Jan-20 | 14-Feb-20 | 12 |
| A1210 | MEP Underground Basement | 15 | 22-Jan-20 | 11-Feb-20 | 10 |
| A1220 | SOG Basement | 15 | 05-Feb-20 | 25-Feb-20 | 10 |
| A1230 | MEP Underground Level 1 (c | 10 | 17-Feb-20 | 28-Feb-20 | 12 |
| A1240 | SOG Level 1 (crew # 1) | 10 | 26-Feb-20 | 10-Mar-20 | 10 |
| A1250 | Remove Braces | 3 | 31-Mar-20 | 02-Apr-20 | 10 |
| A1260 | Infil SOG | 5 | 03-Apr-20 | 09-Apr-20 | 10 |

Legend:
Actual Work
Remaining Work
Critical Remaining W...
Milestone ◆

Page 1 of 2          TASK filter: All Activities          © Oracle Corporation

Elan Powers Ferry

Classic Schedule Layout

10-Oct-19 08:28

| Activity ID | Activity Name | Original Duration | Start | Finish | Total Float |
|---|---|---|---|---|---|
| A1270 | Form Level 1 | 5 | 04-Feb-20 | 10-Feb-20 | 18 |
| A1280 | WF Anchors/MEP | 1 | 11-Feb-20 | 11-Feb-20 | 44 |
| A1290 | Rebar/PT/Inspection | 3 | 12-Feb-20 | 14-Feb-20 | 45 |
| A1300 | Place Finish | 1 | 17-Feb-20 | 17-Feb-20 | 45 |
| A1310 | Stress PT | 1 | 20-Feb-20 | 20-Feb-20 | 45 |
| A1320 | Form Level 2 | 3 | 11-Feb-20 | 13-Feb-20 | 18 |
| A1330 | WF Anchors/MEP | 1 | 14-Feb-20 | 14-Feb-20 | 42 |
| A1340 | Rebar/PT/Inspect | 2 | 17-Feb-20 | 18-Feb-20 | 42 |
| A1350 | Place Finish | 1 | 19-Feb-20 | 19-Feb-20 | 42 |
| A1360 | Stress PT | 1 | 24-Feb-20 | 24-Feb-20 | 42 |
| **Building 3000** | | **54** | **10-Feb-20** | **23-Apr-20** | **0** |
| A1370 | Foundations | 10 | 10-Feb-20 | 21-Feb-20 | 0 |
| A1380 | Walls/Columns | 10 | 17-Feb-20 | 28-Feb-20 | 0 |
| A1390 | Underground MEP (crew # 2) | 5 | 26-Feb-20 | 03-Mar-20 | 0 |
| A1400 | SOG (crew # 2) | 5 | 04-Mar-20 | 10-Mar-20 | 0 |
| A1410 | Form Level 1 | 7 | 11-Mar-20 | 19-Mar-20 | 0 |
| A1420 | MEP | 1 | 20-Mar-20 | 20-Mar-20 | 0 |
| A1430 | Rebar/PT/Inspection | 4 | 23-Mar-20 | 26-Mar-20 | 0 |
| A1440 | Place and Finish | 1 | 27-Mar-20 | 27-Mar-20 | 0 |
| A1450 | Vertical | 5 | 30-Mar-20 | 03-Apr-20 | 0 |
| A1460 | Stress PT | 1 | 01-Apr-20 | 01-Apr-20 | 16 |
| A1470 | Form Level 2 | 7 | 01-Apr-20 | 09-Apr-20 | 0 |
| A1480 | WF Anchors/MEP | 2 | 10-Apr-20 | 13-Apr-20 | 0 |
| A1490 | Rebar/PT/Inspection | 4 | 14-Apr-20 | 17-Apr-20 | 0 |
| A1500 | Place Finish | 1 | 20-Apr-20 | 20-Apr-20 | 0 |
| A1510 | Stress | 1 | 23-Apr-20 | 23-Apr-20 | 0 |



TASK filter: All Activities

Page 2 of 2

© Oracle Corporation

Actual Work
Remaining Work
Critical Remaining W...
Milestone